IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| C.M., on his own behalf and on behalf of his minor child, D.V., | § § § Civil Action No. 5:21-CV-234 |
| Plaintiffs, | § § COMPLAINT § |
| v. | § § |
| UNITED STATES OF AMERICA, | § § |
| Defendant. | § § § |

1)    Plaintiffs C.E.A.M. ("C.M.") and his young son, D.J.A.V. ("D.V."), bring this complaint against the United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), and under state law, stating as follows:

## I.    INTRODUCTION

2)    This action seeks damages for the mistreatment of D.V., a minor, and his father, C.M., while they were in the custody of the United States government. Plaintiffs came to the United States seeking asylum but were instead forcibly separated for four months.

3)    The forced separation by Defendant caused long-lasting injury and ongoing trauma to Plaintiffs C.M. and D.V.

4)    These injuries were a direct and intended result of Defendant's family separation policy. The decision to separate children from their parents at the border was made at the highest levels of government, with the purpose of deterring families from seeking refuge in the United States despite the United States' international and domestic legal obligations to asylum-seekers.

5)    Not only were parents like C.M. traumatized by the initial forced separation from their children, but the trauma was ongoing as agents withheld information concerning their children's whereabouts.

6)    The lack of information as to their children's whereabouts and misrepresentations

made by agents encouraged and coerced parents like C.M. to acquiesce to removal in the hope that they would be reunited with their children. After four months of separation, D.V. and C.M. were reunited only after C.M. agreed to withdraw his request for protection from removal.

7)      Since their deportation, C.M. and D.V. have been forced into hiding with the rest of their family for the very reasons they initially fled Honduras to seek asylum in the United States.

## II.    JURISDICTION AND VENUE

8)      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

9)      Venue is proper under 28 U.S.C. § 1402(b) and 28 U.S.C. § 1391(e)(1) because a preponderance of the acts or omissions complained of and giving rise to these claims occurred within this District.

10)     On March 4, 2020, Plaintiffs submitted administrative claims to the U.S. Department of Homeland Security, U.S. Customs and Border Protection, U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and U.S. Department of Health and Human Services. None of the agencies have made a final disposition of any Plaintiff's administrative claim, and, as six months have passed since submission of the claims, they are deemed finally denied. 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all available administrative remedies.

## III.   PARTIES

11)     Plaintiff C.M. is a thirty-year-old asylum seeker from Honduras. He is the father of Plaintiff D.V.

12)     Plaintiff D.V. is the ten-year-old son of C.M. D.V. was seven years old at the time he was forcibly separated from C.M. by the Defendant.

13)     Defendant United States of America is sued under the FTCA for the tortious acts of its employees, including employees of the Department of Health and Human Services ("DHHS") and the Department of Homeland Security ("DHS"), including its constituent units, Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and

the United States Citizenship and Immigration Services ("USCIS"), as well as for the tortious actions of contractors that DHS and DHHS directly supervised.

14) All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the course and scope of their employment with federal agencies, including, but not limited to, DHS, ICE, CBP, and DHHS.

15) At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## IV. STATEMENT OF THE FACTS

### A. The United States Developed a Family Separation Policy with Knowledge and Intent to Cause Harm.

#### 1. Factual Background.

16) Between the summer of 2017 and June 26, 2018, the United States separated thousands of children from their parents who crossed the U.S.-Mexico border. The core purpose of this executive policy ("Family Separation Policy") was to cause enormous suffering and harm to these migrants, thereby deterring them from seeking refuge in the United States. The Policy violated the Constitution and statutory and common law.

17) The harm caused by family separations is well documented. For example, in a May 8, 2018 statement opposing family separation, the American Academy of Pediatrics (AAP) summarized, "[H]ighly stressful experiences, like family separation, can ... disrupt [] a child's brain architecture and affect [] his or her short- and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."[1]

---

[1] *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) (quoting American Academy of Pediatrics, *AAP Statement Opposing Separation of Children and Parents at the Border*, May 8, 2018, *available at* https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx).

18) The U.S. Department of Health and Human Services, Office of Inspector General Report ("HHS OIG Report") has acknowledged that historically family separations were "rare" and were generally undertaken because "of circumstances such as the parent's medical emergency or a determination that the parent was a threat to the child's safety."[2] Thus, Family Separation Policy was a sharp departure from the governments' practices regarding detained families.

