United States District Court
Western District of Texas
San Antonio Division

C.M. on his own behalf and on behalf of his
minor child, D.V.,

     Plaintiffs,

     v.                                    Case No. SA-21-CV-00234-JKP-ESC

United States of America,

     Defendant.

United States' Motion to Dismiss

     Defendant United States of America respectfully moves to dismiss this action pursuant to

Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for

failure to state a claim.  As discussed below, Congress has not waived sovereign immunity for

the types of claims asserted in this action.  As such, the claims are jurisdictionally barred.  In

addition, Plaintiffs fail to state a claim upon which relief may be granted.  Accordingly, to the

extent the Court exercises jurisdiction over Plaintiffs' claims, they should be dismissed for

failure to state a claim under Texas law.

Table of Contents

I.      OVERVIEW ..................................................................................................... 1

II.     RELEVANT IMMIGRATION FRAMEWORK .......................................................... 2

        A.      Statutory framework for noncitizens entering the United States ........................... 2

        B.      Expedited removal ...................................................................................... 2

        C.      Statutory detention authority ...................................................................... 4

        D.      Statutory framework for immigration custody relating to unaccompanied minors 5

        E.      Flores Agreement requirements ................................................................... 6

        F.      Executive Branch directives regarding immigration enforcement ...................... 7

        G.      Subsequent policy changes ......................................................................... 8

III.    STATEMENT OF FACTS ................................................................................... 9

        A.      C.M. and D.V.'s Apprehension and Separation ............................................. 10

        B.      C.M.'s Criminal Proceedings .................................................................... 12

        C.      D.V.'s ORR Custody .............................................................................. 13

        D.      C.M.'s Immigration Detention and Removal Proceedings ............................... 14

        E.      Reunification and Removal ...................................................................... 14

        F.      Reentry to the United States ..................................................................... 14

IV.     LEGAL STANDARDS ...................................................................................... 15

V.      ARGUMENTS AND AUTHORITIES .................................................................... 17

        A.      The Court Lacks Jurisdiction over Plaintiffs' Claims .................................... 17

                1.      Plaintiffs' claims are barred by the discretionary function exception. ..... 17

                        a.      *The decisions to prosecute C.M., detain him in adult detention
                                facilities pending his immigration proceedings, and designate D.V.
                                a NUC are discretionary in nature and subject to policy analysis.*
                                ................................................................................. 20

                        b.      *Plaintiffs' remaining claims concerning their conditions of
                                confinement are barred by the discretionary function exception.* 25

                        c.      *Plaintiffs' assertion of unconstitutional conduct does not preclude
                                application of the discretionary function exception.* .................... 27

                2.      Plaintiffs' claims relating to the decision to transfer D.V. to the custody of
                        ORR are barred by the FTCA's exception for actions taken while
                        reasonably executing the law. ................................................... 30

3.      Plaintiffs' claims are barred because there is no private person analogue ................................................................................................ 32

B.      Plaintiffs Fail to State a Claim Under Texas Law. ................................................. 34

1.      Plaintiffs' claims challenge privileged conduct. ......................................... 34

a.      *DHS was authorized by law to separate C.M. from D.V.* ............. 34

b.      *C.M.'s battery claim is barred by Texas's use-of-force privilege.* 36

2.      Plaintiffs fail to state a claim for intentional infliction of emotional distress ................................................................................................. 38

3.      Plaintiffs fail to state a claim for abuse of process. ................................... 41

4.      Plaintiffs fail to state a claim for negligence. ............................................ 43

a.      *Texas does not recognize a claim for negligent infliction of emotional distress.* .......................................................................... 44

b.      *Plaintiffs have not identified a duty under Texas law that was allegedly breached by their separation.* ......................................... 45

5.      Plaintiffs fail to state a claim for loss of consortium. ............................... 46

VI.     CONCLUSION ................................................................................................................ 48

## I.      OVERVIEW[1]

In March 2018, Plaintiff C.M. unlawfully entered the United States with his minor son, D.V., by evading inspection at an official port of entry.  Plaintiff C.M. was detained, separated from D.V., and prosecuted for and found guilty of unlawful entry pursuant to 8 U.S.C. § 1325.  Plaintiff C.M. was sentenced to 25 days of imprisonment.   Meanwhile, Plaintiff D.V. was transferred to the care of the Office of Refugee Resettlement and placed in foster care.  After serving his criminal sentence, C.M. was transferred to the custody of Immigration and Customs Enforcement ("ICE") and held in adult immigration detention until his expedited removal.  C.M. and D.V. were reunited and jointly repatriated to Honduras on July 9, 2018.  In June 2021, C.M. and D.V. were granted parole through the Family Reunification Task Force and re-entered the United States.

Plaintiff C.M. brings this action against the United States on his own behalf and on behalf of D.V., under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–80, seeking monetary damages for alleged injuries caused by Defendant's separation of C.M. and D.V. on account of C.M.'s criminal prosecution and immigration detention, and the conditions of confinement of Plaintiffs.  Plaintiffs' alleged injuries, however, are not compensable under the FTCA because Congress has not waived the federal government's sovereign immunity from claims for money damages in these circumstances.  In addition, Plaintiffs fail to state a claim under Texas law based on their separation.  For each of these reasons, Plaintiffs' claims should be dismissed.

---

[1] The United States references exhibits to this Motion that have been redacted as necessary to preserve Plaintiffs' pseudonyms and personally identifying information in accordance with the Local Rules and the Court's Order, ECF No. 9.  Unredacted copies of Exhibits D, E, F, and G are being submitted under seal.

II.    **RELEVANT IMMIGRATION FRAMEWORK**

A.    **Statutory framework for noncitizens[2] entering the United States**

Noncitizens who arrive in the United States are considered "applicant[s] for admission" and must be "inspected by immigration officers" to determine their admissibility to the United States.  8 U.S.C. §§ 1225(a)(1), (a)(3), (b).  Individuals arriving in the United States who, following inspection, are deemed inadmissible, are subject to removal from the United States and, as appropriate, detention pending such removal.  *See id*. §§ 1225(b); 1226; 1357.  These provisions generally apply to both adults and children.

In addition, when a noncitizen eludes examination or inspection by immigration officers, he or she may be prosecuted for criminal immigration violations, including criminal charges for entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers."  8 U.S.C. § 1325(a).  Section 1325(a) is a misdemeanor that is punishable for the first offense by a fine and/or 'imprison[ment of] not more than 6 months" for a first infraction.  *Id*.

B.    **Expedited removal**

Exercising its plenary power over decisions related to the admission of noncitizens identified at the border, Congress has established a system for expedited removal that differs from the procedures available to noncitizens referred to removal proceedings under 8 U.S.C. § 1229a.  *See Kleindienst v. Mandel,* 408 U.S. 753, 766 & n.6 (1972).  Removals under 8 U.S.C. § 1229a involve Notices to Appear and are not expedited.  The expedited removal system was created by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

---

[2] This brief uses the term "noncitizen" as equivalent to the statutory term "alien."  *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

("IIRIRA"), which replaced much of the pre-existing Immigration and Nationality Act ("INA") with a new comprehensive statutory regime governing the classification and admission of noncitizens. *See Tineo v. Ashcroft*, 350 F.3d 382, 392–93 (3d Cir. 2003). Prior to 1996, the INA "established two types of proceedings in which [noncitizens] can be denied the hospitality of the United States: deportation hearings and exclusion hearings." *Vartelas v. Holder*, 566 U.S. 257, 261 (2012). Exclusion hearings—which accorded adult and accompanied noncitizens fewer procedural rights than deportation hearings—were for "[noncitizens] seeking entry to the United States," while deportation hearings were for "[noncitizens] who had already entered this country." *Id.* "Under this regime, 'entry' into the United States was defined as 'any coming of [a noncitizen] into the United States, from a foreign port or place.'" *Id.* (quoting 8 U.S.C. § 1101(a)(13) (1988 ed.)). Thus, prior to 1996, "non-citizens who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who actually presented themselves to authorities for inspection were restrained by more summary exclusion proceedings." *Martinez v. Att'y Gen.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012).

"To remedy this unintended and undesirable consequence," Congress eliminated the concept of "entry" and the distinction between exclusion and deportation procedures, creating instead a uniform "removal" procedure. *Id.*; *see also* H.R. Rep. No. 104-469, at 225–26 (Conf. Rep.) (1996); *Vartelas*, 566 U.S. at 261. Under the new system, removability turns on whether a [noncitizen] is admissible or has been "admitted," defined as the "lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Congress preserved some elements of the former distinction between exclusion and deportation, however, by establishing the "expedited removal" system. *Kucana v.*

*Holder*, 558 U.S. 233, 249 (2010); *see* S. Rep. No. 104-249 (1996). This ensured that the

Executive Branch could both expeditiously remove an adult or accompanied noncitizen lacking a

legal basis to remain in the United States and discourage noncitizens from exposing themselves

to the dangers associated with unlawful immigration. H.R. Rep. No. 104-469, pt. 1, at 117

(1996).

The result of Congress' efforts is found at 8 U.S.C. § 1225(b)(1), which provides that

noncitizens—like Plaintiff C.M.—who are stopped at the border be subject to inspection and

"ordered removed without further hearing or review unless the [noncitizen] indicates either an

intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

Noncitizens who express such a fear of returning to their country of origin are referred for an

interview with an asylum officer to assess whether they have a credible fear of persecution, with

*de novo* review by an immigration judge if the asylum officer makes a negative finding. 8

U.S.C. § 1225(b)(1)(B). If the noncitizen cannot show a credible fear of persecution or torture—

*i.e.*, a significant possibility that they could establish eligibility for asylum under 8 U.S.C.

§ 1158—before either the asylum officer or immigration judge, the asylum officer "shall order

the [noncitizen] removed from the United States without further hearing or review." *Id.*

§ 1225(b)(1)(B)(iii)(I). If the noncitizen establishes a credible fear, he "shall be detained for

further consideration of the application for asylum" by an immigration judge. 8 U.S.C.

§ 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

### C.     Statutory detention authority

The federal government possesses statutory authority to "arrange for appropriate places

of detention for [noncitizens] detained pending removal or a decision on removal." 8 U.S.C.

§§ 1231(g)(1), 1232. Noncitizens in expedited removal proceedings are not entitled to a bond.

1225(b)(1)(B)(ii) & (iii)(IV) ("Any [noncitizen] subject to [expedited removal proceedings] *shall*

4

*be detained* pending a final determination of credible fear of persecution and, if found to not have such a fear, *until removed*.") (emphasis added).  Under the statute, the only opportunity for a noncitizen to be released pending a decision on his or her asylum application is discretionary parole.  *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 673 (S.D. Tex. 2021) (citing 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 212.5(b), 235.3).

