United States District Court
Western District of Texas
San Antonio Division

C.M. on his own behalf and on behalf of his
minor child, D.V.,

     Plaintiffs,

v.

United States of America,

     Defendant.

Case No. SA-21-CV-00234-JKP-ESC

<u>Plaintiffs' Opposition to United States' Motion to Dismiss</u>

Plaintiffs C.M. and D.V. respectfully request that the Court deny the United States' motion to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim. As discussed below, Plaintiffs' claims are not jurisdictionally barred because the United States has waived sovereign immunity through the Federal Tort Claims Act, and Plaintiffs state claims under Texas law upon which relief may be granted.

# TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................................ 2

   A.  The Government's family-separation practices. ................................................ 2

   B.  A U.S. district court holds that the Government's family-separation practices are   likely unconstitutional and enjoins them. .......................................................... 5

   C.  C.M. and D.V.'s separation. ............................................................................. 7

III.  ARGUMENT ............................................................................................................... 11

   A.  Legal Standard ................................................................................................. 11

   B.  The discretionary function exception does not apply here. ............................. 12

     1.  C.M. and D.V.'s separation was not a discretionary act because it violated the Constitution. ................................................................................................ 13

     2.  Plaintiffs are not required to show that their constitutional right to family integrity was clearly established. ................................................................... 20

     3.  Separating C.M. and D.V. was not based on considerations of public policy. .......... 22

     4.  The Government mischaracterizes Plaintiffs' challenge to the Government's separation of C.M. and D.V. ....................................................................... 23

   C.  The due care exception does not shield the Government from liability for Plaintiffs' claims. ......................................................................................... 25

     1.  The Government was not executing a statute or regulation when it separated C.M. and D.V. ............................................................................................ 26

     2.  The Government did not exercise due care when separating C.M. and D.V. ........... 27

   D.  Plaintiffs have satisfied the private person analog requirement. ..................... 29

   E.  Plaintiffs have stated claims under state law and no privilege applies ........... 31

     1.  Plaintiffs' claims do not challenge privileged conduct. ............................... 31

       a.  The Government identifies no privilege that precludes FTCA liability for the family separation claims in this case. ................................................... 32

       b.  The use of force privilege does not bar Plaintiff C.M.'s battery claim. ........ 34

     2.  Plaintiffs have stated a claim for intentional infliction of emotional distress. .......... 36

     3.  Plaintiffs have stated a claim for negligence. .............................................. 39

IV.  CONCLUSION ............................................................................................................ 40

## I.      INTRODUCTION

Plaintiffs C.M. and his minor son D.V. bring this case under the Federal Tort Claims Act, 28 U.S.C. §1346(b) *et seq*., ("FTCA"), to recover money damages for the horrific abuse they experienced in 2018 at the hands of the United States Government after crossing the U.S.-Mexican border and requesting asylum. C.M. and D.V. were subjected to physical and verbal abuse and threats. They were told that D.V. would be put up for adoption because of his father's asylum claim, and that they would never see each other again. C.M. and D.V. were then separated for months without any legitimate law enforcement or child welfare purpose. D.V. was sent to a facility where he endured physical and emotional abuse, and C.M. was held in custody and denied any contact with his son until he agreed to withdraw his asylum claim. The Government's conduct here was unconstitutional, caused Plaintiffs terrible psychological injury, and (as several courts have already held) was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Ms. L. v. U.S Immigration and Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1145-46 (S.D. Cal. 2018), *modified* 330 F.R.D. 284 (S.D. Cal. 2019), *and enforcement granted in part, denied in part sub nom. Ms. L. v. U.S. Immigration and Customs Enf't ("ICE")*, 415 F. Supp. 3d 980 (S.D. Cal. 2020) ("*Ms. L. I*").

The FTCA provides Plaintiffs with a means to recover for the injuries they experienced. Through the FTCA, the Government has waived its sovereign immunity from suit in circumstances where, as here, state law provides a remedy for similar conduct committed by a private person instead of the Government. In short, Plaintiffs have satisfied all the requirements to invoke the FTCA, and there are no applicable exceptions.

Over the past 24 months, courts addressing motions to dismiss FTCA claims involving the Government's border separation policy have rejected most of the arguments the Government

1

now advances. *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020), *motion to certify appeal denied*, No. CV-19-05217-PHX-SRB, 2020 WL 5232560 (D. Ariz. July 6, 2020); *A.P.F. v. United States*, 492 F. Supp. 3d 989 (D. Ariz. 2020); *Nunez Euceda v. United States*, No. 220CV10793VAPGJSX, 2021 WL 4895748 (C.D. Cal. Apr. 27, 2021); *A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543 (D. Ariz. Mar. 31, 2022). These courts have found that the "discretionary function" exception does not bar Plaintiffs' claims because the challenged conduct violated the U.S. Constitution and there is no "element of judgment or choice" or "public policy considerations" in doing so. They have also found that the "due care exception" does not apply, since family separations were conducted pursuant to executive policy; no statute or regulation mandated this course of action.

Finally, Plaintiffs have pled all the elements of claims for intentional infliction of emotional distress and negligence under Texas law, and a "private person analogue" to the Government's conduct does exist: abuse committed against nursing home residents. In Texas, private nursing homes are liable for torts like negligence and intentional infliction of emotional distress arising out of their mistreatment of persons committed to their care. Accordingly, the Government's motion to dismiss Plaintiffs' Complaint should be denied.

## II.    STATEMENT OF FACTS

### A.  The Government's family-separation practices.

Between the summer of 2017 and June 26, 2018, the United States separated thousands of children from their parents who crossed the U.S.-Mexico border. Compl. ¶ 16. The purpose of this executive policy ("Family Separation Policy") was to cause enormous suffering and harm to these migrants, thereby deterring them and others from seeking asylum in the United States. *Id.* The Family Separation Policy violated the Constitution and statutory and common law. *Id.*

Prior to the creation and expansion of the Family Separation Policy, parents and children were detained together (if at all) when federal immigration officials apprehended parents with their children. *See* Compl. ¶ 28. For example, when DHS apprehended adults with children crossing the border, DHS typically detained and administratively removed the adults and children together under civil immigration proceedings or would provide the family unit adult with a Notice to Appear before an Immigration Judge and then release the family to remain in the United States until the adult's immigration hearing date. *Id.* This long-standing DHS practice of deferring to civil immigration proceedings and enforcement, rather than having the DOJ criminally prosecute adults entering the United States with children as a family unit, was related to legal concerns about separating children from their family during the pendency of the parent's prosecution. *Id.*

When the U.S. Government began its Family Separation Policy in 2017, it knew that it would cause harm. *See* Compl. ¶¶ 19–23. For example, in 2016, the DHS Advisory Committee on Family Residential Centers concluded that "separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members." *Id.* ¶ 19. Commander Jonathan White, former Deputy Director of the Office for Refugee Resettlement ("ORR") for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, in early 2017, he warned the Government that the Family Separation Policy "would be inconsistent with [the Government's] ***legal requirement*** to act in the best interest of the child and would expose children to unnecessary risk of harm." *Id.* ¶ 20. He also cautioned that the policy would "exceed the capacity" of ORR's program "to provide a safe and appropriate environment to every child" and would "particularly exceed [their] capacity" to provide care to children under

the age of 12, who are supposed to be housed in specially licensed facilities. *Id.* White also acknowledged in his testimony that "separation of minors from their parents involves a risk of severe psychological trauma." *Id.* [T]he American Academy of Pediatrics (AAP) publicly opposed the Family Separation Policy and warned that proposals to separate children from their families "as a tools of law enforcement to deter immigration are harsh and counterproductive." *Id.* ¶ 21. In another policy statement, the AAP cautioned that "separation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for safety of the child at the hand of [the] parent." *Id.* ¶ 22.

Despite these and other warnings, in 2017, the U.S. Government began a yearlong initiative to deter potential migrants (including migrants lawfully seeking asylum) on the Southwest border by forcibly separating families. Compl. ¶ 23. On April 11, 2017, the Attorney General, Jeff Sessions, issued a memorandum instructing federal prosecutors to prioritize prosecution of certain immigration offenses, including misdemeanors that had not previously been an enforcement priority. *Id.* ¶ 24. Under these policies, the Government prioritized the prosecution of misdemeanor charges of improper entry under 8 U.S.C. § 1325, including the prosecution of parents who crossed the border into the United States with young children. *Id.* With the increased prosecution of parents came the practice of separating children from their parents. *See id.*

The first known, widespread implementation of the Family Separation Policy stemming from Sessions' April 2017 memorandum was in the El Paso sector, which includes the USAO of the Western District of Texas and the District of New Mexico. Compl. ¶ 25. From July through November 2017, the El Paso sector of CBP (an agency within DHS) implemented new policies that resulted in approximately 280 individuals in families being separated. *Id.* Under these

policies, the Government prioritized the prosecution of misdemeanor charges of improper entry under 8 U.S.C. § 1325, including the prosecution of parents who crossed the border into the United States with young children. *Id.* When a child and parent were apprehended together by immigration authorities, DHS separated the family, with the parent being placed in the custody of the U.S. Marshals Service within the DOJ to await prosecution for immigration offenses. *Id.* The child was then erroneously treated as an unaccompanied minor and transferred to the ORR. *Id.*

The specific intention of the Government in creating, piloting, and broadening the Family Separation Policy was to cause severe trauma and harm to ultimately deter families from migrating to the United States. *See* Compl. ¶¶ 29-31. For example, a December 2017 joint DOJ and DHS memorandum noted that the "prosecution of family units," resulting in separation, "would be reported by media and . . . have substantial deterrent effect" on future migration. *Id.* ¶ 29. On May 11, 2018, John Kelly, President Trump's then-Chief of Staff, stated on NPR that "a big name of the game is deterrence . . . . It could be a tough deterrent—would be a tough deterrent." *Id.* When the interviewer asked about whether it was "cruel and heartless" to take a parent away from their children, he replied, "[t]he children will be taken care of—put into foster care or whatever." *Id.* And on June 19, 2018, Steve Wagner, Assistant Secretary of HHS said, "[w]e expect that the new policy will result in a deterrence effect . . . ." *Id.*

### B. A U.S. district court holds that the Government's family-separation practices are likely unconstitutional and enjoins them.