### 2. The U.S. government begins separating families with the knowledge that separations will likely cause substantial harm.

19) When it implemented the Family Separation Policy, the government knew that it would cause harm. For example, in 2016, the DHS Advisory Committee on Family Residential Centers concluded that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children," and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[3]

20) Commander Jonathan White, former Deputy Director of the Office for Refugee Resettlement ("ORR") for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, in early 2017, he warned those devising the policy that the Family Separation Policy "would be inconsistent with [the government's] legal requirement to act in the best interest of the child and would expose children to unnecessary risk of harm."[4] He also

---

[2] U.S. Department of Health & Human Services, Office of Inspector General, *Separated Children Placed in Office of Refugee Resettlement Care*, HHS OIG Issue Brief, OEI-BL-18-00511 at 3 (January 2019), available at https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf ("HHS OIG Report")

[3] U.S. Immigration & Customs Enforcement, Department of Homeland Security, Report of the DSH Advisory Committee on Family Residential Centers 2, 10 (2016), available at https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[4] Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-

cautioned that the policy would "exceed the capacity" of ORR's program "to provide a safe and appropriate environment to every child" and would "particularly exceed [their] capacity" to provide care to children under the age of 12, who are supposed to be housed in specially licensed facilities.[5] White acknowledged in his testimony that "separation of minors from their parents involves a risk of severe psychological trauma."[6]

21) Furthermore, when the U.S. government announced that it was considering a family separation policy, the AAP publicly opposed the policy, stating:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers. Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive.[7]

22) In May of 2017, the AAP issued the following Policy Statement on Detention of Immigrant Children:

> Separation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for safety of the child at the hand of parent. Efforts should always be made to ensure that children separated from other relatives are able to maintain contact with them during detention.[8]

23) Despite these and other warnings, in 2017, the U.S. government began a yearlong initiative that sought to increase criminal immigration enforcement on the Southwest border that included forcibly separating families.

24) On April 11, 2017, the Attorney General, Jeff Sessions, issued a memorandum instructing federal prosecutors to prioritize prosecution of certain immigration offenses,

---

20190207-U1.pdf

[5] *Id.*

[6] *Id.*; *see also* Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html;

[7] Fernando Stein & Karen Remley, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

[8] Julie M. Linton, Marsha Griffin, Alan J. Shapiro, and Council on Community Pediatrics, PEDIATRICS, May 2017, 139 (5) e20170483; DOI: https://doi.org/10.1542/peds.2017-0483

including misdemeanors that had not previously been an enforcement priority.[9] This memorandum required the Southwest border U.S. Attorneys' Offices (USAOs) to develop district-specific guidelines for charging first-time offenders with misdemeanor illegal entry under 8 U.S.C. § 1325, which addresses attempts by an individual who is not a U.S. citizen "to enter the country at an improper time or place."[10]

25) The first known, widespread implementation of the Family Separation Policy stemming from Sessions' April 2017 memorandum was in the El Paso sector, which includes the USAO of the Western District of Texas and the District of New Mexico.[11] From July through November 2017, the El Paso sector of CBP (an agency within DHS) implemented new policies that resulted in approximately 280 individuals in families being separated.[12] Under these policies, the government prioritized the prosecution of misdemeanor charges of improper entry under 8 U.S.C. § 1325, including the prosecution of parents who crossed the border into the United States with young children. When a child and parent were apprehended together by immigration authorities, DHS separated the family, with the parent being placed in the custody of the U.S. Marshals Service within the DOJ to await prosecution for immigration offenses.[13] The child was then erroneously treated as an unaccompanied minor and transferred to the ORR.[14]

26) By the time C.M. and D.V. came to the United States in March 2018, the Family Separation Policy was underway at other border crossings, including in Texas.