### D.    Statutory framework for immigration custody relating to unaccompanied minors

Federal immigration law authorizes the United States to provide for the custody and care of unaccompanied minor children who are present in the United States without lawful immigration status.   Specifically, the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") is charged with "the care and placement of unaccompanied [noncitizen] children who are in federal custody by reason of their immigration status."  6 U.S.C. § 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1).  The term "unaccompanied alien child," now referred to as a "noncitizen unaccompanied child" or "NUC," is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom . . . there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody."  6 U.S.C. § 279(g)(2).

Under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child."  8 U.S.C. § 1232(b)(3).  ORR seeks to place NUCs "in the least restrictive setting that is in the best interest of the child."  *Id.* § 1232(c)(2)(A).  However, ORR "shall not release such children upon their own recognizance."  6 U.S.C.

§ 279(b)(2)(B).   Rather, once in ORR custody, there are detailed statutory and regulatory provisions that must be followed before the child is released to an approved sponsor.  *See* 8 U.S.C. § 1232(c)(3).   Congress requires that "an unaccompanied alien child may not be placed with a person . . . unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being" and that "[s]uch determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  *Id.* § 1232(c)(3)(A).   In some instances, a home study is required.  *Id*. § 1232(c)(3)(B).

### E.    Flores Agreement requirements

In 1996, the federal government entered into a settlement agreement referred to as the "Flores Agreement."  *See*, *e.g.*, *Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101).   The Flores Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [immigration authorities]."  *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (citing Flores Agreement ¶ 9).   Under a binding interpretation of the Ninth Circuit, the Flores Agreement "unambiguously" applies both to unaccompanied minors and to minors who are encountered together with their parents or legal guardians.  *Id.* at 901.   Under the Flores Agreement, the government must expeditiously transfer any minor who cannot be released from custody to a non-secure, licensed facility.  *Id*. at 902–03 (quoting Flores Agreement ¶ 12)).   The government must also "make and record the prompt and continuous efforts on its part toward . . . release of the minor."  *Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting Flores Agreement ¶ 14).

Notably, the Flores Agreement applies only to noncitizen minors.  *Flores*, 828 F.3d at 901. It "does not address . . . the housing of family units and the scope of parental rights for adults

apprehended with their children[,]" and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'"  *Flores*, 828 F.3d at 906; *see also United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *9 (W.D. Tex. Jan. 5, 2018) ("[*Flores*] does not provide that parents are entitled to care for their children if they were simultaneously arrested by immigration authorities[.]"), *aff'd sub nom United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744, 763 (W.D. Tex. 2018) ("any time the government detains or imprisons a parent for criminal activity, that parent's rights as to her children are implicated. . . . But if that kind of interference were actionable under the Eighth Amendment, every imprisoned parent would arguably have a claim.  That is not the state of the law"), *aff'd United States v. Vasquez-Hernandez*, 924 F.3d 164 (5th Cir. 2019); *see also Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018) ("[P]arents and children may lawfully be separated when the parent is placed in criminal custody[.]").  Nor does the Flores Agreement provide any rights to adult detainees, including any rights of release.  *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at *14–15; *Bunikyte v. Chertoff*, No. 07-164, 2007 WL 1074070, at *16 (W.D. Tex. Apr. 9, 2007).  Although the Flores Agreement gives preference to release of minors to a parent, this preference "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice."  *Flores*, 828 F.3d at 908.

### F.    Executive Branch directives regarding immigration enforcement

During the time period relevant to this action, the Executive Branch issued several directives regarding enforcement of federal immigration laws. Exec. Order No. 13767 § 1, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8793 (Jan. 30, 2017) ("EO 13767").  First, in January 2017, the former President issued Executive Order 13767 § 1, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8793 (Jan. 30, 2017) ("EO

13767"), stating that "[i]t is the policy of the executive branch to . . . detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]" *Id*. § 2(b).  Executive Order 13767 directed DHS to "ensure the detention of [noncitizens] apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law," *id*. § 6, and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute . . . and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." *Id*. § 11(d).

Second, on April 11, 2017, DOJ issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement and directed that federal law enforcement prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325 and illegal reentry of individuals who had been removed previously.  *See* U.S. DOJ Memorandum on Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download.

### G.    Subsequent policy changes

On April 6, 2018, Attorney General Jeff Sessions issued a "Memorandum for Federal Prosecutors along the Southwest Border" on "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)" (the "Zero Tolerance Policy"). U.S. DOJ Memorandum on Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a), (April 6, 2018), available at https://www.justice.gov/opa/press-release/file/1049751/download.  The memorandum directed federal prosecutors along the United States–Mexico border "to the extent practicable, and in consultation with DHS, to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *Id*.  In addition, on May 4, 2018, the DHS Secretary

directed officers and agents to ensure that all adults deemed prosecutable for improper entry in violation of 8 U.S.C. § 1325(a) are referred to DOJ for criminal prosecution.[3]  The Complaint focuses heavily on the Zero Tolerance Policy.  *See* Compl. ¶¶ 27–30.  But as Plaintiffs acknowledge, this Memorandum was issued approximately one month *after* Plaintiffs attempted to enter the United States on March 8, 2018.  Compl. ¶ 27.

After taking office, President Biden issued an Executive Order condemning the "human tragedy that occurred" while the Zero Tolerance Policy was in place and creating a Task Force to reunify families separated during the prior Administration.  Exec. Order No. 14011, § 1, Establishment of Interagency Task Force on the Reunification of Families, 86 Fed. Reg. 8273, 8273 (Feb. 5, 2021).  Executive Order 14011 explains that it is the policy of the government "to respect and value the integrity of families seeking to enter the United States" and directs that families entering the United States will not be separated "except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law."  *Id.*

## III.    STATEMENT OF FACTS

This case concerns the separation of a father and son after the father was criminally charged with attempting to enter the United States by running on foot through the vehicle lanes to evade inspection at the Eagle Pass Port of Entry ("POE").

---

[3] The Complaint alleges that "[p]rior to the creation and expansion of the Family Separation Policy, individuals apprehended between ports of entry who were not considered an enforcement priority … were not consistently prosecuted for illegal entry[.]"  Compl. ¶ 28.  But Plaintiffs were not apprehended between ports of entry; they were apprehended as Plaintiff C.M. attempted to evade inspection by running through the vehicular lanes at the port of entry.  *See infra* Part III.A.

A.     **C.M. and D.V.'s Apprehension and Separation**

C.M. and his son, D.V., are citizens of Honduras.  *See* Ex. A-1, CBP Decl. ¶ 3.  Following

alleged threats of gang violence in their home country, C.M. and D.V. traveled to the United

States, along with two other members of their family, C.M.'s brother, H.M., and H.M.'s minor

son, H.V.  Compl. ¶ 32.  D.V.'s mother remained in Central America.  Ex. A-2, HHS Decl. ¶ 4(f).

On or about March 8, 2018, C.M., D.V., and their relatives[4] approached the United States

at the Eagle Pass Port of Entry ("POE").  CBP Decl. ¶ 3; *see also* Compl. ¶ 33.  The Eagle Pass

POE includes two bridges, approximately a half mile apart, that were each built to facilitate

pedestrian and vehicular traffic between Piedras Negras, Mexico, and the United States.[5]  The

Eagle Pass International Bridge (Bridge 1), located north of the second bridge, is more than



Photo of Vehicular Lanes and Pedestrian
Walkway at Bridge 1 (CBP Decl. ¶ 12)

---

[4] C.M.'s brother and nephew are not parties to this action.

[5] Texas-Mexico International Bridges and Border Crossings, Texas Department of
Transportation, available at https://ftp.txdot.gov/pub/txdot/move-texas-freight/studies/texas-
mexico-bridges-crossings-2019.pdf (last accessed February 28, 2022), at p.98.

1,800 feet long.  *Id.* at 87.  In 2018, Bridge 1 processed more than 500,000 north-bound

pedestrian crossings and more than 1.2 million vehicular crossings.  *Id.*

Rather than proceeding to Passport Control with their fellow pedestrians to present

themselves for inspection, C.M. and his brother attempted to evade inspection by running

through the vehicular traffic lanes toward the United States.  CBP Decl. ¶ 3.  A U.S. Customs and

Border Protection Officer (CBPO) apprehended C.M. as he ran.  *Id.*  Because he was running

away from the officer, the CBPO used force to bring C.M. to the ground and arrest him.  *Id.*  The

CBPO then escorted Plaintiffs into Passport Control at the Camino Real Bridge (Bridge 2)[6] for

further inspection.  *Id.* ¶¶ 3, 5.

While in Passport Control of the Camino Real Bridge, C.M. and his brother were patted

down for security screenings.  *Id.* ¶ 5.  C.M. signed that he understood his rights and was willing

to answer any questions asked of him.  *Id.*; Ex. B, CBP Form I-867A.  Because C.M. and his

brother had no legal documents allowing them to remain in the United States, they were each

processed for expedited removal and prosecution for unlawful entry.  CBP Decl. ¶ 5; 8 U.S.C.

§§ 1225(b)(1)(A), 1182(a)(7)(A).

Because their fathers were referred for prosecution under 8 U.S.C. § 1325, D.V. and his

---

[6] The Camino Real Bridge (Bridge 2) is about half of a mile south of Bridge 1.  In 2018, CBP
officers at Bridge 2 processed more than 240,000 pedestrians and 1.5 million privately owned
vehicles, as well as more than 170,000 commercial trucks, including both U.S. citizen and non-
citizens.  Extensive vehicular, pedestrian, and train traffic through the Eagle Pass POE makes
this area a target of drug trafficking and other criminal smuggling operations.  *See*, *e.g.*, Eagle
Pass CBP Officers Seize Meth Worth $1.2 Million, Customs and Border Protection Public
Affairs Media Release (December 18, 2017), available at: https://www.cbp.gov/newsroom/local-
media-release/eagle-pass-cbp-officers-seize-meth-worth-12-million (last accessed February 4,
2022); CBP Officers Seize $212K in Cocaine Concealed in a Bus at Eagle Pass POE, Customs
and Border Protection Public Affairs Media Release (December 21, 2018), available at:
https://www.cbp.gov/newsroom/local-media-release/cbp-officers-seize-212k-cocaine-concealed-
bus-eagle-pass-port-entry (last accessed February 4, 2022).

cousin were processed as noncitizen unaccompanied children (each a "NUC").  *See* 6

U.S.C.  279(g)(2); CBP Decl. ¶ 7.[7]  DHS issued D.V. a Notice to Appear, placing him in full

removal proceedings, and then transferred him to the Office of Refugee Resettlement (ORR)

custody, along with his cousin.  *See* Ex. C, NTA; Ex. A-2, HHS Decl. ¶ 4(a); CBP Decl. ¶ 7; 8

U.S.C. 1232(a)(5)(D).