In June of 2018, a district court enjoined the U.S. Government's Family Separation Policy and practice and found that a plaintiff class, comprised of class members like C.M. and D.V., was likely to succeed on their claim that the U.S. Government violated migrant families' due process rights to family integrity through implementation of the Family Separation Policy.

Compl. ¶ 74 (citing to *Ms. L. I,* 310 F. Supp. 3d at 1149). The district court ordered that the U.S.

Government cease detaining migrant parents apart from their minor children absent a

determination that the parent is unfit or presents a danger to the child. Compl. ¶ 74. In reaching

this holding, the district court observed that the U.S. Government separated families without an

effective system or procedure for tracking children after they were separated, without enabling

communication between the parents and children, and without reuniting the parents and children,

***even after the parents returned to immigration custody following or completing criminal***

***sentences***. *Id.* ¶ 75. The district court found these practices "so egregious, so outrageous, that it

may fairly be said to shock the contemporary conscience." *Id.* (citing to *Ms. L. I*, 310 F. Supp. 3d

at 1145). C.M. and D.V. were subjected to these practices, as described below. The plaintiff class

later moved to enforce the preliminary injunction. *Ms. L. I*, 415 F. Supp. 3d 980. In granting

Plaintiffs' motion in part, the Court noted that being charged and convicted of illegal entry into

the U.S. under 8 U.S.C. § 1325 was not a basis for exclusion from the class. *Id.* at 994.

Indeed, one of the named Plaintiffs –Ms. C.—was prosecuted under 8 U.S.C. § 1325 and

served a 25-day sentence for illegal entry. *Ms. L. v. U.S. Immigration & Customs Enf't ("ICE",)*,

302 F. Supp. 3d 1149, 1155 (S.D. Cal. 2018) ("*Ms. L. II*"). Like the Plaintiff father here, Ms. C.

completed her sentence and was transferred to ICE detention "for removal proceedings and

consideration of her asylum claim." *Id.* During the five months that she was detained, she did not

see her son. *Id.* In denying the Government's motion to dismiss the plaintiffs' due process claim

for family integrity, the district court summarized:

> [I]t is important to note what Plaintiffs do not challenge. They do not challenge the
> Government's initial separation of parent and child when the parent is arrested for
> violating the nation's criminal laws. Nor do Plaintiffs challenge the Government's
> decision to separate families when there are legitimate questions regarding parentage,
> fitness, or danger to the child. Nor do they challenge the Government's powers to deport
> or detain aliens. What Plaintiffs challenge is the Government's separation of migrant

parents and their minor children when both are held in immigration detention and when there has been no showing the parent is unfit or poses a danger to the child. Plaintiffs assert separation of parents and minor children under such circumstances violates their due process rights.

*Id.* at 1162 (S.D. Cal. 2018)

Thus, as to Ms. C., the district court noted that her claim was based on "the continued separation from her child….during removal proceedings." *Ms. L. II*, 302 F. Supp. 3d at 1164. In evaluating whether the plaintiffs had alleged a violation of due process rights to family integrity, the district court acknowledged that "[a] policy of family separation to serve 'ulterior law enforcement goals' admittedly would be 'antithetical to the child welfare values' imposed on government actors by the TVPRA." *Id.* at 1166 (S.D. Cal. 2018) (citing to the Government's opposition for internal quotes). As noted above, the district court ultimately found that plaintiff parents like Ms. C. were not excluded from the class on the basis of their 8 U.S.C. § 1325 conviction.

**C.  C.M. and D.V.'s separation.**

C.M. and D.V. fled Honduras for the United States to seek safety and asylum from extortion by gangs, corrupt police that would not protect them, and the threat of violence that had been directed against them and their family in Honduras. Compl. ¶ 32. On March 9, 2018, C.M. and D.V. were taken into custody at the Eagle Pass, Texas port of entry. *Id.* ¶ 33. C.M. requested asylum from U.S. Customs and Border Protection (CBP) agents at the border as soon as he encountered them. *Id.* The agents immediately began mistreating C.M. and his young son, including calling them "bastards," baselessly accusing C.M. of using his son to smuggle drugs, and stating that D.V. would be taken from his father and put up for adoption. *Id.* ¶ 34. The agents violently forced C.M. to the ground and struck him in the neck, causing a neck injury. *Id.* ¶ 35.

After being taken into custody, C.M. and D.V. were detained in a holding center. Compl. ¶ 36. Because of its cold temperature, the holding center where C.M. and D.V. were held is commonly called "the icebox" ("la hielera") by asylum seekers. *Id.* ¶ 37. CBP held C.M., D.V., and other asylum seekers in this frigid facility in violation of the Government's own internal policies. *Id.* Before placing C.M. and his child in the hielera, agents took his outer clothing, and as a result, he had no way to try to keep himself or D.V. warm. *Id.* ¶ 38. Once in the hielera, C.M. became so cold that he physically shook, yet agents refused his requests for warmer clothing for either himself or his son. Instead, agents informed C.M. that the cold temperature was intended as a punishment. *Id.* ¶ 39. C.M. and D.V. were held in the hielera for approximately two days, along with approximately 20 other adults and children. *Id.* ¶ 40. C.M. did not receive medical treatment for his neck injury, despite the bruising and pain it caused. *Id.* ¶ 43. While there, agents told C.M. that they would deport him and place D.V. up for adoption in the United States. *Id.* ¶ 45. The also agents told C.M. that he would only see his son again once D.V. turned eighteen and was old enough to be deported as well. *Id.*

After C.M. and D.V. had been in the hielera for approximately 48 hours, agents announced in Spanish that all parents should "say goodbye" to their children. Compl. ¶ 46. The agents said the children were being taken and placed for adoption in the United States. *Id.* After hearing that he would be permanently taken from his family, D.V. began crying, clung tightly to C.M., and pleaded with his father not to abandon him. *Id.* ¶ 47. An agent removed D.V. from C.M.'s arms, told them that they would never hear from each other again, and said their permanent separation was due to C.M.'s decision to come to the United States. *Id.* ¶ 48. As agents took his child, C.M. was overwhelmed with worry for his son's safety and whether D.V. would be mistreated or adopted while they were apart. *Id.* ¶ 49.

After agents separated C.M. and D.V., they transported C.M. to the Val Verde ICE detention facility ("Val Verde") in Val Verde County, Texas. *Id.* ¶ 50. During his approximately two weeks in the Val Verde detention center, agents failed to provide C.M. any information about where D.V. had been taken or what would happen to him, despite his requests. *Id.* ¶¶ 51. 53. The lack of any information about his son's location and condition caused C.M. severe emotional distress. *Id.* ¶ 53. Other than the U.S. Government's family separation policy, there was no basis for the prolonged separation of C.M. and D.V. For example, in conducting and maintaining the separation, the U.S. Government did not allege or make any showing that C.M. was unfit to care for or posed a danger to D.V., nor did C.M. have a criminal or medical history warranting separation. *Id.* ¶ 54.