27) On April 6, 2018, not long after C.M. and D.V. arrived in the United States, Attorney General Sessions formally instituted a "zero-tolerance policy" for offenses under 8

---

[9] Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services, Department of Justice, Office of the Inspector General, at 9-10 (January 2021), available at https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf ("DOJ OIG Report").
[10] *Id.* at 9-10
[11] *Id.* at 14-15.
[12] *Id.*
[13] HHS OIG Report at 4.
[14] *Id.*

U.S.C. § 1325(a).[15] During a public speech in May 2018, Attorney General Sessions described this policy, announcing that DHS was now referring all adults making allegedly unlawful Southwest Border crossings to the DOJ for prosecution and that the DOJ would accept those cases.[16] This zero-tolerance policy announcement was the culmination of a yearlong period during which the DOJ, beginning with Sessions' April 2017 memorandum, described above, sought to increase criminal immigration enforcement on the Southwest border.[17] While the April 2017 memorandum had made illegal entry cases a priority, it had not told prosecutors to stop declining illegal entry cases. However, the zero-tolerance policy instituted in 2018 signaled that prosecutors were not to decline illegal entry cases.[18]

28) Prior to the creation and expansion of the Family Separation Policy, individuals apprehended between ports of entry who were not considered an enforcement priority (e.g., a public safety threat, repeat unlawful border crosser, convicted felon, or suspected child trafficker) were not consistently prosecuted for illegal entry under Section 1325, in part to avoid having DOJ resources committed to prosecuting sizable numbers of misdemeanors.[19] And when DHS apprehended adults with children crossing the border, DHS typically detained and administratively removed the adults and children together under civil immigration proceedings or would provide the family unit adult with a Notice to Appear before an Immigration Judge and then release the family to remain in the United States until the adult's immigration hearing date.[20] This long-standing DHS practice of deferring to civil immigration proceedings and enforcement, rather than having the DOJ criminally prosecute adults entering the United States with children as a family unit, was related to concerns about separating children from their family during the pendency of the parent's prosecution.[21]

---

[15] HHS OIG Report at 3-4.
[16] *Id.*
[17] DOJ OIG Report at 8.
[18] *Id.* at 22.
[19] *Id.* at 4.
[20] *Id.* at 6.
[21] *Id.*

### 3. The U.S. Government intended for the harm caused by the Family Separation Policy to have a deterrent effect on migrants.

29) As confirmed by government officials and reports, the purpose of the above-described Family Separation Policy was to deter migrants from seeking entry into the United States. For example, a December 2017 joint DOJ and DHS memorandum noted that the "prosecution of family units," resulting in separation, "would be reported by media and . . . have substantial deterrent effect" on future migration.[22] On May 11, 2018, John Kelly, President Trump's then-Chief of Staff, stated on NPR that "a big name of the game is deterrence . . .. It could be a tough deterrent — would be a tough deterrent."[23] When the interviewer asked about whether it was "cruel and heartless" to take a parent away from their children, he replied, "[t]he children will be taken care of — put into foster care or whatever."[24] And in June 19, 2018, Steve Wagner, Assistant Secretary of HHS said, "[w]e expect that the new policy will result in a deterrence effect . . . ."[25]

30) Even after a federal judge enjoined the Family Separation Policy because it likely violated families' due process rights to family integrity, President Trump continued to underscore the policy's deterrent effect. When speaking with reporters at the White House on October 13, 2018, he said: "If they feel there will be separation, they don't come."[26] And on

---

[22] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html; *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS, Jan. 17, 2019, https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targetingmigrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).
[23] Transcript: White House Chief of Staff John Kelly's Interview with NPR, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr
[24] *Id.*
[25] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASHINGTON POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/
[26] David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, REUTERS, Oct. 13, 2018, https://www.reuters.com/article/us-usa-immigrationtrump/trump-says-family-

April 28, 2019—after the Family Separation Policy had purportedly ended—President Trump told Fox News host Maria Bartiromo, "Now you don't get separated, and while that sounds nice and all, what happens is . . . literally you have ten times as many families coming up because they're not going to be separated from their children[.] . . . It's a disaster."[27]

31) As described above, the administration knew – and specifically intended – for the Family Separation Policy to cause severe trauma and harm to ultimately deter families from migrating to the United States.

### B. C.M. and D.V. Came to the United States Seeking Sanctuary.

32) C.M. and D.V. fled Honduras for the United States to seek safety and asylum from extortion by gangs, corrupt police that would not protect them, and the threat of violence that had been directed against them and their family in Honduras.

33) On March 9, 2018, C.M. and D.V. were taken into custody at the Eagle Pass, Texas port of entry. C.M. requested asylum from U.S. Customs and Border Protection (CBP) agents at the border as soon as he encountered them.