### B.  C.M.'s Criminal Proceedings

C.M. was charged with improper entry under 8 U.S.C. § 1325(a)(2) and held for criminal

prosecution.  Ex. D, Criminal Complaint, submitted under seal.  The Complaint charges:

> That at the Port of Eagle Pass in Eagle Pass, Texas, on March 8, 2018, the
> defendant was arrested after attempting to enter the United States by eluding
> inspection from Customs and Border Protection Officers by running through the
> vehicular primary lanes located at the International Bridge in his attempt to enter
> the United States from Mexico. Defendant was aware that his actions were in
> violation of law.

*Id*.

C.M. later appeared in federal court with his court-appointed attorney to respond to the

charges.  Ex. E, Order Appointing Counsel, submitted under seal.  C.M. pleaded guilty to the

Complaint and was convicted of attempting to enter by eluding inspection.  Ex. F, Criminal

Judgment, submitted under seal.  He was sentenced and "committed to the custody of the United

---

[7] This regulation defines an unaccompanied alien child, or noncitizen unaccompanied child, as
"[a]n individual who: Has no lawful immigration status in the United States; has not attained 18
years of age; and with respect to whom: (i) There is no parent or legal guardian in the United
States; or (ii) No parent or legal guardian in the United States is available to provide care and
physical custody).  "[A]n alien previously determined to have been a UAC" is no longer a UAC
when he or she "has reached the age of 18, when a parent or legal guardian in the United States
is available to provide care and physical custody for such an alien, or when such alien has
obtained lawful immigration status." *Id.*

Because C.M. was detained for prosecution, he was not available to provide care and physical
custody for D.V., and D.V. was processed, along with his minor cousin, as a NUC.

States Bureau of Prisons for a term of 25 days with credit for time already served." *Id.* C.M.'s brother was likewise charged, pleaded guilty, and received the same sentence. Ex. G, Criminal Docket, submitted under seal.

C.M. was released from criminal custody on or about April 3. Ex. A-3, ICE Decl. ¶ 5. From criminal custody, he was transferred to ICE immigration custody. *Id.* ¶¶ 7–11. While in immigration custody, C.M. was detained in adult detention facilities. *Id.*

### C.     D.V.'s ORR Custody

On March 11 (three days after Plaintiffs arrived to the United States), ORR placed D.V. and his cousin with a foster family through a partnership with Bethany Christian Services ("BCS"). Ex. A-2, HHS Decl. ¶ 4(a). D.V.'s care was overseen by a BCS Case Manager while he was in ORR custody. *Id.* ¶ 4(c). While in foster care, D.V. received medical and dental care. *Id.* ¶ 4(d). He also went to school and received regular mental health services. *Id.* D.V. also met with an immigration attorney at least twice while in ORR custody. *Id.*

On March 12, four days after C.M. and D.V. arrived in the United States and one day after D.V. was placed in foster care, D.V.'s Case Manager made contact with D.V.'s mother in Honduras. *Id.* ¶ 4(e). According to call records, D.V. was in regular phone contact with his mother beginning on March 15 and continuing throughout his time in foster care, typically speaking multiple times per week. *Id.* Although the Case Manager had made repeated contact with D.V.'s mother, she was first able to reach C.M. on or about April 9, after he was released from criminal custody. *Id.* ¶ 4(g).

As part of her duties, D.V.'s Case Manager tried to find an appropriate sponsor for D.V. in the United States while C.M. remained in criminal and immigration custody. *See*, *e.g.*, *id.* ¶ 4(c). Although a potential sponsor was eventually identified, C.M. told the Case Manager that if he was deported, he wanted D.V. to go back to Honduras with him. *Id.* ¶ 4(g)–(h). D.V.'s mother

agreed with this plan.  *Id*. ¶ 4(h).  Because the plan was for D.V. to be granted voluntary

departure, he was not placed with a sponsor and remained in foster care until he was reunited

with his father for removal.  *Id.* ¶ 4(i)–(j).

### D.    C.M.'s Immigration Detention and Removal Proceedings

C.M. received a Notice of Expedited Removal on March 9, 2018.  Ex. H, Expedited

Removal Order.  After completing his 25-day criminal sentence, C.M. was referred to

Immigration and Customs Enforcement on April 3, 2018, pursuant to his order of expedited

removal.  ICE Decl. ¶ 5.  C.M. requested a credible fear interview which took place on May 3,

2018.  *Id.* ¶ 12; Ex. A-4, USCIS Decl. ¶ 2.  In his interview, C.M. stated his desire to abandon his

credible fear claim, so that he could pursue removal with his son.  *Id*. ¶¶ 2–5.

Throughout his time in immigration custody, C.M. was held in an adult detention facility,

where he was unable to provide care and custody of D.V.  Ex. A-3, ICE Decl. ¶ 14.  As a result,

he was "unavailable" to care for his child, as that term is used in 6 U.S.C. § 279(g)(2).

### E.    Reunification and Removal.

After D.V. was granted voluntary departure at the end of May, ICE worked to coordinate

Plaintiffs' departure, including by securing travel documents and arranging their departure flight.

ICE Decl. ¶¶ 15–16.  C.M.'s travel document was received on June 19, and D.V.'s travel

document was received on June 26.  *Id*. ¶ 16.

As they requested, C.M. and D.V. were reunited and jointly repatriated to Honduras on

July 9, 2018.  *Id.* ¶ 17.

### F.    Reentry to the United States

In June 2021, C.M. and D.V. were granted parole through the Family Reunification Task

Force and re-entered the United States.  Ex. A-1, CBP Decl. ¶ 10.

## IV.    LEGAL STANDARDS

*Federal Rule of Civil Procedure 12(b)(1).*  Rule 12(b)(1) allows a party to move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).  "Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Clark v. Tarrant Cty., Tex.*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

*Federal Rule of Civil Procedure 12(b)(6).*  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  A plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint may be dismissed under Rule 12(b)(6) based on a successful affirmative defense that appears on the face of the complaint.  *See EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, N.A.*, 467 F.3d 466, 470 (5th Cir. 2006).  A court ruling on a motion to dismiss may rely on documents incorporated into the complaint by reference and matters of which a court may take judicial notice.  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

*Stating a Claim under the FTCA.*  In an action against the Federal Government, a plaintiff

must identify a claim as to which the Government has waived its sovereign immunity. "Absent a

waiver, sovereign immunity shields the Federal Government and its agencies from suit."

*F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (describing sovereign immunity as "jurisdictional in

nature"). Here, Plaintiffs' Complaint invokes the FTCA, which waives the United States'

sovereign immunity for certain torts committed by federal employees while acting within the

scope of their employment. 28 U.S.C. § 1346(b). "Federal courts have jurisdiction over these

claims if they are actionable under 1346(b)." *Brownback v. King*, 141 S. Ct. 740, 746 (2021)

(quoting *Meyer*, 510 U.S. at 477).

Section 1346(b) contains the following six requirements—all of which must be satisfied

in order for an action to qualify within the FTCA's jurisdictional grant: the claim must be "'[1]

against the United States, [2] for money damages, . . . [3] for injury or loss of property, or

personal injury or death [4] caused by the negligent or wrongful act or omission of any employee

of the Government [5] while acting within the scope of his office or employment, [6] under

circumstances where the United States, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred.'" *Meyer*, 510 U.S. at

477 (quoting 28 U.S.C. § 1346(b) (bracketed numerals added by the Court)).

As the Supreme Court recently held in *Brownback*, "a plaintiff must plausibly allege all

six FTCA elements not only to state a claim upon which relief can be granted but also for a court

to have subject-matter jurisdiction over the claim." 141 S. Ct. at 749. "That means a plaintiff

must plausibly allege that 'the United States, if a private person, would be liable to the claimant'

under state law both to survive a merits determination under Rule 12(b)(6) and to establish

subject-matter jurisdiction." *Id.* And it also follows, as the Court held, that "where a plaintiff

fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional

element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6)." *Id.* at
749 n.8.

## V.    ARGUMENTS AND AUTHORITIES

### A.    The Court Lacks Jurisdiction over Plaintiffs' Claims.

For the reasons set forth below, Plaintiffs' claims should be dismissed for lack of
jurisdiction and failure to state a claim.  Plaintiffs cannot prevail on their FTCA claims because
this Court lacks subject-matter jurisdiction under established legal principles.  Their claims
challenge discretionary decisions that are susceptible to policy analysis, including policies
surrounding law enforcement, immigration, and national security.  In addition, Plaintiffs'
Complaint challenges actions taken by federal employees exercising due care in the execution of
federal immigration statutes and regulation.  Lastly, these challenged actions do not have private
person analogues.

In addition to these jurisdictional defenses, Plaintiffs fail to state a claim under Texas law
for intentional infliction of emotional distress, abuse of process, negligence, or loss of
consortium.  Thus, to the extent the Court exercises jurisdiction over Plaintiffs' claims, they
should be dismissed under Rule 12(b)(6).

### 1.    Plaintiffs' claims are barred by the discretionary function exception.

The United States, as a sovereign entity, "is immune from suit except insofar as it has
specifically and expressly consented to be sued." *Lehman v. Nakshian*, 453 U.S. 156, 160–61
(1981) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)).  "[T]he terms of [the
government's] consent to be sued in any court define that court's jurisdiction to entertain the
suit." *Lehman*, 453 U.S. at 160 (internal quotes and citations omitted).  Absent a specific,
express waiver, sovereign immunity bars a suit against the government for lack of subject matter
jurisdiction. *See Meyer*, 510 U.S. at 475.  "The plaintiff bears the burden of showing Congress's

unequivocal waiver of sovereign immunity." *Spotts v. United States*, 613 F.3d 559, 568 (5th Cir. 2010).

The FTCA is "a limited waiver of sovereign immunity." *Leleux v. United States*, 178 F.3d 750, 754 (5th Cir. 1999). The statute allows individuals to sue the United States where a federal employee's conduct, within the scope of his or her employment, causes "injury, loss of property, or personal injury or death." *See* 28 U.S.C. § 1346(b)(1). However, the FTCA's waiver of sovereign immunity is subject to exceptions. *See* 28 U.S.C. § 2680. When an exception applies, the United States retains its sovereign immunity and the court lacks jurisdiction. *Castro v. United States*, 608 F.3d 266, 268 (5th Cir. 2010) (en banc).

The FTCA's "discretionary function exception" ("DFE") bars "[a]ny claim" that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also United States v. Gaubert*, 499 U.S. 315, 325 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

The Supreme Court has applied a two-part test to determine when the DFE applies. *Gaubert*, 499 U.S. at 328–32. Courts first ask whether the challenged conduct was in fact "discretionary in nature"—that is, whether the conduct involved "'an element of judgment or choice.'" *Id.* at 322 (quoting *Berkovitz*, 486 U.S. at 536). This prong is met unless "a federal statute, regulation, or policy specifically prescribes a course of action for the employee to follow." *Id.* A general mandate does not remove discretion. It must be so specific that it leaves the employee with no "room for choice." *Gaubert*, 499 U.S. at 325. In order to eliminate discretion, a directive must "specifically address[] how an official must confront a given situation." *Lopez v. ICE,* 455 F. App'x 427, 433 (5th Cir. 2011). It is the plaintiff's burden to

identify a specific mandate that removes discretion.  *See Campos v. United States*, 888 F.3d 724,

731 (5th Cir. 2018).