On May 3, 2018, C.M. participated in a telephonic Credible Fear Interview ("CFI"). Compl. ¶ 55. C.M. did not have the opportunity to consult with an attorney to prepare for the CFI, nor was an attorney present at the CFI to aid him. *Id.* ¶ 56. During the CFI, C.M. repeatedly begged for any information about D.V.'s safety or location. *Id.* ¶ 57. However, the agent conducting the interview failed to provide C.M. with any information at all about his son. *Id.* C.M. was extremely distressed and wept during the interview. *Id.* His anguish at the then-approximately two-month separation from his son by U.S. officials and their subsequent refusal to provide any information about D.V. left him unable to respond coherently to the questions asked during his CFI. *Id.* Nonetheless, he did convey to the official conducting the interview that he faced threats to his life by gangs in Honduras. *Id.* Due to the emotional distress C.M. suffered because of his separation from D.V., he was unable to participate meaningfully in his CFI. *Id.* ¶ 58. At the end of the CFI, the agent asked C.M. to sign a document. C.M. was unable to read the document because it was written in English. *Id.* ¶ 59. From what the interpreter said, it was

C.M.'s understanding that the purpose of the document was to reschedule the CFI. *Id.* The agent

had actually provided C.M. with a document to "Request for Dissolution of Credible Fear

Process," which waived his claim to asylum. *Id.* ¶ 60. Soon thereafter, C.M. was transferred to

the South Texas Detention Complex. *Id.* ¶ 61. It was only then, approximately three months after

first being separated from D.V., that C.M. was finally provided with limited phone access to his

son. *Id.* He was also informed that D.V. was being held at a shelter home for migrant children in

Michigan. *Id.*

 After being separated from his father, D.V. was taken to a facility where he was

physically and emotionally abused. Compl. ¶ 62. While held at the facility, the facility

employees responsible for D.V.'s care limited his ability to speak with his mother, and D.V. was

not able to speak with his father. *Id.* One or more of the facility employees punished D.V. when

he cried for his family by locking him up in a room that he called the "dark room." *Id.* On at least

one occasion, an adult at the facility physically struck D.V. when he cried for his mother, and

adults at the facility threatened to place D.V. up for adoption in response to him crying for his

mother. *Id.* ¶ 63. D.V. was also subjected to physical and verbal attacks by other children at the

facility, and the adults responsible for the facility failed to protect him from this abuse by other

children. *Id.* Eventually, D.V. was moved to a facility in Michigan. *Id.* ¶ 64.

 C.M. and D.V. were separated from approximately March 8, 2018, until early July of

2018. Compl. ¶ 66. On July 9, 2018, C.M. and D.V. were reunited at the airport in Baltimore,

Maryland, placed on a plane, and deported to Honduras. *Id.*

 The emotional distress and trauma caused by federal officials' forcibly separating D.V.

from his father and exposing him to physically and emotionally abusive treatment in the

detention facilities negatively impacted D.V.'s social interactions, educational capabilities, and

other daily activities. Compl. ¶ 69. D.V. is more timid and fearful at school. *Id.* ¶ 70. He also has difficulty sleeping throughout the night. *Id.* He wakes in the middle of the night and cries about the memories he has from his experience at the facilities in the United States. *Id.* D.V. also struggles to sleep in the dark because it reminds him of being kept in the dark room as punishment at the facility in the United States. *Id.* Indeed, scientific and medical evidence shows that the trauma caused by separating a child from his parent is likely to have extraordinarily harmful and long-lasting effects on the child's development. *Id.* ¶ 68 (citing to peer reviewed articles, including those directly addressing the trauma of the Government's Family Separation Policy). Research shows that such trauma can cause permanent emotional, behavioral, and overall health problems, including, but not limited to, anxiety, depression, PTSD, and developmental delay. *Id.*

## III.   ARGUMENT

### A.  Legal Standard

Defendant moves to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). On a motion to dismiss, the "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)("[T]his suggestion that the Court should dissect the complaint and examine every single allegation seriatim is misguided."). Evaluation of a complaint upon a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Raj v. Louisiana State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013)(quoting *Ramming*

*v. United States,* 281 F.3d 158, 161 (5th Cir.2001)). Plaintiffs' causes of action arise under the FTCA. While the Government is generally immune from liability absent its consent*, U. S. v. Mitchell*, 445 U.S. 535, 538 (1980), the FTCA provides that consent "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *United States v. Olson*, 546 U.S. 43, 44 (2005) (quoting 28 U.S.C. § 1346(b)(1)). The FTCA's waiver of sovereign immunity contains a number of exceptions. When construing an exception a court should "identify 'those circumstances which are within the words and reason of the exception'" *Joiner v. United States*, 955 F.3d 399, 404 (5th Cir. 2020)(quoting Kosak v. United States, 465 U.S. 848, 853 n.9 (1984)). "'[U]nduly generous interpretations of the exceptions [to the FTCA] run the risk of defeating the central purpose' of the FTCA." *Id.* (internal quotations omitted). The Court "do[es] not construe exceptions to the FTCA in favor of any particular party." *Id.*

On a 12(b)(6) motion to dismiss, "[t]he court must accept 'all well-pleaded facts in the complaint as true and viewed in the light most favorable to the plaintiff.'" *Cobos v. Bluefin Water Sols., LLC*, No. 21-CV-00072-DC-DF, 2022 WL 847235, at *2 (W.D. Tex. Mar. 22, 2022) (quoting *Raj*, 714 F.3d at 327) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

### B.  The discretionary function exception does not apply here.

The Government first argues that its actions are protected by the discretionary function exception ("DFE"), which bars claims that (1) "involve an element of judgment or choice," and (2) are "based on considerations of public policy." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). The Government must make both showings. It can make neither.

**1.   C.M. and D.V.'s separation was not a discretionary act because it violated the Constitution.**

The weight of authority in the circuit courts is that unconstitutional conduct is not shielded by the DFE. *See Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009) ("It is elementary that the discretionary function exception does not immunize the government from liability for actions proscribed by federal statute or regulation. Nor does it shield conduct that transgresses the Constitution.") (internal citations omitted); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) ("We must also conclude that the FBI's alleged surveillance activities fall outside the FTCA's discretionary-function exception because [plaintiff] alleged they were conducted in violation of his First and Fourth Amendment rights."); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) (noting that the starting point of the discretionary function exception analysis is that "federal officials do not possess discretion to violate constitutional rights or federal statutes") (quoting *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)); *Nurse v. United States*, 226 F.3d 996, 1002 & n.2 (9th Cir. 2000) ("governmental conduct cannot be discretionary if it violates a legal mandate," including violating the Constitution); *Prisco v. Talty*, 993 F.2d 21, 26 n. 14 (3d Cir.1993) (concluding that the discretionary function exception was inapplicable to an FTCA claim based on conduct that violated plaintiff's constitutional rights); *Loumiet v. United States*, 828 F.3d 935, 944 (D.C. Cir. 2016)("Although the discretionary-function exception shields government policymakers' lawful discretion to set social, economic, and political policy priorities from judicial second-guessing via tort law, there is no blanket exception for discretion that exceeds constitutional bounds."); *Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975)(" It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.")

The Fifth Circuit has not directly addressed this issue. *See Spotts v. United States*, 613 F.3d 559, 569 (5th Cir. 2010) ("This court has not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function exception."). However, in *Sutton v. United States*, the circuit court noted in dicta that it has "not hesitated to conclude that such action does not fall within the discretionary function of § 2680(a) when governmental agents exceed the scope of their authority as designated by statute or the Constitution." Likewise, district courts in this circuit have found that violations of the Constitution are not shielded by the DFE. *McElroy v. United States*, 861 F. Supp. 585, 593 (W.D. Tex. 1994) ("[I]f a specific and intelligible constitutional mandate exists that is related to the alleged torts of the government agency, the Court will conclude that such action occurred during the performance of a function divested of discretion. In such an instance, therefore, the discretionary function exception will be inapplicable."); *Rogers v. United States*, 187 F. Supp. 2d 626, 633–34 (N.D. Miss. 2001) (quoting *McElroy* and analyzing whether the Fifth Amended violation in question was "specific and intelligible").[1]

Every court to consider the question has found that the Government's family separation policy likely violated the Constitution. *Ms. L. I*, 310 F. Supp. 3d at 1145 (S.D. Cal. 2018) ("This

---

[1] To the extent that the Government suggests that plaintiffs have alleged "constitutional tort claim(s)" (Mot. at 27), the Government is incorrect. Plaintiffs are alleging state law tort claims through the FTCA; however, the Government's conduct also violated the Constitution, which removes the conduct from the DFE. Courts have easily understood this distinction. *See e.g. Limone*, 579 F.3d at 102 n. 13 ("[W]e do not view the FBI's constitutional transgressions as corresponding to the plaintiffs' causes of action—after all, the plaintiffs' claims are not *Bivens* claims—but rather, as negating the discretionary function defense.") (citing to *Bolduc v. United States*, 402 F.3d 50, 56 (1st Cir. 2005)("Federal constitutional or statutory law cannot function as the source of FTCA liability.")). Indeed, the district court in *A.I.I.L.*, another family separation case under the FTCA, recently rejected the Government's attempt to recast family separation claims as "constitutional tort" claims. 2022 WL 992543, at *8.

practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim."); *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) ("[T]he Court easily concludes that Ms. Jacinto-Castanon and her sons are likely to succeed on at least one of their claims – namely their substantive due process claim that their continued separation, absent a determination that Ms. Jacinto-Castanon is either an unfit parent or presents a danger to her sons, violates their right to family integrity under the Fifth Amendment"); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018)("The Government has not challenged the California Order, and the parties agree that a constitutional violation occurred when the Government separated children from their parents—both on the basis of substantive due process, as the separation deprived the children of their right to family integrity, and procedural due process, as J.S.R. and V.F.B. were given no notice and no fair opportunity for a hearing before being separated from their parents.").