34) The agents immediately began mistreating C.M. and his young son, including by calling them "bastards," baselessly accusing C.M. of using his son to smuggle drugs, and stating that D.V. would be taken from his father and put up for adoption.

35) The agents violently forced C.M. to the ground and struck him in the neck, causing a neck injury.

### C. C.M. and D.V. Were Detained in an "Icebox."

36) After being taken into custody, C.M. and D.V. were detained in a holding center.

37) Because of its cold temperature, the holding center where C.M. and D.V. were held is commonly called "the icebox" ("*la hielera*") by asylum seekers. The CBP held C.M.,

---

separations-deter-illegal-immigration-idUSKCN1MO00C.
[27] Kimberly Kindy, Nick Miroff & Maria Sacchetti, Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings, WASH. POST, Apr. 28, 2019, https://washingtonpost.com/politics/trumpsays-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-bordercrossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5story.html.

D.V., and other asylum seekers in this frigid facility in violation of the government's own internal policies.[28]

38)     Before placing C.M. and his child in the *hielera*, agents took his outer clothing. As a result, he had no way to try to keep himself or D.V. warm.

39)     Once in the *hielera,* C.M. became so cold that he physically shook, yet agents refused his requests for warmer clothing for either himself or his son. Instead, agents informed C.M. that the cold temperature was intended as a punishment.

40)     C.M. and D.V. were held in the *hielera* for approximately two days, along with approximately 20 other adults and children.

41)     Neither C.M. nor D.V. were permitted any time outside while held in the *hielera*.

42)     The only places to sit or sleep in the *hielera* were cold, hard benches and floors. Despite the frigid temperatures, the government failed to provide cots, mattresses, or even blankets during their detention in the *hielera.*

43)     Over the two days he was held in the *hielera*, C.M. did not receive medical treatment for his neck injury, despite the bruising and pain it caused.

44)     During their detention in the *hielera*, agents repeatedly verbally abused C.M. and D.V. Agents insulted C.M., cursed at him, called him and D.V. disrespectful names, and blamed them for their mistreatment by U.S. officials, saying it was a result of "your choice for leaving your country."

45)     Agents told C.M. that they would deport him and place D.V. up for adoption in the United States. The also agents told C.M. that he would only see his son again once D.V. turned eighteen and was old enough to be deported as well.

---

[28] *See* U.S. CUSTOMS AND BORDER PROT., NATIONAL STANDARDS ON TRANSPORT, ESCORT, DETENTION, AND SEARCH 16 (2015), *available at* https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf ("When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. *Under no circumstances will officers/agents use temperature controls in a punitive manner*.") (emphasis added).

### D. U.S. Immigration Officials Separated C.M. From D.V. For Three Months.

46) After C.M. and D.V. had been in the *hielera* for approximately 48 hours, agents announced in Spanish that all parents should "say goodbye" to their children. The agents said the children were being taken and placed for adoption in the United States.

47) After hearing that he would be permanently taken from his family, D.V. began crying and clung tightly to C.M. He pleaded with his father not to abandon him.

48) An agent removed D.V. from C.M.'s arms, told them that they would never hear from each other again, and said their permanent separation was due to C.M.'s decision to come to the United States.

49) Agents then removed D.V. from the *hielera* and from his father. As agents took his child, C.M. was overwhelmed with worry for his son's safety and whether D.V. would be mistreated or adopted while they were apart.

50) After agents separated C.M. and D.V., they transported C.M. to the Val Verde ICE detention facility ("Val Verde") in Val Verde County, Texas.

51) During his approximately two weeks in the Val Verde detention center, agents failed to provide C.M. any information about where D.V. had been taken or what would happen to him.

52) C.M. experienced abusive and dangerous conditions at Val Verde. Agents placed him in another cold holding cell for approximately two hours before assigning him to a cell. C.M. also feared for his safety at Val Verde after hearing about detainees attacking each other with weapons shortly after he arrived at the facility.

53) At Val Verde, despite repeated requests, agents would not provide C.M. any information about his son. C.M. did not know where D.V. had been taken, whether he was safe, nor how he was responding to the forcible separation from his father. The lack of any information about his son's location and condition caused C.M. severe emotional distress. He worried constantly about his son's safety and whether D.V. was eating, sleeping, being cared for,

11

or feeling well.