Second, if the conduct involves choice or discretion, courts must next determine whether

the judgment of the government employee was "of the kind that the discretionary function

exception was designed to shield."  *Gaubert*, 499 U.S. at 322–23.  Recognizing that tort actions

challenging the government's discretionary policy judgments could "seriously handicap efficient

government operations," Congress incorporated the DFE into the FTCA to "prevent judicial

second-guessing of legislative and administrative decisions grounded in social, economic, and

political policy" through a tort action.  *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).

The focus of this inquiry is whether the "nature of the actions taken," pursuant to an exercise of

discretion, "are susceptible to policy analysis."  *Gaubert*, 499 U.S. at 325.

The government need not prove that it considered these factors and made a conscious

decision on the basis of them.  *See Spotts*, 613 F.3d at 572.  Indeed, under the second prong, the

government actors' subjective intent is immaterial: "the focus of the inquiry is not on the agent's

subjective intent in exercising the discretion conferred by statute or regulation" but rather "on the

nature of the actions taken and on whether they are *susceptible* to policy analysis."  *Gaubert*, 499

U.S. at 325; *see also Freeman v. United States*, 556 F.3d 326, 337 (5th Cir. 2009) (subjective

intent irrelevant to application of the DFE).  Moreover, "when established government policy

allows a government agent to exercise discretion, it must be presumed that the agent's acts are

grounded in policy when he exercises that discretion."  *Baldassaro v. United States*, 64 F.3d 206,

211 (5th Cir. 1995) (citing *Gaubert*, 499 U.S. at 325).  And the statutory text confirms that the

exception applies "whether or not the discretion involved [was] abused."  28 U.S.C. § 2680(a).

Finally, the fact that a policy is later rescinded, as here, does not alter the DFE analysis.  As the

D.C. Circuit explained in *Loughlin v. United States*, 393 F.3d 155, 166 (D.C. Cir. 2004), when the government discards a previous policy decision, "[t]he earlier judgment was no less a matter of policy because the later judgment was arguably better informed."

If both prongs of the *Gaubert* test are met, the DFE applies, the court lacks jurisdiction, and the claim must be dismissed.  *See Cohen v. United States*, 151 F.3d 1338, 1341 (11th Cir. 1998).  This result applies even where the government may have been negligent in the performance of such discretionary acts.  The DFE analysis does not call upon the court to evaluate the merits of a given policy.  As the legislative history of the FTCA explains, the statute's limited waiver of sovereign immunity was "not intended to authorize suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion."  H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10.

The Supreme Court's leading decision on the DFE emphasized that the DFE protects negligent or wrongful acts that are abuses of discretion.  In *Dalehite v. United States*, 346 U.S. 15 (1953), the Court noted that the exception covers "both negligence and wrongful acts in the exercise of the discretion because the Act itself covers only 'negligent or wrongful act[s] or omission[s]'. . .  The exercise of discretion could not be abused without negligence or a wrongful act."  *Id.* at 33.

> a.    *The decisions to prosecute C.M., detain him in adult detention facilities pending his immigration proceedings, and designate D.V. a NUC are discretionary in nature and subject to policy analysis.*

Plaintiffs' claims based on the decision to prosecute C.M. and detain him for prosecution and service of sentence, which resulted in the separation of C.M. and D.V., are barred by the DFE because these decisions involved an element of judgment or choice, and are susceptible to policy analysis.  Plaintiffs do not allege that CBP unlawfully apprehended them after evading

inspection at the Eagle Pass POE.  Nor do Plaintiffs allege that C.M. was not properly subject to prosecution under 8 U.S.C. § 1325 for illegal entry, or that the government lacked discretion to prosecute him.  Plaintiffs do not allege that the government lacked discretion to transfer C.M. to USMS custody in connection with his prosecution and to the Bureau of Prisons ("BOP") custody for a term of imprisonment of 25 days.  And Plaintiffs do not allege that the government lacked discretion to conclude that D.V. was a NUC under the TVPRA.

These decisions, which together resulted in C.M.'s placement in the care and custody of ORR, are quintessentially discretionary.  As the Supreme Court has stated, "the Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation omitted).  Indeed, "[t]he Supreme Court has long recognized that the 'Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'"  *In re Sealed Case,* 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *see also Smith v. United States*, 375 F.2d 243, 247–48 (5th Cir. 1967) ("as an incident of the constitutional separation of powers, . . . the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions"); *Gray v. Bell*, 712 F.2d 490, 513 (D.C. Cir. 1983) (prosecutorial decisions are "quintessentially" discretionary).

As other courts have recognized, the government's decisions concerning whether to prosecute individuals for unlawful entry "amount to the exercise of the prosecutorial discretion that Congress and the Constitution confer on the Attorney General."  *Mejia-Mejia v. ICE,* No. 18-1445 (PLF), 2019 WL 4707150, at *5 (D.D.C. Sept. 26, 2019); *see also Pena Arita v. United States*, 470 F. Supp. 3d 663, 686–87 (S.D. Tex. 2020).  Concerns about "subjecting the

prosecutor's motives and decision making to outside inquiry" are magnified in the immigration context.  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).

The DFE bars the Court from "second-guessing" or inquiring into government actors' intent in exercising that prosecutorial discretion.  *Berkovitz*, 486 U.S. at 536; *Varig*, 467 U.S. at 814.  In determining the applicability of the DFE, the Court looks only at whether the conduct or decision at issue is "susceptible to policy analysis" from an objective perspective; subjective intent is not part of the inquiry.  *Freeman*, 556 F.3d at 337.  Here, Plaintiffs acknowledge that decisions regarding whether to charge crimes under 8 U.S.C. § 1325 and how to detain individuals during their removal proceedings involve questions of public safety, resource allocation within the Department of Justice and the Department of Homeland Security, as well as concern for family units.  *See* Compl. ¶ 28 (alleging policy considerations underlying decisions not to prosecute § 1325 crimes); *see also* Exs. D–G; *see also infra* Part III.A., and n.5.

Following completion of his criminal sentence, C.M. was transferred to ICE custody pending expedited removal proceedings.  During that time, C.M. was mandatorily detained pursuant to 8 U.S.C. § 1225(b) in adult detention facilities.  The government's decisions concerning where to detain C.M. pending removal were also discretionary and susceptible to policy analysis.  The federal government possesses the express statutory authority to "arrange for appropriate places of detention for [noncitizens] detained pending removal or a decision on removal."  8 U.S.C. § 1231(g)(1).[8]  "Congress has placed the responsibility of determining where [noncitizens] are detained within the discretion of the [Secretary]."  *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986); *see also Gandarillas-Zambrana v. Bd. of*

---

[8]  Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" now mean the Secretary of Homeland Security.  *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

*Immigr. Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The INS necessarily has the authority to determine the location of [a noncitizen] in deportation proceedings . . . and therefore, to transfer [noncitizens] from one detention center to another."); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding that the "Attorney General's discretionary power to transfer [noncitizens] from one locale to another, as she deems appropriate, arises from" statute); *Sasso v. Mihollan*, 735 F. Supp. 1045, 1046 (S.D. Fla. 1990) (holding that the Attorney General has discretion over the location of detention); *Ortega v. United States Dep't of Homeland Sec.*, No. 1:18-CV-00508, 2018 U.S. Dist. LEXIS 150768, at *10 (W.D. La. July 6, 2018) (citing 8 U.S.C. 1231(g)(1) for the Attorney General's discretion to choose the detention facility of noncitizens).

A decision to detain a noncitizen pending resolution of immigration proceedings is committed to the discretion of the Attorney General and implicates issues of foreign policy and public safety and therefore falls within the DFE. *See Mirmehdi v. United States*, 662 F.3d 1073, 1081–82 (9th Cir. 2011); *see also Ashford v. United States*, 463 Fed. App'x 387, 395 (5th Cir. 2012) (placement of inmate covered by DFE); *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995) (decisions whether to detain or release are policy-based decisions protected by DFE); *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (placement decisions are susceptible to policy analysis); *Santa-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) ("assignment to particular institutions or units . . . must be viewed as falling within the discretionary function exception to the FTCA"); *Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998) ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons.").

This discretion necessarily entails decisions regarding with whom noncitizens are

23

detained, including decisions about whether adults and minors can be detained together.  *See Pena Arita*, 470 F. Supp. 3d at 691–92 (decisions by DHS to separate family members are protected by the DFE); *Ms. L. v. U.S. Immigration and Customs Enf't*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2020) ("parents and children may lawfully be separated when the parent is placed in criminal custody").  Although the Flores Agreement contains some requirements concerning the detention of minors, it does not specifically prescribe a course of action and thus does not remove the government's discretion.  Moreover, the Flores Agreement does not require release of a parent or mandate that parents be housed with their children.  *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, No. EP-17-MJ-4409, 2018 WL 315759, at *6 (W.D. Tex. Jan 5, 2018); *Bunikyte v. Chertoff*, Nos. A-07-CA-164-SS, *et seq.*, 2007 WL 1074070, at *16 (W.D. Tex. April 9, 2007).

For similar reasons, the determination that D.V. was "unaccompanied" within the meaning of the TVPRA is a decision covered by the DFE.  *See* 6 U.S.C. § 279(g)(2).  Whether a parent is "available to provide care and physical custody" is a policy question vested in federal officials.  *See D.B. v. Poston*, 119 F. Supp. 3d 472, 482–83 (E.D. Va. 2015) ("Federal agencies are afforded discretion under the statutory scheme when classifying juveniles as unaccompanied minor children."), *aff'd in part and vacated in part*, 826 F.3d 721 (4th Cir. 2016); *see also Baie v. Sec'y of Def.*, 784 F.2d 1375, 1377 (9th Cir. 1986) ("interpretation of the statute is a plainly discretionary administrative act the 'nature and quality' of which Congress intended to shield from liability under the FTCA."); *Medina v. United States*, 259 F.3d 220, 227 (4th Cir. 2001) (determining whether conduct constituted "crime of moral turpitude" under applicable statute was "a quintessential exercise of [agency's] broad discretion").  Here, C.M. was prosecuted and transferred to the custody of the USMS, and, after serving his sentence, was then sent to an adult

immigration detention facility.  In those circumstances, the DFE protects the officials'

determination that D.V. should have been deemed unaccompanied and thus transferred to the

custody of the ORR.  *See Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 287 (3d Cir.