And every Court that has considered whether this likely unconstitutional conduct falls outside of the DFE has found that the DFE does not shield the separation of the plaintiff families under similar circumstances. *C.M. v. United States*, 2020 WL 1698191, at *4, *motion to certify appeal denied*, 2020 WL 5232560 ("Plaintiffs have plausibly alleged that the government's separation of their families violated their constitutional rights, which is not shielded by the discretionary function exception."); *A.P.F. v. United States*, 492 F. Supp. 3d at 996 (same); *Nunez Euceda v. United States*, 2021 WL 4895748, at *3 (same); *A.I.I.L. v. Sessions*, 2022 WL 992543, at *4 ("Plaintiffs have plausibly alleged that the government's conduct violated their

constitutional rights," even if "some Plaintiff-Parents had a criminal history which the government could properly consider.")[2]

The Court should not reach a different result here. Indeed, "[t]he rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." *Romero v. Brown*, 937 F.3d 514, 519 (5th Cir. 2019) (quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972)). "[A] parents' right to 'care, custody, and control of their children' is 'perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court.'" *Id.* (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion). "Because a parent's custody and control of her children is a fundamental liberty interest, the government may violate substantive due process when it takes away that right." *Id.*[3]

To determine whether a substantive due process violation has occurred, a court should inquire if the "[b]ehavior of the governmental officer [was] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). The allegations here easily meet this standard. Plaintiffs, a father and his child, initially sought refuge in the United States as asylees who were fleeing extortion by gangs, corrupt police, and threats of violence directed against them and their family. Compl. ¶32 But upon arrival in the U.S., their protectors became their persecutors. They were detained and kept in a holding center that was so cold detainees called it "the icebox." *Id.* ¶ 37. Agents took

---

[2] The government relies on *Peña Arita v. United States*, 470 F. Supp. 3d 663, 690 (S.D. Tex. 2020); however, there, plaintiffs did not argue, and the district court did not consider, whether the unconstitutionality of the Family Separation Policy made the DFE inapplicable.

[3] The Government appears to be arguing that *no* Constitutional conduct could provide a basis for an FTCA claim because constitutional directives are not "specific" enough, even where the Constitution speaks of "due process," and certain due process rights – like the right to family integrity – are "among the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *See* Mot. 18-19. That is not— and cannot—be the law. *See supra* at 13. *See also Ms. L. I*, 310 F. Supp. 3d at 1145.

Plaintiffs' outer clothing, such that they did not have a means to keep themselves warm. *Id.* ¶ 38. Plaintiffs physically shook, and asked for warmer clothing; instead, agents informed them that the cold temperatures were punishment. *Id.* ¶ 39. During the two days that Plaintiffs suffered under these conditions, immigration officials called C.M. and D.V. names, cursed at them, and blamed them for their mistreatment, saying that it was a result of their "choice for leaving [their] country." *Id.* ¶¶ 40-44. After two days, agents announced that parents should "say goodbye" to their children, and that their children would be put up for adoption in the United States. *Id.* ¶ 46. D.V. began crying and clung tightly to C.M. while pleading with him not to leave him. *Id.* ¶ 47. The agent that removed D.V. told Plaintiffs that they would never hear from each other again, and that their permanent separation was due to C.M.'s decision to come to the United States. *Id.* ¶ 48. Agents then transported C.M. to the Val Verde detention center, where they failed to provide C.M. with any information about where D.V. had been taken or what would happen to him. *Id.* ¶¶ 51-52.  On May 3, 2018, C.M. participated in a credible fear interview (CFI). *Id.* ¶ 55. He did not have the opportunity to consult with an attorney to prepare, and during the CFI he repeatedly begged for information about D.V.'s safety, which was not provided to him. *Id.* ¶¶ 56-57.  C.M.'s anguish at the then-approximately two-month separation from his son by U.S. officials and their subsequent refusal to provide any information about D.V. left him unable to respond coherently to the questions asked during the CFI. *Id.* at ¶ 57.  At the end of the CFI, the agent asked C.M. to sign a document, which C.M. understood was to reschedule his interview. *Id.* at ¶ 59. The form was actually a "Request for Dissolution of Credible Fear Process," which waived C.M.'s claim for asylum. *Id.* ¶ 60. Approximately three months after being first separated from D.V., C.M. was finally provided with limited phone access to his son. *Id.* at ¶ 61. He was also informed that D.V. was being held at a shelter home for migrant children in Michigan. *Id.*

Prior to being transferred to Michigan, D.V. was placed in another facility where an adult

physically struck him when he cried for his mother and threatened to placed D.V. up for adoption.

*Id.* at ¶ 63. Despite being released from detention and returned to immigration custody on April

3, 2018 (*see* Dkt. 20-4, ¶ 5) C.M. and D.V. remained separated for over three more months, until

July 9, 2018, when they were reunited and removed together. *Id.* at ¶ 17.

> Upon considering these same practices, the Southern District of California held:
> These allegations sufficiently describe government conduct that arbitrarily tears at the
> sacred bond between parent and child, and is emblematic of the "exercise of power
> without any reasonable justification in the service of an otherwise legitimate
> governmental objective[.]" . . . Such conduct, if true, as it is assumed to be on the present
> motion, is brutal, offensive, and fails to comport with traditional notions of fair play and
> decency. At a minimum, the facts alleged are sufficient to show the government conduct
> at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family
> integrity.

*Ms. L. II*, 302 F. Supp. 3d at 1167 (citation omitted).

The Government's conduct also violated procedural due process. "[The Due Process

Clause] requires that the state follow certain procedures before encroaching on those

parental rights." *Romero*, 937 F.3d at 521. "The [procedural due process] rule is this: A child

cannot be removed 'without a court order or exigent circumstances.'" *Id.* No such Court order or

exigent circumstances were present here. As the district court in *Ms. L.* recognized, even if the

Government may have had grounds to keep parents separated from their children during their

short sentences under 8 U.S.C. § 1325, there was no grounds to continue that separation

afterwards. *Ms. L. II*, 302 F. Supp. 3d at 1164 (noting that Ms. C., who served a 25-day sentence

under 8 U.S.C. § 1325, was on "equal footing" with Ms. L. for pursuing her due process claim,

which was based on "the continued separation from her child."). Indeed, the Government has

provided no explanation, nor demonstrated *any* process, for C.M. and D.V.'s three-month

separation after C.M.'s sentence was served. The Government's sole explanation is that agents

decided to house C.M. and D.V. separately. Mot. at 22-23. As the Court in *J.S.R. by & through*

*J.S.G.* recognized, the Government's continued separation of the plaintiff family lacked "a compelling reason for depriving the children of their family integrity—depriving them of their primary and only consistent source of support." 330 F. Supp. 3d at 741–42. Nor did the Government show that "its [separation] policy was narrowly tailored to achieve that compelling reason."

The Government's cases to the contrary are inapposite. For example, *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210 (4th Cir. 2019) involved non-citizen parents who were transferred away from their U.S.-resident children. *Reyna* did not involve families that were detained *together* and then unlawfully separated as part of the immigration process. *See also Ms. L. II*, 302 F. Supp. 3d at 1163 (considering and rejecting the comparison of family separation cases with cases where non-citizen parents are detained away from their U.S.-resident children). Indeed, in *United States v. Dominguez-Portillo*, which the Government also cites, the district court acknowledged that the separated migrant families' "constitutional rights to familial association may be implicated." No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *6 (W.D. Tex. Jan. 5, 2018). However, there, the Defendant parents were seeking the dismissal of their criminal charges, and the district court found that the records in the case was "slim" such that the "high burden required under the outrageous government conduct doctrine" had not been met to warrant dismissal. *Id.*

Nor does the *Flores* settlement give the Government discretion to separate parents and children, even when parents were charged with illegal entry. *See* Mot. at 6-7. Rather, the central goal of the *Flores* settlement was to protect the best interests of children; the settlement cannot plausibly be read to require forcible separation of children from parents. *See Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 501 ("[T]he fact that Ms. Jacinto-Castanon may be subject to

19

some form of immigration detention does not explain why she must be detained separately from

her sons. The same goal of detention can be accomplished, for example, by temporarily detaining

families together in family residential facilities."); *Ms. L. I*, 310 F. Supp. 3d at 1144 (finding

practice of separating families was implemented without a system for "reuniting the parents and

children after the parents are returned to immigration custody following completion of their

criminal sentence"); *see also Flores v. Sessions*, No. CV 85-4544, 2018 WL 4945000, at *3–4

(C.D. Cal. July 9, 2018) (holding that *Flores* did not require government to separate detained

parents and children and rejecting the Government's argument that it could not comply with the

*Ms. L.* order of reunification and the *Flores* settlement requirements).

In sum, to hold that the DFE applies, the Court would need to conclude—at this early

stage of the case, when the Court must accept Plaintiffs' allegations as true and draw all

reasonable inferences in their favor—either that the Government's separation of the Plaintiff

family was constitutional or that the DFE applies notwithstanding the likely unconstitutionality

of that conduct. If this Court were to reach either conclusion, it would be the first. The uniform

weight of authority—*C.M.*, *A.P.F.*, *Nunez Escueda*, and *A.I.I.L.* —all hold that allegations of this

type plausibly allege a constitutional violation.

### 2. Plaintiffs are not required to show that their constitutional right to family integrity was clearly established.

The Government attempts to create entirely new law by urging the Court to hold that the

United States has discretion to violate a constitutional right unless the right was "clearly-

established" when the violation occurred. Mot. at 27-28. That is a standard that courts apply

when considering qualified immunity defenses in *Bivens* suits against government officials in

their individual capacity,[4] not when considering the DFE in suits against the Government arising under the FTCA, and it is an improper standard to apply to FTCA litigation.