54) No U.S. government official told C.M. where D.V. was going to be taken. Other than the U.S. government's family separation policy, there was no basis for removing C.M. from D.V. For example, in conducting the separation, the U.S. government did not allege or make any showing that C.M. was unfit to care for or posed a danger to D.V., nor did C.M. have a criminal or medical history warranting separation.

55) On May 3, 2018, C.M. participated in a telephonic Credible Fear Interview ("CFI").

56) C.M. did not have the opportunity to consult with an attorney to prepare for the CFI, nor was an attorney present at the CFI to aid him.

57) During the CFI, C.M. repeatedly begged for any information about D.V.'s safety or location. However, the agent conducting the interview failed to provide C.M. with any information at all about his son. C.M. was extremely distressed and wept during the interview. His anguish at the then-approximately two-month separation from his son by U.S. officials and their subsequent refusal to provide any information at all about D.V. left him unable to respond coherently to the questions asked during his CFI. Nonetheless, he did convey to the official conducting the interview that he faced threats to his life by gangs in Honduras.

58) Due to the emotional distress C.M. suffered because of his separation from D.V., he was unable to participate meaningfully in his CFI.

59) At the end of the CFI, the agent asked C.M. to sign a document. C.M. was unable to read the document because it was written in English. From what the interpreter said, it was C.M.'s understanding that the purpose of the document was to reschedule the CFI.

60) The agent had actually provided C.M. with a document to "Request for Dissolution of Credible Fear Process," which waived his claim to asylum.

61) Soon thereafter, C.M. was transferred to the South Texas Detention Complex. It was only then, approximately three months after first being separated from D.V., that C.M. was finally provided with limited phone access to his son. He was also informed that D.V. was being

held at a shelter home for migrant children in Michigan.

### E. The Abusive Conditions D.V. Experienced During His Separation from His Father Further Compounded the Trauma Caused by the Separation.

62) After being separated from his father, D.V. was taken to a facility where he was physically and emotionally abused. While held at the facility, the facility employees responsible for D.V.'s care limited his ability to speak with his mother to about once per week, and D.V. was not able to speak with his father. One or more of the facility employees punished D.V. when he cried for his family by taking him to a room and locking him up in a room. He called it the "dark room."

63) On at least one occasion, an adult at the facility physically struck D.V. when he cried for his mother, and adults at the facility threatened to place D.V. up for adoption in response to him crying for his mother. D.V. was also subjected to physical and verbal attacks by other children at the facility, and the adults responsible for the facility failed to protect him from this abuse by other children.

64) Eventually, D.V. was moved to a facility in Michigan.

65) Upon information and belief, the restrictions on D.V.'s ability to communicate with his parents during his separation caused him additional emotional harm.

66) C.M. and D.V. were separated from approximately March 8, 2018 until early July of 2018. On July 9, 2018, C.M. and D.V. were reunited at the airport in Baltimore, Maryland, placed on a plane, and deported to Honduras.

### F. The Government's Separation of C.M. and D.V. Caused Them Severe and Lasting Emotional Distress, Post-Traumatic Stress, Depression, and Other Psychological Injuries.

67) The brutality that D.V. and C.M. experienced while in U.S. custody caused deep and long-lasting psychological injury.

68) It is well established that forcibly separating families causes severe harm to children. Scientific and medical evidence shows that the trauma caused by separating a child

from his or her parent is likely to have extraordinarily harmful and long-lasting effects on the child's development. Such trauma can cause permanent emotional, behavioral, and overall health problems, including, but not limited to, anxiety, depression, PTSD, and developmental delay.[29]

69) The emotional distress and trauma caused by federal officials' forcibly separating D.V. from his father and exposing him to physically and emotionally abusive treatment in the detention facilities negatively impacted D.V.'s social interactions, educational capabilities, and