1995) (holding that a decision was protected by the DFE when it "necessarily reflects the

decisionmaker's judgment that it is more desirable to make a decision based on the currently

available information than to wait for more complete data or more confirmation of the existing

data").

     In the end, Plaintiffs do not allege injury from any government action or decision that

was not subject to discretion and susceptible to policy analysis.  To the extent that Plaintiffs

suggest that the government should have released them into the interior, should not have

prosecuted C.M. for criminal violations of immigration law, or should not have determined that

D.V. was unaccompanied, those decisions are quintessential discretionary policy judgments

subject to the DFE.

> *b.    Plaintiffs' remaining claims concerning their conditions of
> confinement are barred by the discretionary function exception.*

     Plaintiffs also bring claims based on the alleged "mistreatment [of C.M. and D.V.] while

they were in the custody of the United States government."  Compl. ¶ 2.  Among other things,

Plaintiffs allege that they were placed in a holding center that was too cold and without outer

clothing and were forced to sleep on hard benches and floors.  *Id.* ¶¶ 37–42.  Plaintiffs also allege

that they were unable to speak to each other on the telephone and that C.M. was provided only

limited information about where D.V. had been placed.  *Id.* ¶¶ 51, 61.  While the government is

committed to safe and humane treatment of every individual in detention, Plaintiffs' condition-

of-confinement claims are barred by the DFE.

     Courts have repeatedly held that claims based on acts or omissions relating to "conditions

of confinement" are barred by the DFE because the manner in which the government manages and operates its detention facilities involves discretionary decisions susceptible to policy considerations. *See Huff v. Neal*, 555 F. App'x 289, 298–99 (5th Cir. 2014) (DFE applied to placement of inmates and internal prison security); *Campos*, 888 F.3d at 733 (DFE applied to deficiencies in computer database that failed to reveal immigration status); *Patel v. United States*, 398 F. App'x 22, 29 (5th Cir. 2010) (DFE applied to decision to transfer prisoner); *Bultema v. United States*, 359 F.3d 379, 384 (6th Cir. 2004) (decision not to provide bed rails susceptible to policy considerations); *Lineberry v. United* States, No. 3:08-cv-0597, 2009 WL 763052, at *6 (N.D. Tex. Mar. 23, 2009) (allegation of overcrowding in prison barred by DFE); *Antonelli v. Crow*, No. 08-261, 2012 WL 4215024, at *3 (E.D. Ky. Sept. 19, 2012) (collecting cases in which myriad conditions of confinement claims, including claims based on temperature and crowding, were barred by the DFE).

In particular, courts have held that detained individuals have "no right to unlimited telephone time," *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994), and that a detainee's right to telephone access is "subject to rational limitations in the face of legitimate security interests." *Id.* (quoting *Strandburg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)); *see also Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 559 (E.D. Va. 2006) ("[T]he BOP's provision of telephone services is a matter committed to its discretion that will not be second-guessed through an FTCA claim."); *Janis v. United* States, No. 1:06-cv-1613, 2009 WL 564207, at *14 (S.D. Ind. Mar. 4, 2009) ("telephone usage policy is discretionary with the authority of prison administrators, and the exercise of that discretion requires the balancing of policy considerations such as budget, facilities, staff resources, etc.").

        c.      *Plaintiffs' assertion of unconstitutional conduct does not preclude application of the discretionary function exception.*

That Plaintiffs claim that certain alleged conduct violated the Constitution does not alter the discretionary function analysis.  Congress did not create the FTCA to address constitutional violations, but rather to address violations of state tort law committed by federal employees.  *See Meyer*, 510 U.S. at 477 (recognizing that "§ 1346(b) does not provide a cause of action for" a "constitutional tort claim").  As noted, the Supreme Court has explained that when a "federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow," there is no further discretion to exercise.  *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis added).  The Constitution is no different: in some cases, the Constitution may establish such a specific prescription that it removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute.

The Supreme Court has long recognized that conduct may be discretionary even if it is later determined to have violated the Constitution.  The common law doctrine of official immunity thus applies to the exercise of "discretionary functions" even when the conduct violated the Constitution, so long as the constitutional right was not defined with sufficient specificity that the official should have known the act was prohibited.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 614–15 (1999) (applying the "discretionary function[]" formulation and holding that officers were entitled to qualified immunity because, although their conduct violated the Fourth Amendment, the law was not clearly established at the time).

Thus, when the Supreme Court in *Berkovitz* held that a federal mandate must "specifically prescribe[]" conduct in order to overcome the discretionary function exception, it

referred to official immunity precedent, underscoring that the two standards operate in tandem. 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296–97 (1988)).  Accordingly, the discretionary function exception is not made inapplicable by every allegation of unlawful or unconstitutional conduct, but only by a showing that the government official's discretion was cabined by a specific, clearly established directive, accompanied by plausible assertions that the specific directive was violated.  *See*, *e.g.*, *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019) ("Because . . . the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail" under the discretionary function exception.).

Indeed, even before it specifically addressed the qualified immunity standards applicable to federal employees, the Supreme Court in *Butz v. Economou*, 438 U.S. 478 (1978), explicitly recognized that the discretionary function exception would apply even if alleged conduct might later be held unconstitutional.  The Court in that case held that officials sued for violations of constitutional rights were entitled to qualified, but not absolute immunity.  The Court explained that were it otherwise, the recently recognized *Bivens* remedy would be illusory, and, as relevant here, it noted that "no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused."  *Id.* at 505.  *Butz* and subsequent decisions thus leave no doubt that conduct that violates the Constitution may constitute the type of abuse of discretion that falls within the scope of the discretionary function exception.

The Fifth Circuit has not, in a controlling opinion, addressed under what circumstances an allegation of a constitutional violation removes discretion under the DFE.  *See Campos*, 888 F.3d at 735 ("This Court has not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function exception") (quoting *Spotts v. United States*, 613 F.3d 559, 569 (5th Cir. 2010)).[9]

---

[9]  However, in two unpublished opinions, the Fifth Circuit has held that a constitutional violation only removes discretion if it prescribed a specific course of conduct.  *See Garza v. United States*, 161 F. App'x 341, 343–44 (5th Cir. 2005) (rejecting allegation that Eighth Amendment violation precluded application of DFE, and instead deciding to "join [its] sister circuits in recognizing that . . . the Eighth Amendment's prohibition against cruel and unusual punishment [does not] define a non-discretionary course of action specific enough to render the discretionary function

In any event, whatever the precise standard, it is not satisfied here.  Regardless of whether some or all of these acts reflected an abuse of discretion, Plaintiffs have identified nothing in the decisions of the Supreme Court or the Fifth Circuit that removed any official's discretion with respect to any of the categories of asserted actions by "specifically prescrib[ing] a course of action for an employee to follow."  *Gaubert*, 499 U.S. at 322.  Indeed, as the Fourth Circuit observed, "we . . . have been unable to find a substantive due process right to family unity in the context of immigration detention pending removal."  *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210–11 (4th Cir. 2019); *see also Dominguez-Portillo*, No. EP-17-MJ-4409, 2018 WL 315759, at \*6 (W.D. Tex. Jan 5, 2018) ("the case law provides little guidance on how such parental rights are actually manifested when a parent charged with a petty misdemeanor illegal entry offense is separated from their child who allegedly accompanied them across the border"); *see also id.* (noting "lack of clearly established parental rights in these circumstances and under case law"), *aff'd sub nom United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744, 763 (W.D. Tex. 2018) ("any time the government detains or imprisons a parent for criminal activity, that parent's rights as to her children are implicated. . . .  But if that kind of

_____

exception inapplicable"); *Campillo v. U.S. Penitentiary Beaumont, Tex.*, 203 F. App'x 555 (5th Cir. 2006) (same).  In the Fifth Circuit, unpublished decisions are not treated as precedent but they can be relied upon as persuasive authority.  *See Ballard v. Burton*, 444 F.3d 391, n.7 (5th Cir. 2006).

Several district courts in Texas have agreed with *Garza.  See*, *e.g.*, *Ahern v. United States*, No. 2:14-cv-259, 2017 WL 2215633, at \*10 (S.D. Tex. May 19, 2017) ("adopting the reasoning articulated in *Garza*" and finding § 2680(a) applicable despite argument that the government violated the plaintiff's rights under the Fifth Amendment, which was found to lack requisite specificity); *Fabian v. Dunn*, No. 08-cv-269, 2009 WL 2567866, at \*8 (W.D. Tex. Aug. 14, 2009) (unaccompanied minors who illegally entered United States alleged government violated their Fifth Amendment rights in choosing detention facility where they were allegedly abused; claim held barred by DFE because Fifth Amendment does not prescribe a specific course of conduct, citing *Garza* as the "most applicable case"); *Lane v. Brockman*, No. 3:18-cv-02745, 2019 WL 360836, at \*3 (N.D. Tex. Jan. 9, 2019) (relying on *Garza* to hold DFE applicable to defeat claim alleging constitutional violation).

interference were actionable under the Eighth Amendment, every imprisoned parent would arguably have a claim.  That is not the state of the law"), *aff'd United States v. Vasquez-Hernandez*, 924 F.3d 164 (5th Cir. 2019); *see also Ms. L. v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018) ("[P]arents and children may lawfully be separated when the parent is placed in criminal custody[.]").

In their Complaint, Plaintiffs generally allege that their rights to due process of law and family integrity and familial association were violated.  Compl. ¶ 73.  However, "[t]he assertion of a *general* constitutional right that is clearly established is not sufficient; 'the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense . . . [so] that a reasonable official would understand that what he is doing violates that right.'"  *Burney v. Carrick*, No. 98-50434170 F.3d 183, 1999 WL 47014 *3 (5th Cir. Jan 21, 1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

> **2.      Plaintiffs' claims relating to the decision to transfer D.V. to the custody of ORR are barred by the FTCA's exception for actions taken while reasonably executing the law.**

Plaintiffs' claims relating to the decision to transfer D.V. to the custody of ORR are independently precluded because the FTCA prevents the United States from being held liable for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a).  Thus, "[w]here government employees act pursuant to and in furtherance of regulations, resulting harm is not compensable under the act[.]"  *Dupree v. United States*, 247 F.2d 819, 824 (3d Cir. 1957); *see also Accardi v. United States*, 435 F.2d 1239, 1241 (3d Cir. 1970) (claim based on "enforcement of 'rules and regulations'" barred by § 2680(a)); *Lively v. United States*, 870 F.2d 296, 297–98 (5th Cir. 1989) (recognizing that the due care exception and the discretionary function exception are two separate exceptions under 28 U.S.C.

§ 2680(a)).