The weight of circuit authority is that the DFE does not apply where Plaintiffs' allegations, if taken as true, demonstrate that Government officials violated their constitutional rights, even if the relevant constitutional rights were not "clearly established" at the time of the conduct. *See Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (reversing a district court's dismissal of FTCA claims even though it could "[]not determine at th[at] stage of the proceedings whether the acts of the . . . defendants violated the Constitution, and, if so, what specific constitutional mandates they violated," and also finding that "the level of specificity with which a constitutional proscription must be articulated in order to remove the discretion of a federal actor" was better decided "as [a] case proceeds toward trial," not on a motion to dismiss."); *Limone v. United States*, 579 F.3d 79, 101–02 (1st Cir. 2009) (only examining whether the challenged conduct was unconstitutional; the court did not also evaluate whether the unconstitutional conduct was "clearly established"); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (same); *Loumiet v. United States*, 828 F.3d 935, 946 (D.C. Cir. 2016) (same).

In *Loumiet,* the D.C. Circuit observed that it had "found no precedent in any circuit holding" that "principles similar to those that undergird qualified immunity should extend to preserve discretionary-function immunity for some unconstitutional acts." 828 F.3d at 946. The policy considerations that animated the "clearly established" standard in qualified immunity cases simply do not apply to FTCA claims. "[T]he premise of qualified immunity is that state officials should not be held liable" (by which the court means personally liable) "for money

---

[4] The government cites qualified immunity cases without alerting the Court to their inapplicability here. *E.g.,* Mot. at 27 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and *Wilson v. Layne*, 526 U.S. 603, 614–615 (1999)).

damages absent fair warning that their actions were unconstitutional," which is why constitutional rights must be "clearly established" before they are actionable. *Sandoval v. County of San Diego*, 985 F.3d 657, 674 (9th Cir. 2021), *cert. denied*, 142 S.Ct. 711 (2021). But that premise is inapplicable here, where the Government, not individual officials, bears liability. Thus, there is no legal basis to apply qualified immunity standards to Plaintiffs' claims.[5]

### 3.   Separating C.M. and D.V. was not based on considerations of public policy.

Regardless of whether the Government's conduct qualified as discretionary—which it was not—the Government has failed to demonstrate that the forcible, prolonged separation was "grounded in social, economic, and political policy." *Gaubert*, 499 U.S. at 323 (internal quotations omitted).

The Government's separation of Plaintiffs was not based on legitimate social, economic, or political policy considerations. In general, there are very few legitimate reasons to forcibly separate parent from child. The "cruelty of . . . separation of a parent and child by the government" is only justified "in the most dreadful circumstances," such as when the parent is "unwilling or unfit" to care for the child—circumstances that are not present here. *D.J.C.V. v. U.S. Immigration & Customs Enf't*, No. 18 Civ. 9115 (AKH), 2018 WL 10436675, at *1 (S.D.N.Y. Oct. 15, 2018). Unsurprisingly, courts that have evaluated the Government's practice of separating families at the border have been unable to discern any legitimate governmental objective the practice served. The *Ms. L. II* court, for example, concluded that separating families

---

[5] In the only FTCA case that the government cites – *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019)—the *plaintiffs* argued that the "clearly established" standard applied to their FTCA claim. The Third Circuit had already determined that plaintiffs' *Bivens* claims failed under this standard; therefore, it concluded, without any analysis regarding the applicable test, that "for the reasons set out above, the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail."

at the border was "emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective." *Ms. L. II*, 302 F. Supp. 3d at 1167 (internal quotation marks omitted). Tellingly, the Government's brief does not name a single policy objective that was served by the forcible and prolonged separation of Plaintiff families. That fact, alone, strongly suggests the separations do not satisfy the second prong of the DFE.

Instead of clearly identifying which policy objectives Plaintiffs' separation purportedly served and why those objectives satisfy the second prong of the DFE, the Government vaguely asserts that its "decision to prosecute C.M. and detain him for prosecution and service of sentence" is "susceptible to policy analysis" (Mot. at 20) and that its "decisions concerning where to detain C.M. pending removal" was "susceptible to policy analysis." Mot. at 22. But the Government cites prosecutorial and detention decisions (which is not the tortious conduct challenged here) rather than the Government's practice of separating families (which is the challenged conduct). *See Limone*, 579 F.3d at 101 ("Viewed from 50,000 feet, virtually any action can be characterized as discretionary. But the discretionary function exception requires that an inquiring court focus on the specific conduct at issue."); *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997) ("Consideration of tenets that sweep so broadly is of little use in the application of the discretionary function exception."). Because the Government's family separation policy was not grounded in social, economic, and political policy, the DFE does not apply.

### 4. The Government mischaracterizes Plaintiffs' challenge to the Government's separation of C.M. and D.V.

The Government mischaracterizes Plaintiffs' core claim by arguing that Plaintiffs challenge the Government's efforts to "prosecute C.M. and detain him for prosecution and

service of sentence," and to "detain a noncitizen pending resolution of immigration proceedings." Mot. at 20, 23. But Plaintiffs are not challenging this general conduct.[6] Nor are they challenging the Government's general duties under the TVPRA to transfer unaccompanied minors to the ORR. *See* Mot. at 24. Rather, C.M. and D.V. challenge their forcible and prolonged separation without justification, the practice of which the Government acknowledges was a "human tragedy." Mot. at 9. That distinction is crucial. While it is not inherently unconstitutional to enforce criminal laws, it was unconstitutional to forcibly separate Plaintiffs for three months without justification or process. Indeed, every court considering this issue has denied the Government's motion to dismiss on the grounds that similar separations were likely unconstitutional. *See A.P.F.*, 492 F. Supp. 3d at 996; *C.M.*, 2020 WL 1698191, at *4; *Nunez Euceda v. United States*, 2021 WL 4895748, at *3 ("Indeed, courts within this circuit have held that the government's practice of separating families, and the procedures used to implement this practice, likely violated due process.")(internal quotations omitted); *A.I.I.L.*, 2022 WL 992543, at *4.

Indeed, in each of the Government's other unsuccessful motions to dismiss, the Government has argued that because it has had discretion over some immigration decisions, it necessarily had discretion to separate plaintiff families without notice and to keep them separated for months. There, as here, the Government tried to parse plaintiff families' complaints to find discrete actions over which the Government believed it had discretion without addressing the

---

[6] The court in *Ms. L.* acknowledged that the plaintiffs were "challenging the Government's practice of separating minor children from their parents without legitimate reason, irrespective of the Government's general authority to detain or release." *Ms. L. II*, 302 F. Supp. 3d at 1159. The plaintiffs in *Ms. L.* sought an injunction to reunite plaintiffs with their children "either by detain[ing] them together in the same facility, or by releas[ing] class members along with their children." *Id.* (internal quotations omitted). Like the plaintiffs in *Ms. L.*, C.M. and D.V. here are not challenging the Government's general discretion to determine whether to detain or release.

core family separation practice that the plaintiff families challenged. The Government has lost all four of those motions. In *A.P.F.*, the district court specifically "reject[ed] the United States' recategorization of Plaintiffs' factual allegations as standalone claims."492 F. Supp. 3d at 996–97. In *C.M.*, the district court observed that, "[t]o the extent the United States [was] ask[ing] the Court to parse the Complaint to assess whether claims with respect to individual factual allegations are barred, the Court [would] decline[] to do so." 2020 WL 1698191, at *4; *see also Nunez Euceda*, 2021 WL 4895748, at *3 (denying motion to dismiss). The result here should be no different. Plaintiffs are the "masters of the complaint" and choose which claims to assert. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 395 (1987). The Government cannot mold Plaintiffs' claims to fit its preferred defenses. It must craft its defenses to address the claims.

### C.  The due care exception does not shield the Government from liability for Plaintiffs' claims.

Next, the Government argues that Plaintiffs' claims fall under the Due Care Exception ("DCE"), which applies if (1) "a statute or regulation in question specifically pr[e]scribes a course of action for an officer to follow," and (2) "the officer exercised due care in following the dictates of that statute or regulation." *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005);[7] *see also Buchanan v. United States*, 915 F.2d 969, 970–71 (5th Cir. 1990) (noting that the due care exception exempt[s] actions mandated by statute or regulation" but only where the actor has exercised due care). The Government, however, has failed to satisfy either prong of the DCE—indeed it does not even attempt to address the second prong.

---

[7] District courts in this Circuit apply the *Welch* test. *See In re Katrina Canal Breaches Consol. Litig.*, 627 F. Supp. 2d 656, 667 (E.D. La. 2009) (holding that the test for the application of the "due care" exception is to determine (1) whether the statute or regulation in question specifically proscribes a course of action, and (2) if mandated, whether due care was exercised.); *In re S. Scrap Material Co., L.L.C.*, 713 F. Supp. 2d 568, 571 (E.D. La. 2010).