---

[29] *See, e.g.*, Brenda Punsky et al., *Working with Parents and Children Separated at the Border: Examining the Impact of the Zero Tolerance Policy and Beyond*, 12 J. CHILD & ADOLESCENT TRAUMA 153, 156–57 (2019), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7163859/ ("Vast scientific evidence suggests separation from parents is among the most impactful traumatic experiences that a child can have . . . ."); News Release, American Psychiatric Association, APA Statement Opposing Separation of Children from Parents at the Border (May 30, 2018), *available at* https://www.psychiatry.org/newsroom/news-releases/apa-statement-opposing-separation-of-children-from-parents-at-the-border ("Any forced separation is highly stressful for children and can cause lifelong trauma, as well as an increased risk of other mental illnesses, such as depression, anxiety, and posttraumatic stress disorder (PTSD)."); Martin H. Teicher, *Childhood Trauma and the Enduring Consequences of Forcibly Separating Children from Parents at the United States Border*, 16 BMC MED. 146 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6103973/pdf/12916_2018_Article_1147.pdf ("Forcibly removing a child from their parents is one of the most profound traumas a child can experience, since it undermines a pivotal foundation they require for self-regulation and resilience."); Sarah Reinstein, *Family Separations and the Intergenerational Transmission of Trauma*, Clinical Psychiatry News (July 9, 2018), https://mdedge.com/psychiatry/article/169747/depression/family-separations-and-intergenerational-transmission-trauma ("[C]hildhood trauma is associated with emotional dysregulation, aggression against self and others, difficulties in attention and dissociation, medical problems, and difficulty with navigating adult interpersonal relationships."); Jeremy Raff, *'The Separation Was So Long. My Son Has Changed So Much.'*, THE ATLANTIC (Sept. 7, 2018), https://www.theatlantic.com/politics/archive/2018/09/trump-family-separation-children-border/569584/ ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . . Prolonged separation weaponizes a child's fight-or-flight response, elongating it into toxic stress that can damage health in both the short and long term . . . ."); Olga Khazan, *Separating Kids From Their Families Can Permanently Damage Their Brains*, THE ATLANTIC (June 22, 2018), https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/ (Separating a child from his or her parents "can permanently affect these children's brains, especially if it occurs early in childhood. . . . Studies show that high levels of cortisol [, a stress hormone induced by separation] . . . can suppress the immune system and change the architecture of a developing brain, according to the National Scientific Council on the Developing Child. Another stress chemical, corticotropin-releasing hormone, can damage the hippocampus, which plays a major role in learning and memory.").

other daily activities. The consequences of his separation and mistreatment are ongoing.

70) D.V. is more timid and fearful at school. He also has difficulty sleeping throughout the night. He wakes in the middle of the night and cries about the memories he has from his experience at the facilities in the United States. D.V. also struggles to sleep in the dark because it reminds him of being kept in the dark room as punishment at the facility in the United States.

71) C.M. also continues to suffer from the severe trauma intentionally caused by the U.S. government's unnecessary, forcible, and prolonged separation from his son as well as his treatment by agents while in U.S. custody.

72) C.M.'s sleep is disrupted by the separation and resulting anxiety. He wakes up during the night and runs to check on D.V. He feels deep sadness that he did not experience prior to the separation, and he continued to experience neck pain and headaches from the assault by agents even after being deported to Honduras.

**G.    The Government's Separation of C.M. and D.V. Was Unconstitutional, Unlawful, and Designed to Force Them to Abandon Their Asylum Claims.**

73) The Constitution protects everyone within the territory of the United States, regardless of citizenship; therefore, non-citizens physically on U.S. soil have constitutional rights, including the right to due process of law. Furthermore, the liberty interest identified in the Fifth Amendment provides a right to family integrity and familial association. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (stating "the relationship between parent and child is constitutionally protected."); see also *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").

74) In June of 2018, the Hon. Dana M. Sabraw enjoined the U.S. government's Family Separation Policy and practice and found that a plaintiff class, comprising of class members like C.M. and D.V., was likely to succeed on their claim that the U.S. government violated migrant families' due process rights to family integrity through implementation of the

policy. *Ms. L. v. U.S Immigration & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019) and enforcement granted in part, denied in part sub nom. *Ms. L. v. U.S. Immigration & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020). Judge Sabraw ordered that the U.S. government cease detaining migrant parents apart from their minor children absent a determination that the parent is unfit or presents a danger to the child.

75) In reaching this holding, Judge Sabraw observed that the U.S. government separated families without an effective system or procedure for tracking children after they were separated, without enabling communication between the parents and children, and without reuniting the parents and children, even after the parents returned to immigration custody following or completing criminal sentences. Judge Sabraw found these practices "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 1145. C.M. and D.V. were subjected to these practices, as described above.