This exception "bars tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953); *see also* H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10 (noting that it was not "desirable or intended that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort"); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956) (FTCA does not waive sovereign immunity for claims based on employees' acts "performed under and in furtherance of the regulation … even though the regulation may be irregular or ineffective"). Thus, where a government employee's actions are authorized by statute or regulation—even if that statute or regulation is later found unconstitutional or invalid—the claim must be dismissed for lack of subject matter jurisdiction. *See Bub Davis Packing Co. v. United States*, 443 F. Supp. 589, 593 (W.D. Tex. 1977), *aff'd on basis of district court's opinion*, 584 F.2d 116 (5th Cir. 1978); *Sickman v. United States*, 184 F.2d 616, 619 (7th Cir. 1950); *FDIC v. Citizens Bank & Tr. Co. of Park Ridge, Ill.*, 592 F.2d 364, 366 (7th Cir. 1979); *Borquez v. United States*, 773 F.2d 1050, 1052–53 (9th Cir. 1985); *Hydrogen Tech. Corp. v. United States*, 831 F.2d 1155, 1160–61 & n.5 (1st Cir. 1987) (exception barred claim of owner that FBI destroyed its prototype by dismantling it during criminal investigation conducted pursuant to 28 U.S.C. § 533, which authorizes Attorney General to appoint officials "to detect and prosecute crimes against United States"); *Porter v. United States*, 473 F.2d 1329, 1337 (5th Cir. 1973) (exception barred property damage claim of Lee Harvey Oswald's widow, who alleged that in carrying out their appointed functions FBI personnel had stained or discolored documents and personal effects belonging to her late husband by subjecting them to chemical treatment and analysis while investigating President John F. Kennedy's assassination).

Here, the United States is required to "transfer the custody" of children to the care of ORR "not later than 72 hours after" determining that there is no parent available to provide care and physical custody absent exceptional circumstances.  8 U.S.C. § 1232(b)(3).  In this case, the government made the determination that Plaintiff C.M. was unable to provide care and physical custody for his son, D.V., on account of its discretionary decisions to refer Plaintiff C.M. for criminal prosecution, to transfer him to criminal custody for prosecution and to serve his sentence, and to detain him in an adult immigration detention facility.  Once those protected discretionary determinations were made, the TVPRA required that D.V. be transferred to ORR custody.  The enforcement of that statutory command cannot form the basis of an FTCA claim.[10]

### 3.   Plaintiffs' claims are barred because there is no private person analogue.

Plaintiffs' claims also fail because the government acts that Plaintiffs challenge have no private person analogue.  The FTCA's waiver of sovereign immunity is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The statute authorizes tort recovery against the United States only "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  The FTCA does not waive sovereign immunity for claims against the United States based on governmental "action of the type that private persons could not engage in and hence could not be liable under local law."  *Chen v.*

---

[10] In reaching the contrary conclusion, district courts have stated that there is no statute or regulation "requiring the separation of Plaintiffs upon their entry into the country."  *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020); *see also C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020).  But, as just described, federal law does require that children be placed into ORR custody if their parents are unavailable to provide care and physical custody.  And for the reasons described above, the decision to detain those parents for prosecution is a quintessentially discretionary one.  In *A.P.F.* and *C.M.*, the plaintiffs were not charged with any crime, and the decisions are distinguishable on that basis.

*United States*, 854 F.2d 622, 626 (2d Cir. 1988) (internal quotes omitted).

The FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA [even] in the performance of activities which private persons do not perform." *United States v. Olson*, 546 U.S. 43, 46 (2005) (internal quotations omitted); *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012). Though the private analogue need not be exact, a plaintiff must offer "a persuasive analogy" showing that the government actor sued would be subject to liability under state law if a private person. *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992).

Because only the federal government has the authority to enforce federal criminal and immigration laws and make determinations concerning detention, there is no private person analogue that would support a claim under the FTCA. The alleged harms here stem from the federal government's decision to enforce federal immigration laws, criminally prosecute certain individuals, and hold parents in custody pending immigration proceedings or prosecution, resulting in their children's placement in the care and custody of ORR. *See* Exs. A-1, A-2, A-3, A-4, B–H. The United States has not waived its sovereign immunity for such decisions to enforce federal law, as the decisions have no private-person counterpart. *See*, *e.g.*, *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir. 1997) (decision regarding whether to take enforcement action under federal law was not conduct for which private individual could be held liable and thus did not give rise to FTCA action); *Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9, 26 (1st Cir. 2020) ("Controlling immigration and the presence of noncitizens within the country are duties and powers vested exclusively in the sovereign."); *Elgamal v. Bernacke*, 714 F. App'x 741, 742 (9th Cir. 2018) ("[B]ecause no private person could be sued for anything sufficiently analogous to the negligent denial of an immigration status adjustment

application, that claim must be dismissed as well."); *Elgamal v. United States*, No. 13-00867,

2015 WL 13648070, at *5 (D. Ariz. July 8, 2015) (recognizing that "immigration matters" are

"an inherently governmental function"); *Bhuiyan v. United States*, 772 F. App'x 564, 565 (9th

Cir. 2019) ("[T]here is, as a general matter, no private analogue to governmental withdrawal of

immigration benefits."); *Mazur v. United States*, 957 F. Supp. 1041, 1042–43 (N.D. Ill. 1997) (in

matters relating to naturalization of noncitizens, "only the United States has the power to act,"

and, "[a]ccordingly . . . there is no private analog under state law").[11]

### B.    Plaintiffs Fail to State a Claim Under Texas Law.

To the extent that the Court exercises jurisdiction over one or more of Plaintiffs' claims,

their claims should be dismissed for failure to state a claim upon which relief may be granted.  At

the outset, Plaintiffs' claims challenge conduct considered privileged under Texas law, including

conduct protected by Texas's use-of-force privilege and other conduct authorized by law.

Beyond these privileges, Plaintiffs fail to state a claim under Texas law for intentional infliction

of emotional distress, abuse of process, negligence, and loss of consortium.  For these reasons,

all of Plaintiffs' claims should be dismissed under either Federal Rule of Civil Procedure

12(b)(1) or 12(b)(6).  *See Brownback*, 141 S. Ct. at 749 n.8.

#### 1.    Plaintiffs' claims challenge privileged conduct.

##### a.    *DHS was authorized by law to separate C.M. from D.V.*

Actions that may otherwise subject a person to liability are not considered tortious if the

conduct is privileged.  *See Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1231 (5th Cir. 1988)

---

[11] Although civil in nature, immigration arrests and resulting detention are viewed as more akin to
federal criminal enforcement.  *See Ryan*, 974 F.3d at 27 ("Just as criminal arrests implicate the
uniquely sovereign interests in enforcing the penal laws and protecting the public, so too do civil
immigration arrests seek to vindicate similar kinds of interests in controlling immigration and the
presence of noncitizens in the country.").

(citing *Restatement (Second) of Torts § 10, and W. Keeton, Prosser and Keeton on Torts* 16 (5th ed. 1984)).  This principle applies here because the challenged conduct—the separation of C.M. and D.V. as a result of C.M.'s prosecution and imprisonment—was privileged under Texas law and federal immigration statutes.

It is well established that in FTCA cases, the United States is entitled to invoke state law privileges.  *See Villafranca v. United States*, 587 F.3d 257 (5th Cir. 2009) (Texas' civil privilege defense statute applied in FTCA action alleging assault by federal officer); *McElroy v. United States*, 861 F. Supp. 585 (W.D. Tex. 1994) ("the United States may invoke any defenses available to individual law enforcement officers under Texas law."); *Hernandez v. United States*, No. 1:17-CV-00087, 2018 WL 4103015, at *3–4 (S.D. Tex. July 2, 2018) ("the Government may look to state law privileges as a defense to FTCA claims").

A leading case on this point is *Caban v. United States*, 728 F.2d 68 (2d Cir. 1984), where the INS detained the plaintiff when he arrived at JFK airport from the Dominican Republic because he was not able to satisfactorily show that he was an American citizen.  The INS ultimately determined that he was an American citizen, and he was released after being detained for six days.  He sued under the FTCA for, *inter alia*, false imprisonment. New York's statutory definition of false imprisonment provided that false imprisonment does not occur if "the confinement was . . . otherwise privileged."  *Caban*, 728 F.2d at 72.  The Second Circuit held that the INS agents' conduct was "otherwise privileged" because a federal immigration statute provided that a person entering the United States who cannot clearly show his right to entry "'shall be detained for further inquiry.'"  *Id.* at 71 (quoting 8 U.S.C. 1225(b) (1976)).

The Fifth Circuit recognizes that privileges apply to public officials performing their official functions with legal authority, and has applied them in FTCA cases.  In a case affirmed

by the Fifth Circuit, the district court in *Tovar v. United States*, No. 3:98-cv-1682, 2000 WL 425170, at \*6–7 (N.D. Tex. April 18, 2000), *aff'd* 244 F.3d 135 (5th Cir. 2000), considered the United States' liability under the FTCA for false imprisonment.  Citing *Caban*, the district court looked to federal law to determine whether the INS agents acted with legal authority.  *Id.* at \*7. The district court then held that the "INS acted under authority of law" because federal immigration statutes authorized the challenged government conduct.  Therefore, the privilege applied.[12]

Here, the challenged conduct—the separation of C.M. and D.V. as a result of C.M's prosecution and imprisonment—was authorized by federal law.  *See supra* Part V.A.2. Accordingly, under *Tovar* and its progeny, the conduct was privileged under Texas law and the United States cannot be held liable.

> b.   *C.M.'s battery claim is barred by Texas's use-of-force privilege.*

Outside of Plaintiffs' separation-based claims, C.M. brings a battery claim against the United States.  Compl. ¶¶ 85–89.  Specifically, C.M. alleges that federal officers "intentionally, knowingly, or recklessly caused bodily harm to C.M. by, without consent, physically forcing C.M. to the ground and striking him in the neck at the Eagle Pass, Texas port of entry."  *Id.* ¶ 87; *see also id.* ¶ 35.  The use of force in this circumstance is likewise authorized by law and therefore privileged.

---

[12] *See also Davila v. United States*, 713 F.3d 248 (5th Cir. 2013) (no FTCA liability because Texas's "civil privilege defense" statute provided a privilege for peace officers who use force when they reasonably believe the force is necessary; no liability for false imprisonment because Texas' definition of false imprisonment excludes conduct undertaken under authority of law, and a federal statute permitted the actions of the federal officers); *Saldana v. United States*, 248 F.3d 1139 (5th Cir. 2001) (same); *Garza v. United* States, 881 F. Supp. 1103 (S.D. Tex. 1995) (relying on *Caban*, court found alleged assault by federal agents to be privileged because the federal agents were enforcing federal immigration laws).