**1.   The Government was not executing a statute or regulation when it separated C.M. and D.V.**

The first prong of the DCE requires a statute or regulation specifically prescribe a course of action for an officer to follow. Yet, as the Government implicitly concedes, there was no statute or regulation requiring the Government to separate Plaintiffs. Indeed, the Government has admitted it has stopped separating children from their families in the circumstances alleged in the Complaint (*see* Mot. at 9) such that practice could not have been mandated by a statute or regulation. *See Nunez Euceda*, 2021 WL 4895748, at *3–4; *A.P.F.*, 492 F. Supp. 3d at 995–96; *C.M.*, 2020 WL 1698191, at *3.

Instead, the Government tries to alter the DCE standard by arguing that the DCE applies not only when a course of conduct is mandated by a statute or regulation, but also when the conduct is simply "authorized by statute or regulation." Mot. at 31. But that is simply not the relevant test. As the Fifth Circuit noted in *Buchanan*, the due care exception applies where the actions are "mandated by statute or regulation." 915 F.2d at 970–71. *See also Nunez Euceda*, 2021 WL 4895748, at *4 (stating, en route to denying motion to dismiss FTCA/family-separation claim, that "[t]he [DCE] applies if a statute or regulation 'specifically pr[e]scribes a course of action. . . .'"); *C.M.*, 2020 WL 5232560, at *4 (assessing prevalence of *Welch's* test and declining to certify denial of motion to dismiss for appeal); *A.P.F.*, 492 F. Supp. 3d at 995–96.

The cases the Government cites do not justify departing from this settled law. For example, in *Bub Davis Packing Co., Inc. v. United States*, 443 F. Supp. 589, 593 (W.D. Tex. 1977), the district court did not address the whether the Government's actions must merely be "authorized" by statute or regulation. Likewise, the Fifth Circuit in *Porter v. United States*, 473 F.2d 1329, 1337 (5th Cir. 1973), did not discuss the applicable standard, and instead assumed,

absent any "allegation that the damage [done to property] was due to negligence," that the FBI agents had "properly" carried out their duties.[8]

There is no single statutory or regulatory provision that expressly authorized the Government to separate Plaintiffs in the circumstances alleged in the Complaint. And the Government doesn't identify any. After reciting the DCE standard, the Government uses a single sentence to identify the statute purportedly at issue: 8 U.S.C. § 1232(b)(3), which requires, subject to exceptions, that the Government transfer *unaccompanied* immigrant children from DHS to ORR custody within "72 hours [of] determining that such child is an *unaccompanied alien child*." Mot. at 32 (emphasis added). That provision does not address—let alone authorize—the forcible, prolonged family separation of *accompanied* minors described and challenged in the Complaint.

### 2.   The Government did not exercise due care when separating C.M. and D.V.

The Government omits the second *Welch* prong from its brief, incorrectly asserting that "where a government employee's actions are authorized by statute or regulation . . . the claim must be dismissed for lack of subject matter jurisdiction." Mot. at 31. But, for the DCE to apply, the Government must not only show that officials were executing a statute or regulation, but also

---

[8] The out-of-circuit cases that the Government cites fare no better. For example, *FDIC v. Citizens Bank & Trust Co. of Park Ridge, Ill.* did not address the DCE and instead considered "whether the [FTCA] . . . withdrew the sue-and-be-sued liability of FDIC under 12 U.S.C. § 1819 torts not covered by that Act." 592 F.2d 364, 365 (7th Cir. 1979). *Sickman v. United States* addressed the DCE but does not opine on the appropriate test for determining when it applies. 184 F.2d 616, 619 (7th Cir. 1950). The same is true of *Hydrogen Tech. Corp. v. United States*, 831 F.2d 1155, 1160 (1st Cir. 1987). And as *C.M.* explains, *Borquez v. United States*, 773 F.2d 1050, 1053 (9th Cir. 1985) did not hold that the DCE encompasses any governmental conduct that was "authorized" by a statute or regulation. 2020 WL 1698191, at *3. Instead, and at most, it creates a narrow exception to *Welch* and held that the DCE applies when a single statutory or regulatory provision expressly authorizes the exact tortious conduct challenged by a FTCA claim. In other words, *Borquez's* holding only comes into play if adjudicating a FTCA claim would require the court to rule on the legality of a statutory or regulatory provision.

that those official actually "exercis[ed] due care" when doing so. 28 U.S.C. § 2680(a). "Due care," in turn, "implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956).

The Government has not even attempted to argue that its forcible and prolonged separation of the Plaintiffs was done with due care. That failure is, on its own, reason enough to reject application of the DCE to Plaintiffs' claims. And Plaintiffs allege ample facts showing that the Government failed to take due care. Officials did not, for example, implement systems to track families after they were separated so they could be reunited, despite warnings that such systems were necessary and did not yet exist. Compl. ¶ 75; *see also Ms. L. I*, 310 F. Supp. 3d at 1144 (observing that the "unfortunate reality is that . . . migrant children [we]re not accounted for with the same efficiency and accuracy as property"). In fact, they told Plaintiffs on multiple occasions that D.V. was going to be permanently taken from his family and put up for adoption in the United States and that C.M. would be deported without him. Compl. ¶¶ 34, 45, 46-48. They left Plaintiffs in the dark about how long they were going to be separated and kept C.M. and D.V. separated for months without any means of communication. *Id.* ¶ 62.[9] They refused to answer basic questions about where D.V. was located and how he was faring. *Id.* ¶¶ 53-54, 57-59. D.V. was locked in a room, which he called the "dark room," and on at least one occasion, an adult at the facility physically struck D.V. when D.V. cried for his mother. *Id.* ¶¶ 62-63. D.V. was separated from C.M. for over three months after C.M. was returned to immigration custody. *Id.* ¶ 66. As these allegations show, Government officials did not exhibit even a "minimal

---

[9] The Government's phone records reflect that D.V. only had one 5-minute call with his father on April 23, 2018. Dkt. 20-3. While there is an entry on May 1, 2018, there is no time recorded. Other than those two entries, there are no other calls with his father recorded.

concern" for Plaintiffs when separating them. *Hatahley*, 351 U.S. at 181. The DCE therefore does not apply.

### D.  Plaintiffs have satisfied the private person analog requirement.

The Government also argues that it is immune from suit because there is no "private person analog" to the conduct alleged in this case. (Mot. at 32-34). But the Government misstates and misapplies the legal test. A private analogue need only exist under "like circumstances," not "under the same circumstances." *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955); *see also United States v. Olson*, 546 U.S. 43, 46 (2005). The "private person" standard governs even where, as the Government asserts here, the alleged tortious conduct entails "uniquely governmental functions." *Olson*, 546 U.S. at 46 (quoting *Indian Towing Co.*, 350 U.S. at 64; *see also Rayonier Inc. v. United States*, 352 U.S. 315, 318–19 (1957).

*Olson* is instructive. In *Olson,* injured miners sued the Mine Safety and Health Administration (MSHA) pursuant to the Federal Tort Claims Act (FTCA), alleging negligence by federal mine inspectors. The Court rejected the Ninth Circuit's determination that no private analog existed for negligent actions by mine inspectors, finding that the scope of inquiry undertaken by the lower courts were too narrow:

> As this Court said in *Indian Towing*, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield. 350 U.S., at 64, 76 S.Ct. 122; *see also* S.Rep. No. 1400, 79th Cong., 2d Sess., 32 (1946) (purpose of FTCA was to make the tort liability of the United States "the same as that of a private person under like circumstance, in accordance with the local law").

*Id.* at 46–47. Indeed, in *Olson*, the Government conceded that "similar 'good Samaritan' analogies exist for the conduct at issue . . .  namely, "private persons who conduct safety inspections." *Id.* at 47.

29

The private person analog here is at least as clear as in *Olson*. The Court is not required to look at "good Samaritan" principles to find circumstances where private person liability might attach. The conduct here involved affirmative conduct against custodial victims that created harm. Unsurprisingly, courts have rejected the Government's argument there is no private person analog to the separation of families by immigration authorities.

For example, in *C.M. v. United States*, 2020 WL 1698191 (D. AZ Mar. 30, 2020), another case involving the prolonged separation of a minor child from his parent by immigration officials, the Court considered and rejected the precise argument the Government advances here. The Court found that immigration officials, like nursing home employees, "are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care." *Id*. at *2 (citing *Estate of Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2020 WL 1158552, at *1 (D. Ariz. Mar. 10, 2020)) (finding private analog for Bureau of Prisons officials whose placement of a prisoner in a certain cell was negligent; "like a nursing facility employee, a BOP employee is tasked with the care of persons who are dependent upon them to make daily housing and safety determinations. And, like nursing care employees, BOP has a duty to ensure the safety of the persons who reside at the facility").

Nursing home personnel in Texas are tasked with the care of persons in their custody. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Convalescent Services, Inc.*, 193 F.3d 340 (5th Cir. 1999) (describing tort verdict against nursing home by injured patient). There is thus no question that the private person analog is satisfied.[10]  Whether Plaintiffs' Complaint states claims under Texas law is a separate question addressed below.