76) A January 2021 DOJ, Office of the Inspector General Report concluded that the DOJ, Office of Attorney General "demonstrated a deficient understanding of the legal requirements related to the care and custody of separated children" and "did not effectively coordinate" with other government agencies such as HHS when implementing the policy. The Report also concluded that the OAG's "single-minded focus on increasing immigration prosecutions came at the expense of careful and appropriate consideration of the impact of family unit prosecutions and child separations."

## V. FIRST CAUSE OF ACTION
### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Intentional Infliction of Emotional Distress
### By Plaintiffs C.M. and D.V.

77) The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference.

78) By engaging in the acts described in this Complaint, including but not limited to forcibly separating C.M. and D.V., withholding information about D.V. from C.M., depriving

C.M. and D.V. of contact, and the treatment of C.M. and D.V. while in custody, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

79) As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress, as described herein.

80) Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotion distress.

## VI.   SECOND CAUSE OF ACTION
### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Abuse of Process
### By Plaintiffs C.M. and D.V.

81) The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference.

82) A plaintiff may prove a claim for abuse of process by demonstrating (1) an illegal, improper, or perverted use of a civil or criminal legal process, a use neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damages as a result of the illegal or irregular act.

83) By engaging in the acts alleged herein for the reasons alleged herein, the federal officers and officials described herein abused legal process for an unlawful and improper purpose.

84) Plaintiffs suffered physical injury and mental anguish as a result of the abuse of legal process.

85) Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for abuse of process.

## VII.   THIRD CAUSE OF ACTION
### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Battery
### By Plaintiff C.M.

86) The allegations of each of the preceding paragraphs are re-alleged and

incorporated herein by reference.

87) The federal officers and officials described herein intentionally, knowingly, or recklessly caused bodily harm to C.M. by, without consent, physically forcing C.M. to the ground and striking him in the neck at the Eagle Pass, Texas port of entry.

88) C.M. experienced ongoing pain and bruising in his neck following the violent strike by Defendant U.S.'s employees.

89) Under the Federal Tort Claims Act, the United States is liable to Plaintiff C.M. for battery.

### VIII. FOURTH CAUSE OF ACTION
### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligence
### By Plaintiffs C.M. and D.V.

90) The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference.

91) The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs. They also had mandatory, non-discretionary duties, including but not limited to those imposed by the U.S. constitution.

92) By engaging in the acts alleged herein, the federal officers referenced above failed /to act with ordinary care and breached their duty of care owed to Plaintiffs by forcibly separating Plaintiffs, withholding information about D.V. from C.M., depriving D.V. and C.M. of contact, and the treatment of D.V. and C.M. while in custody, among other actions described herein. As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

93) Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

### IX. FIFTH CAUSE OF ACTION
### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Loss of Consortium
### By Plaintiff D.V.

94) The allegations of each of the preceding paragraphs are re-alleged and

incorporated herein by reference.

95) Plaintiff D.V. had a legal right to parent-child consortium, which the government's employees, officials, and/or contractors violated.

96) The forced separation of D.V. and C.M. caused D.V. severe, permanent, and disabling injuries. These injuries include the long-term health effects and emotional and psychological trauma caused by the forced and prolonged separation.

97) The wrongful conduct of the federal officers referenced above directly and proximately caused the long-term health effects and emotional and psychological trauma, which substantially interfered with Plaintiff parent and child's capacity to interact with one another in a normally gratifying way and has caused D.V. to suffer damages as a result.

98) Under the Federal Tort Claims Act, the United States is liable to Plaintiff D.V. for damages for loss of consortium.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award Plaintiffs:

    a.    Compensatory damages in an amount to be proven at trial;

    b.    All reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

    c.    Such other relief as the Court deems just and equitable.

Respectfully submitted,

RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, California 94612
(415) 421-1800
(415) 421-1700 - Fax

LAW OFFICES OF
GAUL AND DUMONT
315 E. Euclid Avenue San Antonio, Texas 78212
(210) 225-0685
(210) 595-8340 - Fax

/s/  *Malinda A. Gaul*
Malinda A. Gaul (Bar No. 08239800)
Attorney for Plaintiffs