DHS agents are authorized to arrest non-citizens who enter or attempt to enter the United States in violation of law.  *See* 8 U.S.C. § 1357.  Texas courts recognize that, while the acts of making an arrest "necessarily involve a battery," a claim for battery "may not be actionable because of privilege."  *Carter v. Diamond URS Huntsville, LLC*, 175 F. Supp. 3d 711, 741 (S.D. Tex. 2016) (citing *City of Watauga v. Gordon*, 434 S.W.3d 586, 594 (Tex. 2014)); *Pharr v. Wille*, No. 1:14-CV-762-DAE, 2016 U.S. Dist. LEXIS 99456, at *50 (W.D. Tex. July 29, 2016) (Ezra, J.).  Texas law specifically authorizes the use of force by peace officers in making arrests.  *See* Texas Penal Code § 9.51(a).

> Texas Penal Code § 9.51(a) provides that:
>
> A peace officer . . . is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest . . . if:
>
> (1) the actor reasonably believes the arrest or search is lawful . . . ; and
>
> (2) before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer . . . , unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested.

DHS agents are considered "peace officers" for purposes of § 9.51.  *See Mendez v. Poitevent*, 823 F.3d 326, 335 (5th Cir. 2016) (holding that Border Patrol agents are "peace officers" for purposes of Texas's civil use-of-force privilege) (citing *Davila v. United States*, 713 F.3d 248, 261 (5th Cir. 2013) ("Federal officers are peace officers for the purpose of the Texas criminal assault statute and its civil privilege defense.")).  Therefore, the United States is entitled to raise this privilege in FTCA matters challenging a DHS agent's use of force.  *Id.*

Under the facts as alleged in Plaintiffs' Complaint and contained in documents of which the Court may take judicial notice, the peace-officer privilege recognized by Texas courts applies.  Here, C.M. alleges that DHS agents forced him to the ground and struck his neck,

causing pain and bruising, at the Eagle Pass POE.  Compl. ¶¶ 87–88.  But the Court may also take judicial notice of the fact that Plaintiff was "arrested after attempting to enter the United States by eluding inspection from Customs and Border Protection Officers by running through vehicular primary lanes located at the International Bridge in his attempt to enter the United States from Mexico."  *See* Exs. D, F.  The Court may rely on these facts when ruling on the motion to dismiss under Rule 12(b)(6).  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (a court ruling on a motion to dismiss may rely on documents incorporated into the complaint by reference and matters of which a court may take judicial notice) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).  C.M. does not allege any use of force outside of his apprehension, and the facts alleged do not demonstrate that the force used was excessive or otherwise unreasonable.

Conduct that is privileged is not tortious.  *See Mendez*, 823 F.3d at 334; Tex. Penal Code § 9.51(a).  Because C.M. has not pleaded facts to show that the force used by a DHS agent against him was objectively unreasonable, he has not plausibly alleged a claim for battery outside of Texas's use-of-force privilege.  Therefore, C.M.'s battery claim should be dismissed for failure to state a claim.

### 2. Plaintiffs fail to state a claim for intentional infliction of emotional distress.

In their first cause of action, Plaintiffs allege a claim for intentional infliction of emotional distress related to their separation and treatment while in detention.  Compl. ¶¶ 77–88.  As previously argued, Plaintiffs' separation-based claims are not cognizable under the FTCA and Texas law.  *See supra* Part IV.B.1.*a.–b.*  In addition, because Plaintiffs have not pleaded facts which support the essential elements of this claim giving rise to a plausible right of recovery for intentional infliction of emotional distress, their separation-based claims should be dismissed.

The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Wornick Co. v. Casas*, 856 S.W.2d 732 (Tex. 1993); *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999). In *Wornick*, the Texas Supreme Court described the outrageous conduct element as that which "goes beyond all possible bounds of decency as to be regarded as atrocious and utterly intolerable in a civilized society." *Wornick*, 856 S.W.2d at 734 (citing Restatement (Second) of Torts § 46 (1965)). The Court must determine as a matter of law whether the alleged conduct may reasonably be regarded as so extreme and outrageous so as to permit recovery. *Wornick*, 856 S.W.2d at 734; *see also Wyatt v. Kroger Co.*, 891 S.W.2d 749, 754 (Tex. App.—Fort Worth 1994, writ denied).

Texas public policy strongly favors the reporting and prosecution of crime. *See Smith v. Sneed*, 938 S.W.2d 181, 184 (Tex. App.—Austin 1997, no pet.) ("Texas courts have long recognized a strong public policy in favor of exposing crime.") (collecting cases). This policy is so strong that it "prohibits a person convicted of a crime from suing another for damages caused by conviction," including for claims of false imprisonment and intentional infliction of emotional distress. *Jones v. Hyman*, 107 S.W.3d 830, 831–32 (Tex. App.—Dallas 2003, no pet.). This is based on the principle that allowing civil recovery impermissibly shifts responsibility for the crime away from the person convicted. *Id.* (citing *Johnson v. Odom*, 949 S.W.2d 392, 393 (Tex. App.—Houston [14th Dist.] 1997, pet. denied)).

Here, Plaintiffs' intentional infliction of emotional distress claims are largely based on their separation. Compl. ¶ 78. Specifically, Plaintiffs allege that federal officials engaged in "extreme and outrageous conduct" by "forcibly separating C.M. and D.V., withholding

information about D.V. from C.M., and depriving C.M. and D.V. of contact[.]" *Id.*  Plaintiffs
further allege that the "decision to separate children from the parents at the border" was made
"with the purpose of deterring families from seeking refuge in the United States[,]" although
they concede that they were separated prior to the initiation of the Zero Tolerance Policy.  *Id.*
¶¶ 4, 27.  In multiple allegations, Plaintiffs challenge the plain fact of their separation.  *See, e.g.,*
*id.* ¶¶ 3, 12, 21, 68, 69.

These allegations are insufficient to state a plausible claim for intentional infliction of
emotional distress under Texas law.  *See Twombly*, 550 U.S. at 555.  Stated simply, the
prosecution of crime and enforcement of federal immigration law is neither extreme nor
outrageous under Texas law, even when that prosecution and enforcement results in the
separation of a parent from his or her child.  *Cf. Dillard Dep't Stores v. Silva*, 106 S.W.3d 789,
797 (Tex. App.—Texarkana 2003, pet. granted) (where probable cause exists for an arrest, the
decision to initiate criminal proceedings "cannot constitute outrageous behavior"), *aff'd in part,*
*mod. in part on other grounds*, 148 S.W.3d 370 (Tex. 2004).  Indeed, the risk of interference with
the parent-child relationship is inherent to criminal and immigration detention.  *See Aguilar v.*
*United States Immigr. & Customs Enf't*, 510 F.3d 1, 22 (1st Cir. 2007) (recognizing that "every
[detention pending removal] of a parent, like every lawful arrest of a parent, runs the risk of
interfering in some way with the parent's ability to care for his or her children"); *cf. Payne-*
*Barahona v. Gonzales*, 474 F.3d 1, 3 (1st Cir. 2007) (holding that if a child had a constitutional
right to object to his or her parent's deportation it would be "difficult to see why children would
not also have a constitutional right to object to a parent being sent to prison or, during periods
when the draft laws are in effect, to the conscription of a parent for prolonged and dangerous
military service.").

Where, as here, a parent is separated from their child due to the parent's criminal prosecution and/or immigration proceedings, the decision to separate is neither extreme nor outrageous under Texas law, but a consequence of those proceedings that cannot rise to the level of intentional infliction of emotional distress.  *See*, *e.g.*, CBP Decl. ¶¶ 5–7.  Plaintiffs therefore fail to state a claim for intentional infliction of emotional distress based on their separation.  No other facts alleged in the Complaint give rise to plausible right of recovery for intentional infliction of emotional distress such that a private person acting under the same circumstances would be liable.  This claim should be dismissed.

### 3.    Plaintiffs fail to state a claim for abuse of process.

In their second cause of action, both Plaintiffs bring a claim for abuse of process under Texas law.  Compl. ¶¶ 81–85.  Abuse of process is the malicious use or misapplication of process to accomplish an ulterior purpose.  *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  Because Plaintiffs fail to plead facts supporting essential elements of their claim, this claim should be dismissed.

The elements of abuse of process are: (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff as a result of such illegal act.  *Id.*; *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied).  Implicit in the elements is the requirement that the process in question be improperly used after it was issued.  *Hunt*, 68 S.W.3d at 130; *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 133 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).  In other words, the tort assumes that the original issuance of a legal process was justified, but the process itself is subsequently used for a purpose for which it was not intended.  *Hunt*, 68 S.W.3d at 130 (concluding that use of

41

a false affidavit to support a writ of execution did not support a claim for abuse of process).

"The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Blackstock v. Tatum*, 396 S.W.2d 463, 468 (Tex. App.—Houston [1st Dist.] 1965, no writ history).  "There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort. . . . ."  *Id.*  When the process is used for the purpose for which it is intended, even though accomplished for an ulterior motive, no abuse of process has occurred.[13]  *Hunt*, 68 S.W.3d at 130; *see also* 59 Tex. Jur. Process, Notices, and Subpoenas § 10 (3).

In addition, to recover for abuse of process, a claimant must demonstrate that he suffered special damages, that is, some physical interference with the claimant's person or property in the form of an arrest, attachment, injunction, or sequestration.  59 Tex. Jur. Process, Notices, and Subpoenas § 10 (3); *RRR Farms*, 957 S.W.2d at 134 ("Additionally, an abuse of process claim requires a showing of a wrongful seizure of property or an actual interference with the person.").  For purposes of the special-injury requirement of an abuse of process claim, it is insufficient that a party has suffered the ordinary losses incident to defending a civil suit, such as inconvenience, embarrassment, discovery costs, and attorney's fees.  *Id.*  "The policy supporting this rule is that it 'assures good faith litigants access to the judicial system without fear of intimidation by a countersuit.'"  *Pitts & Collard, LLLP v. Schechter*, 369 S.W.3d 301, 333 (Tex. App.—Houston

---

[13] "If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution."  *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. App.—Houston [14th Dist. 2018, no pet.) (quoting *Bossin*, 894 S.W.2d at 33, *Hunt*, 68 S.W.3d at 130).  Plaintiffs have not pleaded a claim for malicious prosecution.

[1st Dist.] 2011, no pet.) (citing *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 209 (Tex. 1996).

"The special damage requirement also serves to avoid needless and vexatious litigation." *See id*.

Here, Plaintiffs have not pleaded facts showing that any federal employee "made an illegal, improper, or perverted use of [] process, a use neither warranted nor authorized by the process." *Hunt*, 68 S.W.3d at 129.  Instead, Plaintiffs allege the use of process exactly as it was intended: to pursue criminal charges and expedited removal proceedings against C.M, and to allow D.V. to seek relief through full removal proceedings.[14]  The allegations in the Complaint therefore do not state a claim for abuse of process.