---

[10] The other cases cited by the Government are easily distinguishable, as all involved challenges to the Government's decision not to take enforcement action or grant a benefit. None involve affirmative conduct in the nature of physically separating children from parents and holding

### E.  Plaintiffs have stated claims under state law and no privilege applies

The Government also contends that the Complaint should be dismissed because Plaintiffs fail to state a claim under Texas law. The Government argues that (1) Plaintiffs claims challenge privileged conduct and hence are not tortious; (2) Plaintiffs cannot state a claim for intentional infliction of emotional distress under Texas law; (3) Plaintiffs fail to state a claim for abuse of process; (4) Plaintiff fail to state a claim for negligence; and (5) Plaintiffs fail to state a claim for loss of consortium.

As discussed below, Plaintiffs challenge conduct that is not privileged under Texas law and have sufficiently pled the elements of intentional infliction of emotional distress and negligence.[11] Accordingly, the Government's motion to dismiss Plaintiffs' complaint in its entirety must be denied.

### 1.  Plaintiffs' claims do not challenge privileged conduct.

The Government advances two distinct privilege arguments. First, the Government contends that the conduct of Government agents in forcibly separating a father from his minor son was privileged because the DHS was authorized by law to separate C.M. from D.V. Second, the Government argues that C.M.'s battery claim is barred by Texas' use-of-force privilege. (Mot. at 34-38). Neither contention has merit.

---

them separately without reasonable justification. *See, e.g., Elgamal v. Bernacke* (challenging denial of immigration status adjustment); *Sea Air Shuttle Corp v. United States* (challenging failure of the FAA to take regulatory enforcement action); *Bhuiyan v. United States* (challenging withdrawal of immigration benefits). Meanwhile, another case cited by the Government, *Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020) does not even address the private person analog requirement.

[11] Plaintiffs do not oppose dismissal of their claims for abuse of process and loss of consortium.

### a. The Government identifies no privilege that precludes FTCA liability for the family separation claims in this case.

The Government cites numerous cases and treatises for the general proposition that conduct which is privileged may not give rise to tort liability. But that black letter principle of law (see Restatement (Second) of Torts § 10; W. Keeton, Prosser and Keeton on Torts 16 (5th ed. 1984) begs rather than answers the question presently before the Court: is the separation of a father and sole custodial parent from his minor child for punitive purposes privileged under Texas law?  The Government identifies no case holding that such conduct is privileged under Texas law. Rather, the cases cited by the Government address entirely different legal and factual issues. *See e.g., Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223 (5th Cir. 1988) (noting that a peace officer is privileged to display or use force in the performance of his duties in "necessary situations").

Indeed, to the extent there are any conclusions to be drawn from the Government cited cases, they undercut the Government's argument. For example, in *Villafranca v. United States*, 587 F.3d 257 (5th Cir. 2009), the question before the Court was whether agents' conduct constituted assault under Texas tort law. As the Court explained, under Texas law a peace officer is justified in using force "when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or search." *Id.* at 261 (citing Tex. Pen. Code § 9.51(a)). Texas law thus creates no blanket privilege for use of force by law enforcement personnel. Rather, under Texas law, an officer must have a reasonable belief that force is "immediately necessary to make or assist in making an arrest." *Id.* at 261, 264; *see also Davila v. United States*, 713 F.3d 248, 261 (5th Cir. 2013) (for the civil privilege defense to apply, law enforcement officers "must have 'reasonably believe[d] the force [was] immediately necessary to make or assist in making an arrest or search,'" (citing Tex. Pen. Code § 9.51(a)).

Here, Plaintiffs have pled facts that support the conclusion that the separation of Plaintiff C.M. and his minor son D.V. was not immediately necessary to an arrest, and that it was undertaken with malice and punitive intent. *See* Cmpl. ¶¶ 16-31, 46-66, 78.[12]

Villafranca underscores another flaw in the Government's privilege argument. There is no free-floating Texas state law privilege that attaches to every tort committed by a law enforcement officer. Rather, privileges are creatures of statute. For example, the Government cites *Hernandez v. United States*, No. 1:17-CV-00087, 2018 WL 4103015, at *3–4 (S.D. Tex. July 2, 2018) for the proposition that "the Government may look to state law privileges as a defense to FTCA claims." Mot. at 35. In *Hernandez*, as in *Villafranca*, the Court looked to statute to determine the existence of a privilege. And in *Hernandez*, the Court found that the relevant statute treated merely negligent conduct differently from conduct where the Government agents acted with "reckless disregard for the safety of others," citing Tex. Transp. Code § 546.005. As the Court explained "The Supreme Court of Texas has interpreted this passage to mean that the statute does not impose liability for substandard conduct that is merely negligent, but does impose liability if government agents act with 'reckless disregard.'" *Hernandez*, 2018 WL 4103015, at *4 (citing *City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1996)).[13]

---

[12] Because Plaintiffs have pled facts supporting the conclusion that their separation was done with malice, punitive intent, and the goal of dissuading others potential asylees from following in their footsteps, *Davila* undercuts rather than supports the government's motion to dismiss here. Significantly, in *Davila*, the Court concluded that "the NPS Rangers' use of force against Davila, Duarte, and Davila's grandson during a traffic stop was reasonable, *given the totality of circumstances* of the traffic stop." 713 F3d at 262 (emphasis added). There is no basis to reach a similar conclusion regarding the "totality of the circumstances" in this case, at least at the pleadings stage.

[13] The remaining cases cited by the Government (Mot. at 35-36) are distinguishable. In *Tovar v. United States*, the Court did not address whether any state law privilege applied to the agent's conduct, and the Court's "infer[ence]" that federal rather than Texas law should govern the inquiry because the conduct at issue was committed by federal agents has been called into question by the Fifth Circuit's contrary decision in *Villafranca*, 587 F.3d 257 (applying Texas'

In sum, the Government fails to identify *any* Texas state law privilege that bars Plaintiffs' separation-based claims. To the extent the Government contends that the civil privilege defense applies to the separation-based claims, it would only provide a defense if the forced separation was "immediately necessary to make or assist in making an arrest." Tex. Pen. Code § 9.51(a). Because the Complaint alleges that the separation occurred over a period of *months* and was imposed for punitive rather than legitimate law enforcement purposes, there is no basis to conclude that the family separation was "immediately necessary to make or assist in making an arrest."

### b.  The use of force privilege does not bar Plaintiff C.M.'s battery claim.

The Government also mistakenly contends that the Texas use-of-force privilege bars C.M.'s battery claim. In moving to dismiss the FTCA battery claim, the Government relies upon the civil defense privilege codified in Tex. Pen. Code § 9.51(a), which, as discussed above, provides that a peace officer is justified in using force which the actor reasonably believes is immediately necessary to make or assist in making an arrest." *Id*. The Government also seeks to have the Court take judicial notice of statements by arresting agents that Plaintiff C.M. sought to elude inspection "by running through vehicular primary lanes located at the International Bridge in his attempt to enter the United States from Mexico." Mot. at 38.

The Government's arguments must be rejected. First, it would be plain error for the Court to take judicial notice of the statements of law enforcement agents to dismiss Plaintiff's battery

---

civil privilege defense in FTCA action involving federal agents). Meanwhile, in *Garza v. United States*, 881 F. Supp. 1103 (S.D. Tex. 1995), the Court did not find that torts committed by INS agents were generally privileged because the federal agents were enforcing federal immigration laws. Mot. at 36 n. 12. Rather, the Court was analyzing the particular torts of *false arrest and false imprisonment*, which have as an element that the arrest or imprisonment was conducted "without authority of law." 881 F. Supp. at 1107. Plaintiffs in this case have not pled either tort in their Complaint.

claim. Plaintiff C.M. did not attach those officers' statements to his Complaint (or otherwise incorporate them into the Complaint), and Plaintiffs are aware of no rule of court, rule of evidence, or court decision that would allow a defendant to introduce the disputed statements of arresting officers (or anyone else, for that matter) in support of a Rule 12(b)(6) dismissal motion. Under the Federal Rules of Evidence, judicial notice is limited to such matters as federal public laws and treaties, state public laws, and official regulations of both federal and local government agencies. *See* Fed. R. Evid. 201 ("the court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Here, the statements of law enforcement personnel are hotly disputed, and were not attached to Plaintiff's complaint. The Court should not consider them in deciding the present motion.

Second, the standards governing a Rule 12 motion are well-settled. On a Rule 12(b)(6) motion, the court "must accept all well-pleaded facts as true, draw all inferences in favor of the nonmoving party, and view all facts and inferences in the light most favorable to the nonmoving party." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal quotes and citations omitted). "*Iqbal* does not allow us to question the credibility of the facts pleaded .... *Iqbal*, instead, tells us to assume the veracity of well-

pleaded factual allegations." *Ramirez v. Escajeda*, 921 F.3d 497, 501 (5th Cir. 2019) (alteration, internal quotes, and citations omitted).[14]

Here, the allegations of the Complaint, which must be accepted as true for purposes of this motion, are that (1) Plaintiff C.M. crossed the border at a port of entry, (2) was confronted by federal agents; (3) requested asylum from U.S. Customs and Border Protection (CBP) agents at the border as soon as he encountered; and (4) notwithstanding his request for asylum, he was forced to the ground and struck in the back of the neck, causing injury severe enough to need medical treatment. Compl. ¶¶ 33-35.[15] The Government cites no controlling authority supporting the notion that beating a compliant individual requesting asylum at the border does not constitute excessive use of force. The Court should reject the Government's contention that the agents' conduct was privileged under Texas law.