In addition, under Federal Rule of Civil Procedure 9(g), "[i]f an item of special damage is claimed, it must be specifically stated."  Plaintiffs' Complaint does not specifically state any special damage claims.  Instead, Plaintiffs allege that "Plaintiffs suffered physical injury and mental anguish as a result of the abuse of legal process."  Compl. ¶ 84.  But the only physical injury alleged in the Complaint includes an injury to Plaintiff C.M.'s neck during his arrest.  *See* Compl. ¶¶ 35, 88.  This conduct occurred prior to the issuance of process against C.M., was an authorized use of force, and was privileged.  No other improper interference with Plaintiffs' person or property is alleged.  Indeed, any interference with Plaintiffs' persons was an authorized use of the criminal and civil process issued against C.M.  Because the Complaint does not specifically state any special damages incurred, the Complaint fails to satisfy the heightened pleading standard of Rule 9(g), and Plaintiffs have not stated a claim for abuse of process.

### 4.      Plaintiffs fail to state a claim for negligence.

In their fourth cause of action, Plaintiffs allege federal officials acted negligently by

---

[14] In full removal proceedings, D.V. was entitled to seek additional relief from removal that was not available to C.M. in his expedited removal proceedings.  By requesting D.V.'s voluntary departure with C.M., D.V. gave up his rights to seek asylum and other relief from removal.

"forcibly separating Plaintiffs, withholding information about D.V. from C.M., depriving D.V. and C.M. of contact[.]"  Compl. ¶ 92.  Plaintiffs also generally challenge "the treatment of D.V. and C.M. while in custody."  *Id.*  Plaintiffs do not specify the "substantial damages" suffered as a result of these alleged actions in their negligence claim, but elsewhere in the Complaint they allege that their separation caused C.M. and D.V. mental and emotional harm.  Compl. ¶ 92; *see*, *e.g.*, Compl. ¶¶ 57–58, 65 ("the restrictions on D.V.'s ability to communicate with his parents during his separation caused him additional emotional harm");  (alleging that the Government's separation of C.M. and D.V. caused them severe and lasting emotional distress), 79 (alleging that Plaintiffs suffered severe emotional distress), 96 (same).  This negligence claim should be dismissed for two reasons: First, because Texas does not recognize a cause of action for negligent infliction of emotional distress; and second, because Plaintiffs fail to identify an actionable duty under Texas law that was allegedly breached by Plaintiffs' separation.

> a.    *Texas does not recognize a claim for negligent infliction of emotional distress.*

By layering a general negligence claim on top of their claims for intentional infliction of emotional distress, abuse of process, battery, and loss of consortium, Plaintiffs have attempted to plead a claim for negligent infliction of emotional distress.  Compl. ¶ 92 (challenging Defendant's actions to separate Plaintiffs, withhold information about D.V. from C.M. and depriving D.V. and C.M. of contact).  Texas does not recognize such a claim, regardless of the severity of the alleged emotional distress that is suffered.  *Garza v. United States*, 881 F. Supp. 1103, 1108 (S.D. Tex. 1995) (holding that a plaintiff's layering of a general negligence claim on top of specific tort claims for assault and false arrest "does [] sound suspiciously like an impermissible claim for negligent infliction of emotional distress") (citing *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993)).  Because Texas does not recognize a claim for negligent infliction

of emotional distress, Plaintiffs' general negligence claim should be dismissed.

>    b.    *Plaintiffs have not identified a duty under Texas law that was
>          allegedly breached by their separation.*

Even if Plaintiffs' negligence claims are not dismissed as improper negligent infliction of

emotional distress claims, they should be dismissed for failure to identify an applicable duty

under Texas law.  To maintain a negligence claim under Texas law, a plaintiff must show "the

existence of a legal duty, a breach of that duty, and damages proximately caused by the breach."

*Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021); *D. Houston, Inc. v. Love*, 92

S.W.3d 450, 454 (Tex. 2002); *see also Tripp v. United States*, 257 F. Supp. 2d 37, 45 (D.D.C.

2003) ("Unless plaintiff can establish a duty under District law to keep employee records such as

security clearance application forms confidential, she cannot state a claim for negligence under

the FTCA."); *Grost v. United States*, No. EP-13-CV-158-KC, 2014 U.S. Dist. LEXIS 61608, at

*59 (W.D. Tex. May 4, 2014) (holding that Plaintiff failed to state a claim for negligence because

Texas did not recognize a duty not to allow a hostile work environment).  This is true even if the

Court finds that a sufficient private-person analog exists for Plaintiffs' claims.  *See, e.g.*, *Tripp*,

257 F. Supp. 2d at 45.[15]  Nor does the FTCA's waiver of sovereign immunity extend to claims

premised on alleged violations of federal constitutional rights.  *Meyer*, 510 U.S. at 477–78;

*Spotts*, 613 F.3d at 565 n.3 ("Constitutional torts, of course, do not provide a proper predicate for

an FTCA claim."); *see also* Compl. ¶¶ 74–75.  The existence of a duty is a threshold question of

---

[15] There, the Court concluded as part of its analysis that the challenged conduct—the release of
information contained on an employment-related form—had an analogous counterpart in the
private sector.  *Id.* at 45.  The Court still dismissed the plaintiff's negligence claim under Rule
12(b)(6), however, because the plaintiff could not establish a duty under the law of the District of
Columbia to keep employee records, such as security clearance application forms, confidential.
*Id.* at 45–48 ("Unless plaintiff can establish a duty under District law to keep employee records
such as security clearance application forms confidential, she cannot state a claim for negligence
under the FTCA.").

law. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998); *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995).

Here, Plaintiffs' claims are based on their separation after C.M. attempted to enter the United States by eluding inspection, was prosecuted, and was processed for expedited removal. But Plaintiffs have not identified any duty under Texas law to keep them unified during this time. *Cf. Rathod v. Barr*, No. 1:20-CV-161-P, 2020 WL 1492790, at *5 (W.D. La. Mar. 5, 2020) (holding in a habeas matter that a noncitizen "does not have a right to be housed in any particular facility, nor does this court have the authority to order the ICE to house [a noncitizen] in any particular facility"); *cf. Davis v. Carlson*, 837 F.2d 1318, 1319 (5th Cir. 1988) (denying mandamus and holding that the Bureau of Prisons has "no clear duty—**nor, indeed, any duty**" to transfer a prisoner to a facility near his wife) (emphasis added). Thus, Plaintiffs have not stated a claim for negligence, and their separation-based claims should be dismissed.[16]

### 5. Plaintiffs fail to state a claim for loss of consortium.

In the Complaint's fifth cause of action, Plaintiff D.V. alleges a claim for loss of parental consortium. *See* Compl. ¶¶ 94–98. Because the allegations in the Complaint do not support essential elements of a loss of consortium claim under Texas law, the Court should dismiss this

---

[16] While the *Tripp* court dismissed the plaintiff's claim for failure to identify an applicable duty under Federal Rule of Civil Procedure 12(b)(6), other courts dismiss on these grounds under Federal Rule of Civil Procedure 12(b)(1), holding that the United States maintains its sovereign immunity because a private person would not be liable under the same circumstances. *Compare Tripp*, 257 F. Supp. 2d at 38, 44 *to, e.g., Harter v. United States*, 344 F. Supp. 3d 1269 (D. Kan. 2018) ("Because the FTCA's waiver of sovereign immunity extends only to conduct for which a private person could be held liable under state tort law, this Court lacks subject matter jurisdiction to hear Plaintiffs' claims."). In *Brownback*, the Supreme Court approved of both practices. 141 S. Ct. at 746; *see also Leleux v. United States*, 178 F.3d 750 (5th Cir. 1999) (holding that when a plaintiff failed to identify an applicable duty, her "complaint fail[ed] to state a claim and was properly dismissed under Rule 12(b)(6) as barred by § 2680(h)"). The United States primarily raises its failure-to-state-a-claim arguments under 12(b)(6) and alternatively under Rule 12(b)(1).

claim.

In *Whittlesey v. Miller*, the Texas Supreme Court held that "either spouse has a cause of action for loss of consortium that might arise as a result of an injury caused to the other spouse by a third-party tortfeasor's negligence." 572 S.W.2d 665, at 668 (Tex. 1978). Later, in *Reagan v. Vaughn*, the Texas Supreme Court extended consortium rights to children "when a third party causes serious, permanent, and disabling injuries to their parent." 804 S.W.2d 463 at 467; *see also Roberts v. Williamson*, 111 S.W.3d 113, 116–18 (Tex. 2003) (discussing *Reagan* and *Whittlesey*).

Texas "does not recognize claims for parental loss of consortium based on purely emotional harm." *Rodriguez v. H.E. Butt Grocery Co., L.P.*, No. 13-20-00467-CV, 2021 WL 4597106, at *8 (Tex. App.—Corpus Christi Oct. 7, 2021, no pet.) (citations omitted). "[T]o successfully maintain a claim for loss of parental consortium resulting from injury to the parent-child relationship, the plaintiff must show that the defendant physically injured the child's parent in a manner that would subject the defendant to liability." *Reagan*, 804 S.W.2d at 467; *see also Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 294 (Tex. 1994). A claimant "may not recover for loss of consortium absent a physical injury that is serious, permanent and disabling." *Verinakis v. Med. Profiles, Inc.*, 987 S.W.2d 90, 99 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (citing *Browning-Ferris Indus. Inc.*, 881 S.W.2d at 294). Importantly, loss of consortium does not include an element of mental anguish. *Reagan*, 804 S.W.2d at 467.

Here, Plaintiff D.V. alleges that the "forced separation of D.V. and C.M. caused D.V. severe, permanent, and disabling injuries." Compl. ¶ 96. "These injuries include the long-term health effects and emotional and psychological trauma caused by the forced and prolonged separation." *Id*. Each of these alleged injuries constitute emotional harm. The Complaint does

not allege that C.M. suffered any serious, permanent, and disabling *physical* injuries.  Moreover, because the use of force against C.M. was privileged, *see supra* Part V.B.1.*a.–b.*, D.V. cannot show that C.M. was physically injured "in a manner that would subject the [United States] to liability."  *Reagan*, 804 S.W.2d at 467.

For these reasons, D.V. fails to state a claim for loss of consortium.  To the extent the Court exercises jurisdiction over this claim, it should be dismissed.

## VI.   CONCLUSION

For the foregoing reasons, Defendant United States requests that this action be dismissed for lack of subject matter jurisdiction and/or failure to state a claim upon which relief may be granted.

Respectfully submitted,

Ashley C. Hoff
United States Attorney

By:   */s/ Faith Johnson Lowry*
Faith Johnson Lowry
Assistant United States Attorney
601 NW Loop 410, Suite 600
San Antonio, Texas 78216-5597
Texas Bar No. 24099560
faith.johnson@usdoj.gov
Tel. (210) 384-7355
Fax. (210) 384-7358

Attorneys for Defendant