### 2. Plaintiffs have stated a claim for intentional infliction of emotional distress.

Like Arizona and forty-five other states, Texas has adopted the Restatement (Second) of Torts formulation of the tort of intentional infliction of emotional distress. *See Twyman v. Twyman*, 855 S.W.2d 619, 622–23 (Tex. 1993) (citing *Savage v. Boies*, 77 Ariz. 355 (Ariz. 1954)) ("[o]f the forty-six states that have recognized this tort, forty-three have adopted this

---

[14] When matters outside the pleadings are submitted in support or in opposition to a Rule 12(b)(6) motion to dismiss, "the best path" is to exclude them. *General Retail Services, Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed.Appx. 775, 786 n.8 2007 WL 2909565 (5th Cir. Oct. 5, 2007) (citing *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 194 n. 3 (5th Cir.1988)). However, should the Court instead decide to covert the Rule 12 motion to one for summary judgment, Plaintiffs must be given notice and an opportunity to submit affidavits that will create a question of fact warranting the denial of summary judgment. *Scott v. Courtesy Inns, Inc.*, 472 F.2d 563 (5th Cir. 1973).

[15] Plaintiff's allegation that he immediately requested asylum supports the inference that he did not resist arrest. Compl. ¶ 33 ("CM requested asylum from U.S. Customs and Border Protection (CBP) agents at the border as soon as he encountered them."). However, if necessary, Plaintiff should be granted leave to amend the Complaint to expressly allege that he did not resist or attempt to evade arrest.

Restatement formulation. . . . Today we become the forty-seventh state to adopt [this definition]." The Restatement elements of intentional infliction of emotional distress are: 1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe. Restatement (Second) of Torts § 46(1).

Under the Restatement, a claim for intentional infliction of emotional distress under the FTCA is sufficient where the agents' actions were motivated by malice. Restatement (Second) of Torts, § 46; *Martinez v. United States*, 2018 WL 3359562, at *10–12 (D. Ariz. July 10, 2018) (citing *Gasho v. United States*, 39 F.3d 1420, 1434 (9th Cir. 1994) (recognizing viability of an IIED claim brought under the FTCA simply where [federal] agents' actions were motivated by malice.).  Texas courts have allowed intentional infliction of emotional distress claims to proceed where the underlying wrong involved the interference and/or destruction of a family relationship. *See, e.g., Fulton v. Bed Bath & Beyond, Inc*., 2006 WL 8436984 at *3 (N.D. Texas Oct. 30, 2006) (denying motion to dismiss IIED claim based on individual's encouragement of husband to divorce spouse).

Here, Plaintiffs were housed in freezing conditions without proper clothing or protection. Compl. ¶¶ 36-43. Federal agents spewed verbal abuse on C.M. and D.V., and falsely and maliciously told them that that D.V. would be taken from C.M. and put up for adoption and that they would never see each other again as punishment for having sought asylum. Compl. ¶¶ 34, 44-49. This abuse was then followed by a forced and lengthy separation of a very young child from his parent with no legitimate law enforcement or public safety purpose, during which no contact was permitted, reinforcing the agents' prior threats that Plaintiffs in fact would never see each other again. Compl. ¶¶ 50-61. And as a result of the separation, D.V. suffered physical

abuse in the facility where he was housed. Compl. ¶¶ 62-63. The malicious purpose of this inhumane conduct was to cause Plaintiffs to abandon their asylum cases and deter other Central Americans from seeking asylum or other immigration relief in the United States. The Government took these actions for the purpose of intentionally inflicting emotional distress on the thousands of parents and children they separated, including Plaintiffs. Compl. ¶¶ 16-31.

Courts addressing FTCA claims arising out of family separations under the prior Administration's family separation policy have rejected the precise arguments the Government makes here and have found that the conduct satisfies the Restatement (Second) standard for intentional infliction of emotional distress. For example, just three weeks ago, a district court in Arizona held that the same conduct alleged here satisfied the Restatement (Second) standard:

> Here, the FAC alleges that the government's enforcement of the family separation policy was motivated by malice (See FAC ¶¶ 15, 69, 79, 89, 104, 114–16, 120, 125–30, 168, 171–72, 242–58), and rooted in prejudice against aliens crossing the border from Central America (See FAC ¶ 9 ("Defendants destroyed families to inflict severe pain on Central American immigrants, hoping that this would cause them to abandon their asylum cases and deter other Central Americans from seeking asylum or other immigration relief in the United States. They took these actions for the purpose of intentionally inflicting emotional distress on the thousands of parents and children they separated, including Plaintiffs.").) Moreover, a jury could find the government's conduct extreme and outrageous and that such emotional distress resulted from the government's conduct. Accordingly, the FAC plausibly alleges an IIED claim.

*A.I.I.L.*, 2022 WL 992543 at *7; *Ms. L. I.*, 310 F.Supp. 3d at 1145 (finding the alleged practices "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience'). The conduct alleged in this case mirrors and is predicated on the same wrongdoing as the IIED claims in *Ms. L.* and *I.I.I.L. v. Sessions.* For the same reasons, the Government's request to dismiss Plaintiffs' IIED claims should be denied.

### 3.   Plaintiffs have stated a claim for negligence.

The Government also moves to dismiss Plaintiffs' negligence claim, arguing (1) Texas does not recognize a claim for negligent infliction of emotional distress ("NIED"); and (2) Plaintiffs have not identified a duty that was breached by their separation. Neither argument has merit.

To begin with, Plaintiffs have not pled a claim for negligent infliction of emotional distress and are not seeking to recast an NIED claim as a negligence claim. It is true that at least one Texas court has disapproved of negligence claims where no duty and breach has been pled, other than emotional distress resulting from an alleged false arrest or assault. *See, e.g., Garza v. U.S.*, 881 F.Supp. 1103 (S.D. Tex. April 4, 1995) (damages alleged from pursuit and stop of vehicle). But *Garza* is plainly distinguishable. Here, Plaintiffs have not pled false arrest or assault and are not claiming damages resulting from an arrest or assault. Rather, Plaintiffs have alleged a negligence claim grounded in a breach of the duty owed by federal agents to persons like Plaintiffs in their care.

In order to state a negligence claim, Plaintiffs must show that, under circumstances similar to those alleged in this case, Texas law would "make a 'private person' liable [for negligence]." *Olson*, 546 U.S. at 44 (quoting 28 § 1346(b)(1)); see 28 U.S.C. § 2674 (the United States may be liable in tort "in the same manner and to the same extent as a private individual under like circumstances"). Under Texas common law, "a negligence cause of action consists of: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996).

Here, Plaintiffs have pled all the elements of negligence. The Government says that Plaintiffs are owed no duty of care, but in fact Texas recognizes a duty that private persons owe to individuals in their custodial care. *See, e.g., Harris v. Harris County Hosp. Dist.*, 557 S.W.2d 353, 355 (Tex. Civ. App.—Houston [1st Dist.] 1977, no writ) ("It [is] the duty of the hospital to provide for the care and protection of its patients, and in the exercise of this duty the hospital [is] required to provide such reasonable care as the patient's known condition require[s]"); *St. Paul Fire and Marine Ins. Co.*, 193 F.3d at 341 (describing negligence verdict against nursing home for injuries sustained by nursing home resident); *cf. Browning v. Graves*, 152 S.W.2d 515 (Tex.Civ.App.—Fort Worth 1941) (citing *King v. Brown*, 100 Tex. 109, 94 S.W. 328, 330 (1906)) (recognizing jailer has duty to "care for and protect his prisoners from harm").[16]

Plaintiffs allege that the Government breached its duty of care to Plaintiffs by prolonging their separation without justification and for failing to protect D.V. from physical and emotional abuse at the facilities where he was housed, and that such breach proximately caused their emotional and physical injuries. Compl. ¶¶ 62-63, 46-72, 91-92. These allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6) as to Plaintiffs' negligence claim.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs request that the Government's motion to dismiss be denied.

---

[16] State laws limiting the liability of state and local governments for the tortious conduct of their employees do not apply to FTCA claims brought by persons held in federal custody, since the FTCA holds the Government liable for the actions of its agents as if they were private persons. *United States v. Muniz*, 374 U.S. 150, 164–65 (1963). Thus, while this Court looks to Texas common law to determine the elements of the negligence claim, any immunities that would be provided to state actors under the Texas Tort Claims Act ("TTCA") are inapplicable.

Respectfully submitted,

Valerie Brender
RUKIN HYLAND & RIGGIN LLP


By: */s/ Valerie Brender*
Valerie Brender*
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Suite 290
Oakland, California 94612
vbrender@rukinhyland.com
(415) 421-1800
(415) 421-1700 – Fax

*Admitted Pro Hac Vice*
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

  I certify that on May 18, 2021, a true and correct copy of the foregoing Opposition to United States' Motion to Dismiss was electronically filed via the Court's CM/ECF system which will send notice to the following:

  Faith Johnson Lowry, Esq.
  Assistant United States Attorney
  601 NW Loop 410, Suite 600
  San Antonio, Texas 78216-5597
  faith.johnson@usdoj.gov


               */s/ Valerie Brender*