# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**C.M. on his own behalf and on behalf of his
minor child, D.V.,**

      *Plaintiff,*

**v.**                                    **Case No. 5:21-CV-0234-JKP-ESC**

**UNITED STATES OF AMERICA,**

      *Defendant.*

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is a *Motion to Dismiss* (ECF No. 22) filed by Defendant United States of America ("the Government").[1] Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), the Government seeks dismissal of this action for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted. Plaintiff C.M., an asylum-seeker from Honduras, filed this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), on behalf of himself and his minor son, D.V., based upon its policy of forced separation of parents and children at the United States' border.[2] *See*, *generally*, Compl. (ECF No. 1). At the time of separation, D.V. was seven years old. *Id*. ¶ 12.

In their response (ECF No. 24), Plaintiffs maintain that they have stated claims under Texas law upon which the Court can grant relief and that jurisdiction exists because the FTCA waives sovereign immunity. With the Government's reply (ECF No. 25), the motion became ripe for

---

[1] The Government attaches eleven redacted exhibits to protect the identity of the Plaintiffs, as permitted by Court order (ECF No. 9), Fed. R. Civ. P. 5.2, and W.D. Tex. Civ. R. 5.2(b). For the benefit of the Court, the Government has also filed unredacted copies of four exhibits (Exs. D, E, F, and G) under seal. *See* ECF No. 21. Although the docket entry for the motion seems to show the motion and all exhibits as under seal, only the four unredacted exhibits are actually under seal. The Clerk of Court should take appropriate steps to clarify the docket entry to reflect that the motion and all exhibits (other than Exhibits D, E, F, and G) are not sealed. The Court, furthermore, finds no reason to seal this Memorandum Opinion and Order.

[2] Because C.M. brings this action on behalf of himself and his minor son, the parties collectively refer to C.M. and D.V. as Plaintiffs even though C.M. is technically the only plaintiff in the case. The Court will do the same.

ruling. Plaintiffs recently moved for leave to provide notice of supplemental authority,[3] which the Court granted as unopposed. For the reasons that follow, the Court grants the motion to dismiss in part and denies it in part.

## I. BACKGROUND[4]

In short, Plaintiffs allege that federal officials deliberately inflicted trauma on them by forcibly separating them pursuant to a governmental policy designed to cause harm, instill fear, and deter other parents and children from migrating to the United States. Compl. ¶¶ 2-7. They allege that the forced separation caused long-lasting injury and ongoing trauma. *Id.* ¶ 3. In addition to the trauma inflicted by the forced separation, C.M. alleges that he was subjected to abusive treatment during detention, denied any information about the whereabouts of his son, then tricked into signing a waiver of his asylum claim. *Id.* ¶¶ 4-6. D.V. was also allegedly subjected to emotional and physical abuse during the separation. *Id.* ¶¶ 62-64. The Government reunited Plaintiffs at an airport after four months of separation, placed on a plane, and deported to Honduras. *Id.* ¶ 6. They allege that, after their removal, they were in hiding in Honduras "for the very reasons they initially fled . . . to seek asylum in the United States." *Id.* ¶ 7.

Given the complexities of this FTCA case, including differing views of the allegations depending on whether the Court is examining the allegations under Fed. R. Civ. P. 12(b)(1) or (6), the Court sets out the background in more detail in multiple sections.

### A. Immigration Framework

The Supreme Court has long recognized "that the power to exclude aliens is 'inherent in sovereignty, necessary for maintaining normal international relations and defending the country

---

[3] While the Court appreciates the supplemental authority, it had already uncovered the recent decision through its independent research.

[4] Citations to the complaint refer to allegations of Plaintiffs that are taken as true for purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) but are not necessarily taken as true for a motion under Rule 12(b)(1). Other background information is either uncontested or taken from documents provided by the Government for purposes of determining jurisdiction.

against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government.'" *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). In making such recognition, the Supreme Court found the above-quoted language "[i]n accord with ancient principles of the international law of nation-states" and with *Ping v. United States*, 130 U.S. 581 (1889) and *Fong Yue Ting v. United States*, 149 U.S. 698 (1893). *Ting* reaffirmed:

> It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. In the United States this power is vested in the national government, to which the constitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political department of the government, and may be exercised either through treaties made by the president and senate or through statutes enacted by congress.

149 U.S. at 705 (quoting *Nishimura Ekiu v. United States*, 142 U. S. 651, 659 (1892)). And as stated in *Ping*:

> The control of local matters being left to local authorities, and national matters being intrusted to the government of the Union, the problem of free institutions existing over a widely extended country, having different climates and varied interests, has been happily solved. For local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power. To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated. It matters not in what form such aggression and encroachment come, whether from the foreign nation acting in its national character, or from vast hordes of its people crowding in upon us.

130 U.S. at 605-06.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Unquestionably, "[f]ederal governance of immigration and alien status is extensive and complex." *Id*. Immigration law consists of a vast morass of statutes and regulations. *See Deng Chol v. Garland*, 25 F.4th 1063, 1071 (8th Cir. 2022) (recognizing the difficulties in navigating through "the morass of immigration law"); *Mendoza-Garcia v. Barr*, 918 F.3d 498, 504 (6th Cir. 2019) (same); *Al*

*Khouri v. Ashcroft*, 362 F.3d 461, 464-65 (8th Cir. 2004) (same); *Agyeman v. I.N.S.*, 296 F.3d 871, 877 (9th Cir. 2002) (same).

Naturally, immigration law has not remained stagnant over the years. It has undergone both minor tweaks and substantial overhaul. "In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009-546." *Vartelas v. Holder*, 566 U.S. 257, 260 (2012). With that enactment, "Congress abolished [a former] distinction between exclusion and deportation procedures and created a uniform proceeding known as 'removal.'" *Id.* at 262 (citing 8 U.S.C. §§ 1229, 1229a; *Judulang v. Holder*, 565 U.S. 42, 46 (2011)). "In the same legislation, Congress amended the [prior statute] aggressively to expedite removal of aliens lacking a legal basis to remain in the United States." *Kucana v. Holder*, 558 U.S. 233, 249 (2010). These 1996 amendments to immigration law "charted a new course." *Texas v. United States*, 606 F. Supp. 3d 437, 483 (S.D. Tex. 2022), *cert. granted before judgment*, 143 S. Ct. 51 (2022).

Under the new statutory regime, "Congress made 'admission' the key word, and defined admission to mean 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.'" *Vartelas*, 566 U.S. at 262 (quoting 8 U.S.C. § 1101(a)(13)(A)). A noncitizen[5] "seeking 'admission' to the United States is subject to various requirements, *see, e.g.*, § 1181(a), and cannot gain entry if she is deemed 'inadmissible' on any of the numerous grounds set out in the immigration statutes, *see* § 1182." *Id.* at 263.

In addition to the 1996 statutory changes, "immigration policy fundamentally changed" following the tragic events of September 11, 2001. *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *1 (W.D. Tex. Apr. 9, 2007). Before that tragedy, "families apprehended for entering the United States illegally were most often released rather than detained because of a limited amount of family bed space; families who were detained had to be housed

---

[5] As recognized by the Supreme Court, "the term 'noncitizen' [i]s equivalent to the statutory term 'alien.'" *Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (citing 8 U.S.C. § 1101(a)(3)).

separately, splitting up parents and children." *Id*. Congress acted swiftly in response to the attack

on American soil.

> In order to implement policy changes regarding immigration, Congress passed the Homeland Security Act in 2001, splitting the function of the Immigration and Naturalization Service (INS) into three separate agencies and placing all three agencies under the jurisdiction of the Department of Homeland Security (DHS). The Act transferred responsibility for the care and custody of unaccompanied alien children to the Department of Health and Human Services' Office of Refugee Resettlement (ORR).

*Id*. at *1 n.3. The then "current policy of more restrictive immigration controls, tougher enforce-

ment, and broader expedited removal of illegal aliens . . . made the automatic release of families

problematic." *Id*. at *1.

Initially, DHS "responded by detaining more family groups," thereby separating legitimate

family groups. *Id*. "Congress rejected this approach" in 2005 stating:

> Children who are apprehended by DHS while in the company of their parents are not in fact 'unaccompanied' and if their welfare is not at issue, they should not be placed in ORR custody. The committee expects DHS to release families or use alternatives to detention such as the Intensive Supervised Appearance Program whenever possible. When detention of family units is necessary, the Committee directs DHS to use appropriate detention space to house them together.

*Id*. at *2 (quoting House Committee on Appropriations, Department of Homeland Security Appro-

priations Bill, 2006: report together with additional views (to accompany H.R. 2360), 109th Cong.,

1st Session, 2005, H. Rep. 109–79). Despite the 2005 "expressed preference for family release

'whenever possible,' DHS [was] reluctant to return to a policy of automatically releasing family

groups." *Id*. Consequently, immigration authorities began exploring the use of "Family Detention

Centers" to house family members together, and in April 2007, Texas had one "of only two family

detention centers . . . operating in the United States." *Id*.

### 1. Current Statutory Framework

At present, through the current statutory framework, a noncitizen arriving in the United

States is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). All applicants for

admission "shall be inspected by immigration officers." *Id.* § 1225(a)(3). Such inspection is to determine their admissibility to the United States and includes general screening as well as screening for asylum claims. *Id.* § 1225(b)(1). Immigration officers and employees have enumerated powers to act "without a warrant," including interrogating persons believed to be noncitizens and arresting noncitizens personally seen "entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or removal of aliens." *Id.* § 1357(a).

Subject to an exception not relevant here,[6] noncitizens deemed inadmissible following inspection shall be removed from the United States "without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." *Id.* § 1225(b)(1)(A)(i). Upon such indication, the immigration "officer shall refer the alien for an interview by an asylum officer." *Id.* § 1225(b)(1)(A)(ii). That interview will either result in the noncitizen being "detained for further consideration of the application for asylum" or being ordered "removed from the United States without further hearing or review," depending on whether or not the officer determines that "a credible fear of persecution" exists. *See id.* § 1225(b)(1)(B)(ii) and (iii). The statute provides for mandatory detention "pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *See id.* § 1225(b)(1)(B)(iii)(IV). "Under the statute, the only opportunity for a noncitizen to be released pending a decision on [an] asylum application is temporary parole "for urgent humanitarian reasons or significant public benefit." *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 673 (S.D. Tex. 2021) (citing 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 212.5(b), 235.3).

Section 1226 governs the apprehension and detention of noncitizens. "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the

---

[6] Subparagraph F provides an exception to the applicability of § 1225(b)(1)(A) that is not relevant on the facts of this case.

alien is to be removed from the United States." *Id*. § 1226(a). Except as provided for criminal noncitizens in § 1226(c), the Attorney General may detain the noncitizen pending the removal decision or release him or her on conditional parole or bond with conditions pending that decision. *See id*. § 1226(a)(1), (2). If released on bond or parole, the Attorney General may "at any time" revoke the bond or parole, rearrest the noncitizen under the original warrant, and detain the noncitizen. *See id*. § 1226(a)(3).

With respect to criminal noncitizens, the Attorney General "shall take into custody any" noncitizen who is (A) inadmissible by virtue of 8 U.S.C. § 1182(a)(2) (criminal and related grounds); (B) deportable by virtue of committing a criminal offense covered by 8 U.S.C. § 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D); (C) deportable by virtue of § 1227(a)(2)(A)(i) if sentenced "to a term of imprisonment of at least 1 year"; or (D) inadmissible under § 1182(a)(3)(B) or deportable under § 1227(a)(4)(B).[7] *See id*. § 1226(c). Through § 1182, Congress "specified categories of aliens who may not be admitted to the United States." *Arizona v. United States*, 567 U.S. 387, 395 (2012).

And through §§ 1325-26, Congress has made "[u]nlawful entry and unlawful reentry into the country . . . federal offenses." *Id*. It is a violation of federal law for a noncitizen to (1) enter or attempt to enter "the United States at any time or place other than as designated by immigration officers, or (2) elude[] examination of inspection by immigration officers, or (3) attempt[] to enter or obtains entry to the United States" through "a willfully false or misleading representation or the willful concealment of a material fact." 8 U.S.C. § 1325(a). A first offense violation of this provision is a misdemeanor that is punishable by a fine, imprisonment of "not more than 6 months, or both." *Id*. Misdemeanor offenses, such as this, "are the least serious category federal offenses." *United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *1 n.5

---

[7] Section 1227 defines classes of deportable noncitizens and addresses deporting certain nonimmigrants, waiver of deportation for special immigrant statuses, and administrative stay of a final order of removal.

(W.D. Tex. Jan. 5, 2018) (identifying illegal entry and traffic offenses in a federal enclave as examples of such offenses), *aff'd sub nom*., *United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019).

The statutory framework also addresses initiation of removal proceedings. *See* 8 U.S.C. § 1229. Among other things, the statute provides for notice to appear, notices for changes in time or location of proceedings, securing counsel, and expedited removal proceedings after a conviction. *See id*. § 1229(a), (b), (d). Section 1229a governs removal proceedings themselves. The Supreme Court has aptly summarized the removal process:

> Congress has specified which aliens may be removed from the United States and the procedures for doing so. Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law. *See* § 1227. Removal is a civil, not criminal, matter. A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal. *See* § 1229a(c)(4); *see also*, *e.g.*, §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure).
>
> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission. The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

*Arizona*, 567 U.S. at 396-97 (omitting non-statutory citation).

While, in general, the statutory and regulatory regime does not differentiate between adults and children, federal immigration law authorizes the United States to provide for the custody and care of unaccompanied minor children who are present in the United States without lawful

immigration status. The ORR is specifically charged with "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status." 6 U.S.C. § 279(b)(1)(A). The ORR is mandatorily responsible for making all placement determinations for all such noncitizen children.[8] *Id*. § 279(b)(1)(C). The statute provides the following definitions for terms used within § 279:

> (1) the term "placement" means the placement of an unaccompanied alien child in either a detention facility or an alternative to such a facility; and

> (2) the term "unaccompanied alien child" means a child who—

>> (A) has no lawful immigration status in the United States;

>> (B) has not attained 18 years of age; and

>> (C) with respect to whom—

>>> (i) there is no parent or legal guardian in the United States; or

>>> (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

*Id*. § 279(g).

Furthermore, Congress amended federal immigration law through "the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. §§ 1158, 1229a, 1232." *Sanchez v. R.G.L.*, 761 F.3d 495, 509 (5th Cir. 2014). The TVPRA is "principally codified in relevant part at 8 U.S.C. § 1232." *Flores v. Lynch*, 828 F.3d 898, 904 (9th Cir. 2016) (quoting from a parenthetical).

Section 1232 concerns enhancing efforts to combat the trafficking of children, and § 1232(b)(1) provides: "Consistent with section 279 of Title 6, and except as otherwise provided under subsection (a), the care and custody of all unaccompanied alien children, including

---

[8] Consistent with *Barton*, the Court will generally use "noncitizen" in place of "alien," unless the term is within a quotation. *See* 140 S. Ct. at 1446 n.2. Also, according to the Government, an "unaccompanied alien child" is often referred to as a "noncitizen unaccompanied child" or "NUC." *See* Mot. at 5. The Court may use those designations as appropriate.

responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." Section 1232(b)(3) governs transfers of noncitizen unaccompanied children and states in full:

> Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services [(ORR)] not later than 72 hours after determining that such child is an unaccompanied alien child.

Subsection (c) of § 1232 provides instruction about providing safe and secure placements for children. Section 1232(c)(1) broadly directs:

> The Secretary of Health and Human Services, Secretary of Homeland Security, Attorney General, and Secretary of State shall establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity, including policies and programs reflecting best practices in witness security programs.

Section 1232(c)(2)(A), which addresses placements for minors who are in the custody of the Department of Health and Human Services ("DHHS"), directs that, subject to 6 U.S.C. § 279(b)(2), "an unaccompanied alien child in the custody of the Secretary of Health and Human Services shall be promptly placed in the least restrictive setting that is in the best interest of the child." Section 279(b)(2)(B) prohibits release of "such children upon their own recognizance." And § 1232(c)(3) sets out details for addressing safety and suitability assessments with respect to placements of children with a person or entity.

### 2. *Flores* Agreement

In 1997, the Government entered into a class action settlement agreement ("the Agreement") that also impacts the immigration framework. *See Flores*, 828 F.3d at 901. This Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of [immigration authorities]." *Id.* (quoting ¶ 9 of the 1997 *Flores* Agreement). The Agreement "creates a presumption in favor of releasing minors and requires placement of those not released in

10

licensed, non-secure facilities that meet certain standards." *Id*. It also "unambiguously applies both to accompanied and unaccompanied minors, but does not create affirmative release rights for parents." *Id*. Paragraph 14 of the Agreement provides that when immigration authorities "determine[] that the detention of the minor is not required either to secure his or her timely appearance . . . or to ensure the minor's safety or that of others, [immigration authorities] shall release a minor from [their] custody without unnecessary delay." *Id*. at 903.

Further, ¶ 12(A) of the Agreement establishes various standards: (1) when a minor is taken into immigration custody, immigration authorities "shall expeditiously process the minor and shall provide the minor with a notice of rights"; (2) after apprehension, immigration authorities "shall hold minors in facilities that are safe and sanitary and that are consistent with the . . . concern for the particular vulnerability of minors"; (3) although immigration authorities must transfer minors to a non-secure, licensed facility within five days of arrest or apprehension, the transfer need only be made "as expeditiously as possible" when there is "an emergency or influx of minors into the United States." *Id*. at 902-03 (quoting Agreement ¶ 12(A)). Paragraph 12 of the Agreement also "clearly states that facilities holding the minors after arrest 'will provide . . . contact with family members who were arrested with the minor." *United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *1 n.5 (W.D. Tex. Jan. 5, 2018) (omitting added emphasis and quoting ¶ 12), *aff'd sub nom*., *United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019).

Not only does the Agreement create "a presumption in favor of release," but it also "favors family reunification." *Flores*, 828 F.3d at 903. Indeed, the Agreement requires "prompt and continuous efforts . . . toward family reunification and the release of the minor." *See id*. (quoting Agreement ¶ 18 in parenthetical); *accord Dominguez-Portillo*, 2018 WL 315759, at *8 (including quote of ¶ 18 in its entirety). Thus, "family reunification, with a clear preference for custody by a parent, is an immediate and ongoing requirement under the [Agreement]." *Dominguez-Portillo*,

2018 WL 315759, at *8. Still, the Agreement "makes clear that '[n]othing herein shall require [immigration authorities] to release a minor to any person or agency whom [they have] reason to believe may harm or neglect the minor or fail to present him or her before [immigration authorities] or the immigration courts when requested to do so." *Id*. (quoting ¶ 11 of Agreement).

"The *Flores* Agreement is a binding settlement on the United States between the Immigration and Naturalization Service ("INS")—the former federal immigration agency—and a plaintiff class of minors in INS custody." *D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *6 (W.D. Tex. Mar. 23, 2023). Even though the "INS has since dissolved and its functions transferred to various organizations including [the United States Customs and Border Protection ("CBP"), the United States Immigration and Customs Enforcement ("ICE")," DHS, and ORR," the Agreement binds these successor organizations. *Id*. Because the Agreement binds successor organizations, it is binding on the Government. *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *2 (W.D. Tex. Apr. 9, 2007).

The terms of the Agreement "were never intended to be permanent authority, much less the *only* binding authority setting standards for the detention of minor aliens." *Id*. Even though the Agreement came into existence about twenty-five years ago, the Agreement "was intended as a stopgap measure until the United States could promulgate reasonable, binding standards for the detention of minor aliens." *Id*. By its terms, the Agreement terminates "45 days following . . . publication of final regulations implementing th[e] Agreement," and as of the July 6, 2016 Ninth Circuit opinion, the government had "not yet promulgated those regulations." *See Flores*, 828 F.3d at 903. However, the TVPRA did partially codify the Agreement "by creating statutory standards for the treatment of unaccompanied minors." *Id.* at 904.

The Government does not contest that the Agreement remains in effect; in fact, the Government addresses it in its motion. *See* Mot. at 6-7. While the Agreement is no longer "the only binding standard directly applicable to the detention of minor aliens by the United States

government" as it was in 2007, *see Bunikyte*, 2007 WL 1074070, at *2, it remains in effect, *see*, *e.g.*, *B.A.D.J. v. United States*, No. CV-21-00215-PHX-SMB, 2022 WL 11631016, at *3 (D. Ariz. Sept. 30, 2022) (continuing to consider the *Flores* Agreement as still in effect); *Barry v. United States*, No. 21-CV-7684 (BCM), 2022 WL 4467504, at *2 (S.D.N.Y. Sept. 26, 2022) (same); *A.E.S.E. v. United States*, No. 21-CV-0569 RB-GBW, 2022 WL 4289930, at *9 (D.N.M. Sept. 16, 2022) (same).

Notably, the Agreement "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Flores*, 828 F.3d at 906. Nor does it "address the potentially complex issues involving the housing of family units and the scope of parental rights for adults apprehended with their children." *Id*. It "does not provide that parents are entitled to care for their children if they were simultaneously arrested by immigration authorities, nor does it express a preference for releasing parents charged with criminal offenses." *Dominguez-Portillo*, 2018 WL 315759, at *9. It "does not provide any particular rights or remedies for adult detainees" even "[t]hough family unification is a stated goal of both the *Flores* Settlement and U.S. immigration policy generally." *Bunikyte*, 2007 WL 1074070, at *16.

While "[t]he *Flores* Agreement does not mandate that INS successor organizations preserve family unity in circumstances such as Plaintiffs' . . . because the problem it sought to remedy was the poor treatment of unaccompanied minors in INS custody," the Agreement does "require that successor organizations house unaccompanied minors in facilities that provide contact with family members who were arrested with them." *D.A.*, 2023 WL 2619167, at *7 (citations and internal quotations marks omitted). Thus, "the *Flores* Agreement" does not remove the Government's "discretion to physically separate [families] or keep them separated, but it d[oes] remove discretion to house [minors] in a facility that prohibit[s] them from speaking to [their parents]." *Id*.

### 3. <u>Other Immigration Considerations</u>

"Prompted by controversy over DHS's policies and practices relating to family detention,

[the DHS Secretary] announced the establishment of the DHS Advisory Committee on Family Residential Centers (ACFRC or the Committee) on June 24, 2015." *See* U.S. Immigration & Customs Enforcement, Department of Homeland Security, Report of the DSH Advisory Committee on Family Residential Centers [hereinafter "the Report"] 4 (2016).[9] On September 30, 2016, the Committee issued the Report. *See id.* at 1.

Stated succinctly, the "overarching recommendation is for DHS [to] simply avoid detaining families." *Id.* at 8. The Committee initially recommended:

> DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children. DHS should discontinue the general use of family detention, reserving it for rare cases when necessary following an individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release. If such an assessment determines that continued custody is absolutely necessary, families should be detained for the shortest amount of time and in the least restrictive setting possible; all detention facilities should be licensed, non-secure and family-friendly. If necessary to mitigate individualized flight risk or danger, every effort should be made to place families in community-based case-management programs that offer medical, mental health, legal, social, and other services and supports, so that families may live together within a community.

*Id.* The Committee later commented:

> Disconcertingly, recent evidence suggests that some families are separated and adults detained and placed in expedited removal or reinstatement proceedings while children are sent to the Office of Refugee Resettlement. Family separation in these circumstances raises serious concerns and violates the best interests of the child – which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members. The same family integrity and unity considerations favor joint release of families with other family members in the U.S. (and who often may be mixed-status families). The best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS, including in the custody decisions about adults arriving with their children, and should favor release of the whole family together as soon as possible – even if some family members are undergoing expedited removal or reinstatement procedures.

*Id.* at 17.

---

[9] The Report is available at https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf. Because the document has two sets of pages one through four, the Court uses the PDF page numbers.

After the 2016 election, the Executive Branch began issuing directives in January 2017. The then newly elected President issued Executive Order ("EO") 13767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8793 (Jan. 30, 2017). The stated purpose was "to direct executive departments and agencies (agencies) to deploy all lawful means to secure the Nation's southern border, to prevent further illegal immigration into the United States, and to repatriate illegal aliens swiftly, consistently, and humanely." EO 13767 § 1.

The EO set out a multi-faceted "policy of the executive branch." *Id.* § 2. One facet was to "detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations." *Id.* § 2(b). Section 6 of the EO directed the DHS to "immediately take all appropriate actions to ensure the detention of [noncitizens] apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law."

Section 11 set out "the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens." One aspect of such policy was directing the DHS to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." *Id.* § 11(d).

After EO 13767, on April 11, 2017, the Department of Justice ("DOJ"), through the United States Attorney General ("AG") directed the law enforcement to prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325. *See* U.S. DOJ Mem. on Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017) (last visited Apr. 18, 2023).[10]

---

[10] This document is available at https://www.justice.gov/opa/press-release/file/956841/download.

A year later, the AG issued a "Memorandum for Federal Prosecutors along the Southwest Border" regarding "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)," hereinafter referred to as "the Zero-Tolerance Policy," to direct federal prosecutors along the United States-Mexico border "to the extent practicable, and in consultation with DHS" to immediately adopt "a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *See* U.S. DOJ Memorandum on Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a) (Apr. 6, 2018) (last visited Apr. 18, 2023).[11] As noted by the Government, the next month, the DHS "directed officers and agents to ensure that all adults deemed prosecutable for improper entry in violation of 8 U.S.C. § 1325(a) are referred to DOJ for criminal prosecution." Mot. at 9.

"Between April and June 2018," the Government "implemented [this] 'Zero Tolerance Policy' toward illegal immigration across the southern border of the United States." *D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *1 (W.D. Tex. Mar. 23, 2023). Pursuant to "that policy, federal authorities separated children from parents with whom they had improperly entered the United States. Parents were prosecuted for illegal entry and children were transferred to the custody of the [DHHS]." *Id*. During this time, the Government used the forced separation policy "as a means of deterring immigration." *Id*.

On January 17, 2019, the Office of Inspector General ("OIG") of the DHHS issued a report resulting from "an internal investigation into the Administration's zero tolerance policy given 'the potential impact of [the policy] on vulnerable children and ORR operations[,]' and 'to determine the number and status of separated children who have entered ORR care' as a result of the policy." *Ms. L. v. U.S. Immigr. & Customs Enf't*, 330 F.R.D. 284, 286 (S.D. Cal. 2019). The report, titled,

> "Separated Children Placed in Office of Refugee Resettlement Care' . . . reveals [that] the [DOJ] and the [DHS] began separating migrant families as early as July 1, 2017, well before the zero tolerance policy was publicly announced in May of 2018, and that pursuant to the policy, potentially "thousands" more families had

---

[11] This document is available at https://www.justice.gov/opa/press-release/file/1049751/download.

been separated.

*Id*. at 286-87.

Based on that same report, the Fifth Circuit recognized that, prior to "July 2017, children were typically only referred to ORR when they entered without a parent or guardian," but "some children [were] referred to ORR after being separated by DHS from a parent . . . with whom the child arrived." *United States v. Vasquez-Hernandez*, 924 F.3d 164, 167 (5th Cir. 2019) (citing report while attributing second quote to the report). The report noted that, "[h]istorically, these separations were rare and occurred because of circumstances such as the parent's medical emergency or a determination that the parent was a threat to the child's safety." *Id*. (quoting report).

Soon after taking office in 2021, the now current President issued an EO to establish an interagency task force to facilitate the reunification of families separated "at the United States-Mexico border." Exec. Order No. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 Fed. Reg. 8273, 8273 (Feb. 2, 2021). Section 1 of that EO set out the Policy of the current Administration:

> It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States. My Administration condemns the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians (families), including through the use of the Zero-Tolerance Policy. My Administration will protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law.

*Id*. § 1. The EO defines the "Zero-Tolerance Policy" as the April 6, 2018 memorandum "and any other related policy, program, practice, or initiative resulting in the separation of children from their families at the United States-Mexico border." *Id*. § 7(b).

This complex and ever-evolving framework provides the immigration environment in which the Court considers the issues raised.

### B. Plaintiffs' Allegations and Claims

Plaintiffs left their home country to seek refuge in the United States. Compl. ¶ 2. On March 9, 2018, when they encountered border agents at the port of entry in Eagle Pass, Texas, they immediately requested asylum from agents of the United States Customs and Border Protection ("CBP"). *Id*. ¶ 33. From the outset, CBP agents mistreated them through derogatory insults ("bastards"), baseless accusations ("using his son to smuggle drugs"), and falsehoods regarding D.V., i.e., that he "would be taken from his father and put up for adoption." *Id*. ¶ 34. Agents also "violently forced C.M. to the ground and struck him in the neck, causing a neck injury." *Id*. ¶ 5.

After apprehending Plaintiffs, the Government initially detained them in a facility commonly referred to as "the icebox" by asylum seekers due to its cold temperature. *Id*. ¶¶ 36-37. Agents took C.M.'s outer clothing and he "became so cold that he physically shook, yet agents refused his requests for warmer clothing"; they instead told him "that the cold temperature was intended as a punishment." *Id*. ¶ 39. While there, agents would not permit Plaintiffs to go outside and did not provide them cots, mattresses, or even blankets. *Id*. ¶¶ 41-42. They had to sleep and sit on cold, hard benches or the floor. *Id*. ¶ 42. Despite bruising and pain, "C.M. did not receive medical treatment for his neck injury." *Id*. ¶ 43.

The Government housed Plaintiffs in this facility for about two days with approximately twenty other detainees. *Id*. ¶ 40. Agents repeatedly verbally abused them through cursing, insults, and blaming "them for their mistreatment" because of their "choice for leaving [their] country." *Id*. ¶ 44. Agents told C.M. that they would deport him, place his son "up for adoption in the United States," and "he would only see his son again once D.V. turned eighteen and was old enough to be deported as well." *Id*. ¶ 45.

Plaintiffs contend that detention in this facility violates an internal CBP policy, which provides that, with respect to temperature controls: "When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both

detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner." *Id.* ¶ 37 & n.28 (quoting CBP's Nat'l Standards on Transport, Escort, Detention, & Search (2015) at 16).[12]

Just prior to their transfer to a different facility, Agents told all detainees to "say goodbye" to their children and that the children "were being taken and placed for adoption in the United States." *Id.* ¶ 46. At that point, D.V. began crying, clinging to his father, and pleading for his father not to abandon him. *Id.* ¶ 47. The agent who removed D.V. from his father's arms "told them that they would never hear from each other again" and that their separation was due to the decision to come to the United States. *Id.* ¶ 48. Other than the Family Separation Policy[13] of the United States at that time, the Government had no basis to separate D.V. from C.M. – the Government made no allegation or showing that C.M. was unfit or posed a danger to D.V.; nor did C.M. have any criminal or medical history warranting separation. *Id.* ¶ 54.

Upon separating father and son, agents transported C.M. to the Val Verde detention facility of the United States Immigration and Customs Enforcement ("ICE") and detained him there for about two weeks during which agents provided no information about D.V.'s location or what would happen to him. *Id.* ¶¶ 50-51. Agents housed C.M. in another cold holding cell upon arrival before assigning a cell two hours later. *Id.* ¶ 52. While at Val Verde, C.M. feared for his safety because he heard that detainees would attack each other with weapons. *Id.* Further, despite repeated requests, agents would not provide information about D.V.'s whereabouts, safety, or how he was handling the separation. *Id.* ¶ 53. The lack of responsive information caused C.M. emotional distress and constant worry about his son. *Id.*

---

[12] This document is available at https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf). While not mentioned by Plaintiffs, Section 4.12 of that document also provides that "Clean bedding must be provided to juveniles. When available, clean blankets must be provided to adult detainees upon request."

[13] Plaintiffs define the Family Separation Policy as commencing "[b]etween the summer of 2017 and June 26, 2018." Compl. ¶ 16. It thus encompasses the formal written Zero-Tolerance Policy as well as the informal policy in place before the written policy.

On May 3, 2018, C.M. had a telephonic Credible Fear Interview ("CFI") related to his asylum request. *Id*. ¶ 55. Prior to the CFI, no one had given C.M. an opportunity to consult with an attorney, nor did an attorney appear on his behalf at the CFI. *Id*. ¶ 56. During the CFI, C.M. received no information about his son despite begging for information. *Id*. ¶ 57. He wept during the interview and was unable to coherently respond to questions, but he was able to convey "that he faced threats to his life by gangs in Honduras." *Id*. He contends that he was unable to meaningfully participate in the CFI due to his emotional distress. *Id*. ¶ 58. At the end of the CFI, he was asked to sign a document written in English, and from what the interpreter stated, C.M. thought "the purpose of the document was to reschedule the CFI." *Id*. ¶ 59. But the document was actually a "'Request for Dissolution of Credible Fear Process,' which waived his claim to asylum." *Id*. ¶ 60. Soon thereafter, the Government transferred C.M. to the South Texas Detention Complex, where, after about three months separation, the Government finally provided him limited telephone access to his son. *Id*. ¶ 61.

The Government kept Plaintiffs separated for approximately four months before reuniting them, placing them on a plane, and deporting them to Honduras on July 9, 2018. *Id*. ¶ 66. At his first detainment facility while separated from his father, D.V. was abused physically and emotionally, had limited access to speaking with his mother (about once per week), and had no access to his father. *Id*. ¶ 62. D.V. might be punished when he cried for his family by being locked in a room (referred to as the "dark room") or by being physically struck. *Id*. ¶¶ 62-63. He would also be threatened with adoption when he cried for his mother. *Id*. ¶ 63. Adults at that facility also failed to protect D.V. from physical and verbal attacks from other children. *Id*. ¶ 63. Eventually, the Government moved D.V. to a facility in Michigan. *Id*. ¶ 64.

Plaintiffs contend that their experiences while detained in custody "caused deep and long-lasting psychological injury." *Id*. ¶ 67. They further contend that it is well-established that forcibly separating families causes severe harm to children. *Id*. ¶ 68 & n.29. The separation has negatively

impacted D.V.'s social interactions, educational capabilities, and other daily activities. *Id*. ¶ 69. C.M. also suffers from the severe trauma he experienced. *Id*. ¶¶ 71-72.

Plaintiffs also contend that their separation was unconstitutional. *Id*. ¶¶ 73-76. They assert that the separation violated their Fifth Amendment rights to due process to family integrity and familial association. *Id*. ¶ 73.

Plaintiffs assert claims under the FTCA for intentional infliction of emotional distress, abuse of process, battery, negligence, and loss of consortium. *See id*. ¶¶ 77-98. They seek money damages. *See id*. at 19.

## C. Government's Facts and Submissions

The Government provides a declaration that, on March 8, 2018, CBP agents apprehended C.M. and D.V. attempting to illegally enter Eagle Pass by evading inspection.[14] *See* Decl. Barron (ECF No. 22-1) ¶ 3. Plaintiffs did not comply with commands to stop, and they proceeded to run across the primary vehicular lanes into the United States. *See id*. The agents used forced to prevent Plaintiffs from avoiding arrest as they ran. *Id*. After apprehending Plaintiffs, agents escorted them to Passport Control for further inspection. *Id*. Agents patted them down for officer safety before transporting them to the Camino Real Bridge (Bridge 2) in Eagle Pass for processing. *Id*. ¶ 5. At processing, agents advised Plaintiffs of their rights, Plaintiffs stated that they understood those rights and would answer questions. *Id*. Because the Government processed C.M. for expedited removal pending criminal proceedings, it processed D.V. as an unaccompanied child ("UAC") and ultimately transferred him to the care of the Office of Refugee Resettlement ("ORR"). *Id*. ¶ 7.

A Notice and Order of Expedited Removal dated March 9, 2018, includes a Determination of Inadmissibility that found C.M. "subject to removal" based upon his March 8, 2018 attempt to

---

[14] The slight difference in dates between the parties is immaterial. Although it does not matter whether the events occurred on the 8th or 9th of March, the records support finding that the attempt to enter occurred on March 8, 2018. Furthermore, the fact that the Government apprehended C.M.'s brother and nephew at the same time does not matter for this case.

elude inspection. *See* ECF No. 22-11 at 1. It notes that "[o]nce apprehended" C.M. "made a credible fear claim of being returned to . . . Honduras," by C.M.'s "own admission," C.M. was "an intended immigrant not in possession" of any required documentation and not exempt from the "documentary requirement." *Id*. The second page contains a hand-written acknowledgment of "receipt of this form." *Id*. at 2.

The Government also provides true and correct copies of documents related to criminal proceedings against C.M. *See* Decl. Barron ¶ 11 (identifying the criminal docket, criminal complaint, appointment of counsel order, and judgment). The criminal complaint alleges that C.M. knowingly attempted "to enter the United States by eluding examination or inspection by an Immigration Officer" in violation of 8 U.S.C. § 1325(a)(2). *See* ECF No. 22-7. It alleges the following predicate facts:

> That at the Port of Eagle Pass in Eagle Pass, Texas, on March 8, 2018, the defendant was arrested after attempting to enter the United States by eluding inspection from Customs and Border Protection Officers by running through vehicular primary lanes located at the International Bridge in his attempt to enter the United States from Mexico. The defendant was aware that his actions were in violation of law.

*Id*. After appointment of counsel on March 9, 2018, *see* ECF No. 22-8, C.M. entered a "petty plea" to the charge and received a twenty-five-day sentence of imprisonment, *see* ECF No. 22-10. The criminal judgment confirms the entry of plea, imposition of a twenty-five-day sentence with credit for time served, and waiver of a fine due to inability to pay. *See* ECF No. 22-9.

A declaration from an ICE Enforcement Programs Manager or Chief of Staff contains the following information based upon a review of ICE records:

> (1) a Notice and Order of Expedited Removal was issued for C.M. on March 9, 2018;

> (2) C.M. was transferred to ICE custody from the custody of the United States Marshals Service on April 3, 2018, after he completed his criminal sentence;

> (3) D.V. was not housed in an ICE facility, but ICE detained C.M. at various adult detention facilities in 2018, including (a) San Antonio DRO Holding Facility on April 3, 2018; (b) Central Texas Detention Facility and then back to the San

Antonio DRO Holding Facility on April 4, 2018; (c) South Texas ICE Processing Center in Pearsall between April 4, 2018, through April 14, 2018; (d) La Salle County Regional Detention Center in Encinal between April 14, 2018, through April 17, 2018; (e) Baltimore Field Office, on April 17, 2018, where he was officially booked into (f) Ordnance Road Correctional Center, a facility in Glen Burnie, Maryland, on April 18, 2018, and remained there until his removal on July 9, 2018.

(4) a credible fear interview took place for C.M. while he was at the Baltimore Field Office;

(5) C.M. signed a Request for Dissolution of Credible Fear Process on May 3, 2018;

(6) C.M. requested to be removed with D.V.;

(7) Plaintiffs were issued travel documents in June before coordinating flights; and

(8) Plaintiffs were reunited at the airport for joint removal.

*See* Decl. Adams (ECF No. 22-3).

The Government also submits a Declaration from the Director of the Arlington Asylum Office regarding a credible fear interview conducted on May 3, 2018. *See* Decl. Donis (ECF No. 22-4) (mistakenly stating that interview was on May 3, 2021).The interview of that date was conducted via telephone; C.M. expressed a desire to withdraw his credible fear claim so as to seek removal from the United States with his son; C.M. testified that his fear of returning to Honduras subsided because his wife had paid the debt he owed; he was informed that, if he changed his mind, he could receive a new interview before his departure from the United States; and based on C.M.'s representations, the Asylum Officer prepared the Request for Dissolution that was interpreted for C.M. and signed by hm, the asylum officer, and a supervisory asylum officer. *Id*. ¶¶ 2-5.

With respect to D.V.'s custody, the Government provides a declaration of a former senior field specialist supervisor of the ORR. *See* Decl. De La Cruz (ECF No. 22-2). The declarant states: the ORR "places minors in its custody into ORR-funded, state-licensed care provider facilities in order to provide a safe environment in the least restrictive setting appropriate for the child's needs while it attempts to unify minors with a qualified sponsor." *Id*. ¶ 2. Database records of the ORR show that the Government placed D.V. in ORR custody in Michigan on March 11, 2018. *Id*. ¶ 4a.

According to the declarant, an agency call log shows that personnel made first contact with D.V.'s mother on March 12, 2018, and was in regular contact with her beginning on March 15, 2018. *Id.* ¶ 4e. Although the attached call log shows no entry for March 12, 2018, it does show regular contact with the mother between March 15 and July 3, 2018. *See id.* at 4-6. The Government placed D.V. with a Michigan foster family on March 20, 2018. *Id.* ¶ 4b.

C.M. contacted ORR on April 9, 2018, and the case manager discussed sponsorship opportunities for D.V. or potential deportation with C.M. *Id.* ¶ 4g. Two days later, C.M. again contacted the case manager, stated that he wanted to sign the deportation order, and requested initiation of the voluntary departure process for D.V., which his mother agreed. *Id.* ¶ 4h. The call log shows two calls involving C.M. – a five-minute call on April 23, 2018, and a call on May 1, 2018, of unspecified duration. *See id.* at 4-6.

D.V. remained with ORR pending removal with his father because the Government was processing D.V. for voluntary departure. *Id.* ¶ 4i. D.V. left ORR custody on July 9, 2018, when the Government reunited him with his father at the airport for removal. *Id.* ¶ 4j.

**D. Government's Motion**

The Government has moved to dismiss this action under Fed. R. Civ. P. 12(b)(1) on various grounds while also invoking Fed. R. Civ. P. 12(b)(6). For purposes of determining jurisdiction, it attaches previously discussed documentation to the motion. Plaintiffs oppose the motion to dismiss in its entirety. The motion is ready for ruling.

## II. JURISDICTION

Pursuant to Fed. R. Civ. P. 12(b)(1), the Government seeks to dismiss this case for lack of jurisdiction on grounds that Plaintiffs' claims fall outside the FTCA's waiver of sovereign immunity because (1) the discretionary function exception, (2) the due care exception, and (3) the requirement that there be a private person analog bar the claims. Mot. at 20-34.

## A. General Jurisdictional Principles

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). They "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). But given overlap between the merits and jurisdiction in the FTCA context, courts may consider them together and may issue a decision under Rule 12(b)(1), 12(b)(6), or both. *Brownback v. King*, 141 S. Ct. 740, 750 & n.8 (2021).

Although "a federal court always has jurisdiction to determine its own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), it may not otherwise take judicial action in the absence of jurisdiction, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."). With that said, however, "a federal court can decide an element of an FTCA claim on the merits if that element is also jurisdictional." *Brownback*, 141 S. Ct. at 750. When "a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim" and it does not matter whether the dismissal is under Rule 12(b)(1), Rule 12(b)(6), or both. *Id.* at 750 n.8. Naturally, when there is no such "overlap between merits and jurisdiction," subject matter jurisdiction might be lacking "for non-merits reasons, in which case [the court] must dismiss the case under just Rule 12(b)(1)." *Id.*

Bottom-line, courts typically consider jurisdictional challenges before addressing the

merits, but in those rare circumstances when merits and jurisdictional elements merge or overlap, such as in FTCA cases, courts may address them together under either Rule 12(b)(1) or 12(b)(6) or both. Nevertheless, in general, by first considering a Rule 12(b)(1) motion, courts avoid "prematurely dismissing a case with prejudice" when it lacks jurisdiction. *Ramming*, 281 F.3d at 161. A "court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Id.* But again, in the FTCA context when "pleading a claim and pleading jurisdiction entirely overlap, a ruling that the court lacks subject-matter jurisdiction may simultaneously be a judgment on the merits." *Brownback*, 141 S. Ct. at 749. In any event, despite such a merits aspect, courts lack authority to dismiss FTCA claims with prejudice when they lack subject matter jurisdiction over the claims. *Campos v. United States*, 888 F.3d 724, 738 (5th Cir. 2018).

Courts have "the power to dismiss for lack of subject matter jurisdiction based on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)); *accord Flores v. Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019); *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009). When determining issues of subject matter jurisdiction, the courts "may consider outside matter attached to a motion to dismiss without first converting it into a motion for summary judgment." *State of Ala. ex rel. Baxley v. Woody*, 473 F.2d 10, 12 (5th Cir. 1973).

The Fifth Circuit has long distinguished between "facial" and "factual" jurisdictional attacks. *See Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). "An attack is 'factual' rather than 'facial' if the defendant 'submits affidavits, testimony, or other evidentiary

materials.'" *Id.* When faced with a factual jurisdictional attack, "a plaintiff 'must prove the existence of subject-matter jurisdiction by a preponderance of the evidence' and is 'obliged to submit facts through some evidentiary method to sustain his burden of proof.'" *Id*. (quoting *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989) (internal quotation marks and footnotes omitted), *aff'd sub nom.*, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990)).

For factual attacks, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Williamson*, 645 F.2d at 413 (quoting *Mortensen v. First Fed. Sav. & Loan Assoc.*, 549 F.2d 884, 891 (3rd Cir. 1977)). On the other hand, a facial attack requires the courts to "consider the allegations of the complaint as true." *Id*. "Regardless of the nature of the attack, the plaintiff seeking a federal forum 'constantly bears the burden of proof that jurisdiction does in fact exist.'" *Chandler v. United States*, 338 F. Supp. 3d 592, 599 (N.D. Tex. 2018) (quoting *Ramming*, 281 F.3d at 161). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Raj v. La. State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013) (quoting *Ramming*, 281 F.3d at 161).

The Government makes a factual jurisdictional attack by presenting evidence with its motion to dismiss. Accordingly, for purposes of its jurisdictional inquiry, the Court does not presume the truthfulness of any allegation of Plaintiffs and determines whether jurisdiction exists by examining the complaint as supplemented by undisputed facts. Because, with respect to jurisdiction, Plaintiffs do not contest facts within the proffered evidence, the Court has no need to resolve any disputed facts.

## B. Sovereign Immunity

This case presents the issue of sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "It is axiomatic that the United States may not be sued without its consent and that the

existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

Plaintiffs assert claims under the FTCA. While the Government is generally immune from liability absent its consent, *United States v. Mitchell*, 445 U.S. 535, 538 (1980), the FTCA provides that consent "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," *United States v. Olson*, 546 U.S. 43, 44 (2005) (quoting 28 U.S.C. § 1346(b)(1)). Because this provision waives sovereign immunity when "local law would make a '*private person*' liable in tort," there is no "waiver simply upon a finding that local law would make a 'state or municipal entit[y]' liable." *See id*.

The FTCA provides jurisdiction when an asserted claim is "actionable under § 1346(b)." *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (quoting *Meyer*, 510 U.S. at 477).

> A claim is actionable if it alleges the six elements of § 1346(b), which are that the claim be:
>
> > "[1] against the United States, [2] for money damages, . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Id*. (quoting *Meyer*, 510 U.S. at 477). Given "the unique context of the FTCA . . . a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim." *Id*. at 749.

Of course, this waiver of sovereign immunity is subject to a number of exceptions. As provided in 28 U.S.C. § 2680(a), the FTCA

> shall not apply to . . . (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty

on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

"The subsection contains two clauses, separated by the disjunctive 'or', which set forth two separate exceptions to the FTCA." *Lively v. United States*, 870 F.2d 296, 297 (5th Cir. 1989). "The first clause, exempting actions mandated by statute or regulation, applies only if the actor has exercised due care." *Buchanan v. United States*, 915 F.2d 969, 970-71 (5th Cir. 1990). The other "clause, exempting actions based on a discretionary function, contains no due care requirement." *Id.* at 971. "The discretionary function exception, embodied in the second clause of § 2680(a), marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).

Congress intended the § 2680(a) exceptions "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814. "This congressional intent applies to both clauses of the subsection, because the first clause exempts from judicial scrutiny the decisions of legislative bodies and the second clause exempts the decisions of government employees at every level, acting in the exercise of their discretion." *Buchanan*, 915 F.2d at 971.

In general, courts "strictly construe" waivers of sovereign immunity and "resolv[e] all ambiguities in favor of the sovereign." *Joiner v. United States*, 955 F.3d 399, 404 (5th Cir. 2020). Nevertheless, "unduly generous interpretations of the exceptions to the FTCA run the risk of defeating the central purpose of the FTCA, making application of the general rule improper in this context." *Id.* (internal quotations, brackets, and citation omitted). A court's "objective when construing an exception to the FTCA 'is to identify those circumstances which are within the words and reason of the exception – no less and no more." *Id.* (omitting some internal quotation marks)

(quoting *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984)). Courts "do not construe exceptions to the FTCA in favor of any particular party." *Id.*

Consistent with general jurisdictional principles, "plaintiffs bear the burden of showing Congress's unequivocal waiver of sovereign immunity." *Spotts v. United States*, 613 F.3d 559, 568 (5th Cir. 2010). "At the pleading stage, [the] plaintiff must invoke the court's jurisdiction by alleging a claim that is facially outside of the discretionary function exception." *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021) (quoting *St. Tammany Par. ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 & n.3 (5th Cir. 2009)). This requires "pleading facts that facially allege matters outside [such] exception." *Spotts*, 613 F.3d at 568. The rationale for such pleading requirement appears equally applicable to other FTCA exceptions. *Cf. St. Tammany Par.*, 556 F.3d at 315 n.3 (explaining split of authority as to "whether the plaintiff or the government bears the burden of proof to show whether a discretionary function exception to waiver of sovereign immunity applies"). Regardless of "which party bears the ultimate burden of proving the applicability of [an FTCA] exception," Plaintiffs "must advance a claim that is facially outside" asserted exceptions "in order to survive the motion to dismiss." *Id.*

With these legal principles in mind, the Court proceeds to the presented jurisdictional issues. It will consider the issues in the reverse order presented to it because each successive issue requires more in-depth analysis.

### III. PRIVATE PERSON ANALOG

The Government argues that Plaintiffs' claims are barred because there is no private person analog. Mot. at 32-34. Undoubtedly, the waiver of sovereign immunity within the FTCA is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). This parallels 28 U.S.C. § 2674, which provides: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private

individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." In general, these limitations have become known as a private person analog. *See In re FEMA Trailer Formaldehyde Prod. Liab. Litig. [hereinafter FEMA]*, 668 F.3d 281, 289 (5th Cir. 2012) (using phrase "private person analogue"); *Martin Operating P'ship, LP v. United States*, 616 F. App'x 688, 698 (5th Cir. 2015) (mooting argument premised on the "private person analogue requirement"); *D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *6, 10-11 (W.D. Tex. Mar. 23, 2023) (discussing private person analog).

"Whether a private person in 'like circumstances' would be subject to liability is a question of sovereign immunity and, thus, is ultimately a question of federal law." *FEMA*, 668 F.3d at 288 (quoting *United States v. Olson*, 546 U.S. 43, 44 (2005)). Given that "the federal government could never be exactly like a private actor," the court's task "in applying the standard is to find the most reasonable analogy." *Id*. And when undertaking such task, courts cannot allow "[i]nherent differences between the government and a private person . . . to disrupt this analysis." *Id*.

The Government argues that no appropriate analog exists here "[b]ecause only the federal government has the authority to enforce federal criminal and immigration laws and make determinations concerning detention." Mot. at 33. As found in *D.A.*, however, that argument "misses the point" because "Plaintiffs are not challenging [the Government's] authority to enforce federal law but rather the forced separation of their family." 2023 WL 2619167, at *10. Additionally, other courts have likewise found the Government's argument not persuasive because it is better "to focus on the behavior involved, not the legal labels applied, and then look for analogies with private conduct." *Fuentes-Ortega v. United States*, No. CV-22-00449-PHX-DGC, 2022 WL 16924223, at *4 (D. Ariz. Nov. 14, 2022) (quoting *Arvanis v. Noslo Eng'g Consultants, Inc.*, 739 F.2d 1287, 1290 (7th Cir. 1984)). That indeed appears to be the proper focus.

Plaintiffs submit that an apt analogy lies with comparing the duty of care owed by immigration officials with the duty of care owed by private nursing home personnel. Resp. at 30. The

Fifth Circuit has described a Texas jury verdict finding the nursing home liable for negligence in the care provided. *See St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340, 341 (5th Cir. 1999). This verdict indicates that, in "like circumstances," a private nursing home is subject to liability for the negligent acts of its employees. While not a perfect analogy, the Court finds it may be a sufficient private person analog. In similar circumstances, an Arizona federal court has recognized such an analogy. *See C.M. v. United States*, No. CV-19-5217-PHX-SRB, 2020 WL 1698191, *2 (D. Ariz. Mar. 30, 2020).

In addition, other "district courts presented with similar claims stemming from the Zero Tolerance Policy have recognized private analogies." *Fuentes-Ortega*, 2022 WL 16924223, at *4 (citing *A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543, at *5-8 (D. Ariz. Mar. 31, 2022) (acknowledging the existence of a private analogy to intentional infliction of emotional distress ("IIED"), negligence, and loss of consortium); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 994 (D. Ariz. 2020) (same); *C.M.*, 2020 WL 1698191, *2 (recognizing the existence of a private analogy to IIED and negligence); *B.A.D.J. v. United States*, No. CV-21-00215-PHX-SMB, 2022 WL 11631016, at *4-5 (D. Ariz. Sept. 30, 2022) (acknowledging the existence of a private analogy to IIED, negligence, and loss of consortium); *F.R. v. United States*, No. CV-21-00339-PHX-DLR, 2022 WL 2905040, at *3 (D. Ariz. July 22, 2022) (same)). The Court does not intend for this list of cases to fully encompass the breadth of cases addressing the private person analog in similar contexts. It instead provides them for purposes of illustration only.

While Texas law is not at issue in these authorities, Texas undoubtedly recognizes similar causes of action. *See*, *e.g.*, *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022) (identifying elements of a common-law negligence claim); *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998) (identifying elements for an IIED claim). And as discussed later, Plaintiffs have stated plausible IIED and negligence claims in this case. This Court, furthermore, agrees with *D.A.*, and

> finds an analogous circumstance exists under which "the United States, if a private person, would be liable" under Texas law. Specifically, Texas courts recognize a tort cause of action for interruption of the parent-child relationship when someone abducts, entices away, or harbors a parent's minor child. Here, [the Government] took [C.M.'s son] from h[im] plausibly without due process of law. Had it done so as a private person, it would be liable under Texas law.

*See* 2023 WL 2619167, at *10 (footnotes and citations omitted).

Since 1886, Texas has recognized "that a father has a tort cause of action when someone entices away or harbors his minor child." *Silcott v. Oglesby*, 721 S.W.2d 290, 292 (Tex. 1986) (citing *Gulf C. & S.F. Ry. Co. v. Redeker*, 2 S.W. 527, 528 (Tex. 1886)). Although Plaintiffs in this case do not assert this specific basis for overcoming the private analog requirement, *see* Resp. at 29-30, the Court cannot ignore the private analog under Texas law found applicable under similar facts. The Supreme Court has consistently recognized that there may be a private person analog even when "uniquely governmental functions" are at issue. *See Olson*, 546 U.S. at 46 (relying on *Rayonier Inc. v. United States*, 352 U.S. 315, 318-19 (1957); *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955)). In *Olson*, furthermore, the Supreme Court reaffirmed that the words, "like circumstances," as used in 28 U.S.C. § 2674, "do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield." *Id. Silcott* supports finding that a private person analog exists under Texas law.

For these reasons, the private person analog requirement poses no bar to Plaintiffs' FTCA claims.

## IV. DUE CARE EXCEPTION

The Government also invokes the due care exception to the waiver of sovereign immunity. *See* Mot. at 30-32. It argues that this exception precludes Plaintiffs' claims relating to the decision to transfer D.V. to ORR custody. *See id.* at 30. Plaintiffs argue that, not only did the Government not exercise due care when separating them, but it did not even act pursuant to any mandatory statute or regulation. *See* Resp. at 25-29. They contend that *Welch v. United States*, 409 F.3d 646

(4th Cir.2005) provides the proper test for determining the due care exception. *See id.* at 25. In reply, the Government contests the applicability of the *Welch* test while arguing that, "even if the Court were to apply *Welch*'s two-part test, the exception still would shield the United States from liability in this case." Reply at 11.

The due care exception is the first of "two separate exceptions to the FTCA" found within 28 U.S.C. § 2680(a). *Lively v. United States*, 870 F.2d 296, 297 (5th Cir. 1989). It "except[s] claims based on the execution of a statute or regulation." *Id.* It "bars tests by tort action of the legality of statutes and regulations." *D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *5 (W.D. Tex. Mar. 23, 2023) (quoting *Dalehite v. United States*, 346 U.S. 15, 33 (1953)). Although the Government suggests that the exception applies even when a statute or regulation merely authorizes certain conduct, *see* Mot. at 31, the Fifth Circuit has noted that the exception only "exempt[s] actions mandated by statute or regulation," *Buchanan v. United States*, 915 F.2d 969, 970-71 (5th Cir. 1990). And the exception necessarily "applies only if the actor has exercised due care." *Id.* at 971.

"The Fifth Circuit has not established a test for the due care exception, although many courts . . . follow the two-prong test laid out by the Fourth Circuit in *Welch*." *D.A.*, 2023 WL 2619167, at *5. This two-part test requires courts to "determine whether the statute or regulation in question specifically [prescribes] a course of action for an officer to follow," and "if a specific action is mandated, [courts] inquire as to whether the officer exercised due care in following the dictates of that statute or regulation." *Welch*, 409 F.3d at 652. In short, when the federal actor exercises due care, the FTCA does not waive sovereign immunity. *Id.*

The Court sees no issue in applying the *Welch* test. As discussed in the next section, courts fully accept that the discretionary function exception does "not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988). In other words, if a federal statute,

regulation, or policy provides discretion then the discretionary function exception applies and there is no need to consider whether a federal actor exercised due care. As recognized in *Lively*, the discretionary function exception "has no [due care] requirement." 870 F.2d at 297. Further, because § 2680(a) only refers to "execution of a statute or regulation," within the due care exception, it follows that the specific prescription requirement flows directly from that initial exception of § 2680(a). This makes sense given that the statute has no due care requirement when the federal actor is acting under discretionary authority. Consequently, the first prong of the *Welch* test flows directly from the discussion in *Berkovitz*. And, with respect to the second prong, no one can reasonably argue that it is not inherent in the exception itself.

The *Welch* test, moreover, appears eminently consistent with *Buchanan*, which notes that the due care exception exempts actions mandated by statute or regulation so long as the actor exercised due care. *See* 915 F.2d at 970-71. Absent binding authority to the contrary, the Court finds that *Welch* succinctly states the test applicable to determining whether the due care exception maintains the Government's sovereign immunity despite the waiver within the FTCA.

The Government argues that, absent exceptional circumstances, 8 U.S.C. § 1232(b)(3) required it to transfer D.V. to the ORR within 72 hours of determining the child to be an unaccompanied minor with no parent available to provide care. Mot. at 32. Plaintiffs argue that this statute does not mandate their separation given the Government's implicit concession that it has stopped separating families in similar circumstances. Resp. at 26. But Plaintiffs' argument overstates the implicit concession resulting from changed governmental policies that occurred with the newly elected President taking office in January 2021 and issuing EO 14011. As EO 14011 reveals, the focus of the condemned human tragedy was the intentional separation of families through various means including the Zero-Tolerance Policy. One cannot unravel the complexities and intricacies of the immigration system merely by pointing to a re-focused policy and thereby concluding that a specific statute from within the immigration morass is accordingly non-mandatory. The tangled

web of immigration is not so easily unraveled.

Plaintiffs cite three cases to support their position, but the cases are more properly under-stood as finding that the due care exception is inapplicable when "separations were conducted pursuant to executive policy, not any statute or regulation." *See Nunez Euceda v. United States*, No. 2:20-CV-10793-VAP-GJSx, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2021); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 995-96 (D. Ariz. 2020); *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2020). In each of these cases, the Government cited no statute or regulation mandating the separation of families. In two of the cases, the Government suggested that § 1232(b)(3) authorized the separation of individuals "amenable to prosecution" from those who are not amenable. *See A.P.F.*, 492 F. Supp. 3d at 995-96 & n.3; *C.M.*, 2020 WL 1698191, at *3 & n.4. In this case, however, C.M. was not only amenable to prosecution, but the Government did prosecute him. The different factual circumstances of this action reduce the persuasiveness of the cited cases.

Plaintiffs' stronger argument is that the due care exception applies only when a statute or regulation mandates a course of conduct. *See* Resp. at 26. To the extent the Government contends that a statute or regulation must merely authorize the conduct, the Court finds such contention inconsistent with Fifth Circuit precedent.

From that forceful argument, Plaintiffs proceed to argue that "[t]here is no single statutory or regulatory provision that expressly authorized the Government to separate Plaintiffs in the cir-cumstances alleged in the Complaint." *Id*. at 27. Although they recognize that the Government identifies § 1232(b)(3) as a statutory provision that mandated its actions, they contend that the statute has no applicability to their situation because D.V. was an accompanied minor. *See id.* There is some initial merit to the contention considering that Plaintiffs arrived in the United States together and the Government apprehended and initially detained them together. To that extent, C.M. accompanied his son, D.V. But the definition of unaccompanied minor includes minors who

lack an available parent in the United States to provide care and physical custody. *See* 6 U.S.C. § 279(g). The Government argues that C.M. became unavailable to provide care of D.V. once it commenced criminal charges against C.M. and placed the father "in secure immigration detention separate from D.V." Reply at 11.

The court in *D.A.* accepted that § 1232(b)(3) required the Government to transfer the minor children of that case to DHHS/ORR once the mother "was incarcerated." 2023 WL 2619167, at *11. Actual incarceration of an accompanying parent indeed makes the parent unavailable to provide care to the child. After the Government exercises its discretionary authority to prosecute a noncitizen parent accompanying his or her minor child, the Government may determine the minor to be an unaccompanied minor subject to mandatory placement with the ORR under § 1232(b)(3).

But even when the Government has determined that a child is unaccompanied, the statute provides an exception to transfer in a "case of exceptional circumstances." 8 U.S.C. § 1232(b)(3). The Government does not explain how or whether the "exceptional circumstances" component of § 1232(b)(3) affects the mandatory nature of the statute. And Plaintiffs do not directly focus on that component in any respect, even though they make vague arguments that might touch upon the component, if more developed. Furthermore, caselaw addressing what qualifies as exceptional circumstances is remarkably sparse in general, and no cases expressly discuss that component in the current context. Absent argument that the exceptional circumstances component removes the mandatory nature of § 1232(b)(3), the Court accepts the premise that the statute mandates specific governmental action.

Nevertheless, the Government must exercise due care while executing the mandatory requirements of the statute. As the Supreme Court held many years ago, due care within the meaning of the FTCA "implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956). At this stage of litigation, Plaintiffs must advance a claim that is facially outside the due care exception. *Cf. Dickson v. United States*, 11 F.4th 308, 312 (5th Cir.

2021) (addressing requisite showing in context of discretionary function exception); *In re Katrina Canal Breaches Consol. Litig.*, 627 F. Supp. 2d 656, 668 (E.D. La. 2009) (addressing exception at summary judgment and finding "that once Plaintiffs allege and offer substantial evidence that due care was not used . . . the cloak of this immunity statute is unavailable, and the [the Government] must rely on the discretionary function exception for immunity").

Here, Plaintiffs allege enough facts to advance claims outside the due care exception. When dealing with minors, the best interests of the minor are of paramount importance. But based on the allegations of Plaintiffs, the welfare of D.V. took a back seat to a decision to prosecute the father for a misdemeanor offense of unlawful entry. Further, after the father pled guilty to such offense, the court imposed a twenty-five-day sentence with credit for time served. Although the court could have imposed a fine with or without a term of imprisonment, it waived any fine due to C.M.'s inability to pay. The Government then housed father and son separately during that brief sentence.[15]

Once the father completed his sentence, the Government took no steps to reunite the family while it processed their asylum application. Even though noncitizens in expedited removal proceedings are not entitled to release on bond, *see* 8 U.S.C. § 1225(b)(1)(B)(ii) & (iii)(IV), the Government has statutory authority to "arrange for appropriate places of detention for aliens pending removal or decision on removal," *id*. § 1231(g)(1), and may grant temporary parole "for urgent humanitarian reasons or significant public benefit," *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 673 (S.D. Tex. 2021). Reuniting a seven-year-old child with his parent may qualify as an urgent humanitarian reason. Regardless, this alleged series of events is enough to advance claims outside

---

[15] This separation may be acceptable when viewed in isolation. But still, the Government has not identified either statutory or regulatory authority for why it was unable to house such a convict in an immigration detention center near or with his seven-year-old son who had accompanied him to the United States seeking refuge. Such a minimal sentence should provide immigration authorities with options for detention. Surely, the placement decisions for both the convicted father and his son can factor in the best interests of the child when the Government apprehends them together. Although the Government might have authority that mandates otherwise, its failure to identify any such authority is notable.

the realm of the due care exception.

The Court further notes that acts taken pursuant to an EO or the Zero-Tolerance Policy are not taken pursuant to a statute or regulation, thus making the due care exception inapplicable for such acts. *See D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 597-98 (S.D.N.Y. 2022). Although the Government points out that it apprehended Plaintiffs prior to any official date for the Zero-Tolerance Policy, various governmental reports recognize that the Government enforced and pursued such policy prior to the formal written policy. Given these government reports, which are subject to judicial notice, the Court accords no weight to the Government's position that this case occurred before the Zero-Tolerance Policy.

For these reasons, the Court finds that the due care exception does not affect the waiver of sovereign immunity by the FTCA at this juncture.

## V. DISCRETIONARY FUNCTION EXCEPTION

The Government primarily argues that the discretionary function exception of the FTCA bars Plaintiffs' claims. *See* Mot. at 17-30. Plaintiffs disagree. *See* Resp. at 12-25.

Despite the waiver of sovereign immunity within 28 U.S.C. § 1346(b)(1), "if the suit implicates 'the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused'—the so-called 'discretionary function' exception—sovereign immunity is retained." *Joiner v. United States*, 955 F.3d 399, 403-04 (5th Cir. 2020) (quoting 28 U.S.C. § 2680(a)). "The discretionary function exception is one of several limitations on the FTCA's waiver." *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016). This "exception preserves the government's sovereign immunity when the plaintiff's claim is based on an act by a government employee that falls within that employee's discretionary authority." *Id*.

Notably, "it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exception." *United States v. S.A. Empresa de Viacao Aerea Rio*

*Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984). But there are "factors useful in determining when the acts of a Government employee are protected from liability by § 2680(a)." *Id.* One, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Id.* In other words, "the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Id.* Two, "whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Id.* at 814. This is reflected in the previously mentioned Congressional intent "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* Three, when "there is room for policy judgment and decision there is discretion." *Lively v. United States*, 870 F.2d 296, 298 (5th Cir. 1989) (quoting *Varig Airlines*, 467 U.S. at 811).

"At the pleading stage, the plaintiff has the burden to 'invoke the court's jurisdiction by alleging a claim that is facially outside of the discretionary function exception.'" *Gibson v. United States*, 809 F.3d 807, 811 n.1 (5th Cir. 2016) (quoting *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009)). Plaintiffs thus have "the burden of establishing that the discretionary function exception does not apply at this stage in the proceedings." *Joiner*, 955 F.3d at 404.

Courts "apply a two-part test to determine whether an agency's conduct qualifies as a discretionary function or duty." *Gibson*, 809 F.3d at 811 (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991)). The first step requires courts to "consider whether the conduct at issue was 'discretionary in nature' and involved an 'element of judgment or choice.'" *Joiner*, 955 F.3d at 404 (quoting *Gaubert*, 499 U.S. at 322). Next, even if the conduct at issue qualifies as discretionary, "the court must evaluate whether it is 'of the kind that the discretionary function exception

was designed to shield.'" *Id.* (quoting *Gaubert*, 499 U.S. at 322-23).

## A. Discretionary Function or Duty

Because "the conduct must be a 'matter of choice for the acting employee,'" *Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)),

> the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Berkovitz*, 486 U.S. at 536.

Stated differently, "the discretionary function exception does not apply if the challenged actions in fact violated a federal statute, regulation, or policy." *Spotts*, 613 F.3d at 567 (citing *Gaubert*, 499 U.S. at 324; *Berkovitz*, 486 U.S. at 547). "The requirement of judgment or choice is not satisfied" in those circumstances. *Gaubert*, 499 U.S. at 322. The reasoning behind "this rule is obvious—a federal employee cannot be operating within his discretion if he is in fact violating a nondiscretionary policy." *Spotts*, 613 F.3d at 568. As the Fifth Circuit has explained:

> Just because the discretionary function exception would generally shield the government from FTCA liability otherwise arising from [a] policy decision, it does not follow that the government is automatically shielded from such liability when the acts of the particular agents seeking to implement that policy violate another federal law, regulation, or express policy. Actions taken to carry out a discretionary policy must be taken with sufficient caution to ensure that, at a minimum, some other federal law is not violated in the process.

*Id.* (quoting *Johnson v. Sawyer,* 980 F.2d 1490, 1503 (5th Cir.1992), *vacated on other grounds,* 47 F.3d 716 (5th Cir. 1995) (en banc)). "Acting in contravention of a statute not only takes conduct outside the permissible scope of discretion, it also often establishes negligence per se." *Tsolmon*, 841 F.3d at 383 n.3. But a statutory violation removes the protection of the discretionary function exception "only when the statute governing the action 'giv[es] specific direction as to any of these

functions in a way that would make [the acts] nondiscretionary.'" *Id.* at 384 (quoting *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005)).

On first glance, the reasoning behind applying the above rationale to a constitutional violation likewise appears obvious. Federal employees cannot operate within their discretion when they are in fact violating the United States Constitution – there is simply no discretion for an employee to violate constitutional rights. The Government agrees that the Constitution is similar to statutes, regulations, and policies and that "in some cases, the Constitution may establish such a specific prescription that it removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute." Mot. at 27. It contends that a mere allegation of unconstitutional conduct does not render the exception inapplicable, but a plaintiff may show the exception to be inapplicable through "a specific, clearly established directive, accompanied by plausible assertions that the specific directive was violated." *Id.* at 28 (citing *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019)).

The Government also argues that the Supreme Court has "explicitly recognized that the discretionary function exception would apply even if alleged conduct might later be held unconstitutional." *Id.* (citing *Butz v. Economou*, 438 U.S. 478 (1978)). Plaintiffs do not directly address *Butz* but argue that the weight of authority within the circuits is that the discretionary function exception does not shield unconstitutional conduct. *See* Resp. at 13. They also point out that the Fifth Circuit has stated that it has not directly addressed the issue. *Id.* at 14.

Whether the rationale applicable to statutes, regulations, and policies likewise applies to constitutional violations is unclear under current Fifth Circuit precedent. *D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *4 n.63 (W.D. Tex. Mar. 23, 2023). But as recognized in *D.A.*, the Western District of Texas previously found the rationale applicable "for constitutional violations as well, presuming 'there is a specific and intelligible constitutional mandate.'" *Id.* (quoting *McElroy v. United States*, 861 F. Supp. 585, 593 (W.D. Tex. 1994)). *D.A.* and *McElroy*

42

provide a basis for quickly and easily extending the *Gaubert* rationale to the constitutional arena. But even though the Government has conceded the applicability in some instances, its reliance on *Butz* and its argument for requiring a specific, clearly established constitutional directive to overcome the discretionary function exception, require the Court to take a deeper dive into the murky waters of Fifth Circuit precedent in this area.

### 1. <u>Fifth Circuit Precedent</u>

In 1987, a circuit panel stated: "[W]e have not hesitated to conclude that [an] action does not fall within the discretionary function [exception] of § 2680(a) when governmental agents exceed the scope of their authority as designated by statute or the Constitution." *See Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987). While suggesting prior Fifth Circuit cases supported the statement, *Sutton* merely provides a single example of when it had "held that violation of agency regulations represents conduct outside the discretionary function exception, and thus outside sovereign immunity." *Id*. (citing *Collins v. United States*, 783 F.2d 1225, 1230-31 (5th Cir. 1986)). As expounded upon in *Sutton*:

> A government agent who departs from the duties of an investigator and embarks on an intentional abuse within the meaning of § 2680(h) similarly exceeds the scope of his authority and acts outside his discretion. One may hypothesize, the classic *Bivens*-style tort, in which a federal law enforcement officer uses excessive force, contrary to the Constitution or agency guidelines, which simply does not involve the exercise of discretion as that term has been applied under § 2680(a).

*Id*.

Twenty-two years later, the circuit reiterated *Sutton*'s clear statement about the interplay between the discretionary function exception and constitutional violations while recognizing that, although "an argument can be made that the district court properly analyzed the two *Gaubert* factors, that [district] court erred by not first considering whether the Border Patrol Agents exceeded the scope of their authority" as explained in *Sutton*. *See Castro v. United States (Castro II)*, 560 F.3d 381, 389 (5th Cir. 2009) (quoting *Sutton*) (omitting procedural history). In fact, that circuit

panel accepted that "[t]his principle of law has been recognized by a majority of other circuits as well." *See id*. at 389 (citing cases). The *Castro II* panel further stated:

> Admittedly, this court and others have been less than clear about where this "scope of authority" analysis fits within the *Gaubert* factors: arguably some courts have treated it as a prerequisite, while others have seemingly integrated it into the first *Gaubert* factor. Nevertheless, it is overwhelmingly clear that, as the First Circuit has written, "courts have read the Supreme Court's discretionary function cases as denying protection to actions that are unauthorized because they are unconstitutional, proscribed by statute, or exceed the scope of an official's authority." *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003) (internal citations omitted). Because the Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply, if the Agents acted in violation of [an individual's] constitutional rights, and therefore outside their scope of authority, that conclusion would eclipse the district court's analysis under the *Gaubert* framework.

*Id*. at 389 (omitting some citations). The panel rejected governmental arguments at least in part "because even though governmental actors have wide discretion to carry out their statutory and regulatory obligations, courts have never interpreted delegated authority so broadly as to infringe upon constitutionally-protected rights and freedoms." *Id*. at 391 (citing, *e.g.*, *Hernandez v. Cremer*, 913 F.2d 230, 237 (5th Cir. 1990) (explaining that courts should "construe narrowly all [Congressionally-]delegated powers that curtail or dilute [constitutional protections.]" (citing *Kent v. Dulles*, 357 U.S. 116, 129 (1958))).

If either *Sutton* or *Castro II* remain controlling authority, then constitutional violations undoubtedly make the discretionary function exception inapplicable. Plaintiffs characterize the *Sutton* discussion about constitutional violations as mere dicta, *see* Resp. at 14, and thus not controlling. Furthermore, "the Fifth Circuit, en banc, summarily vacated the *Castro* panel decision, but [in doing so] failed to address, resolve, and provide lower courts with guidance regarding the interplay between constitutional allegations and the discretionary-function exception." *Campos v. United States (Campos I)*, 226 F. Supp. 3d 734, 741 (W.D. Tex. 2016) (citing *Castro v. United States (Castro III)*, 608 F.3d 266, 268-69 (5th Cir. 2010) (per curiam) (en banc)), *aff'd in part, rev'd in part on other grounds*, 888 F.3d 724 (5th Cir. 2018). The en banc court (*Castro III*) instead

"adopted the prior district court opinion that the Government had satisfied both *Gaubert* prongs, remaining silent on the import of the plaintiff's constitutional allegations."[16] *Id.*

While *Castro II*, the panel opinion, "has no precedential value," *Lopez v. U.S. Immigr. & Customs Enf't*, 455 F. App'x 427, 434 (5th Cir. 2011) (per curiam), *Castro III* did not eliminate the possibility that a constitutional violation may make the discretionary function exception inapplicable. Indeed, the Fifth Circuit has subsequently stated that it has "not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function exception." *Spotts*, 613 F.3d at 569 (citing *Castro III*); *accord Campos v. United States (Campos II)*, 888 F.3d 724, 735 (5th Cir. 2018) (recognizing the same lack of determination and finding no need to "decide the issue . . . because we find the question not to be sufficiently raised"); *Doe v. United States*, 831 F.3d 309, 319 (5th Cir. 2016) ("Whether a properly pled constitutional violation allows a plaintiff to circumvent the discretionary function exception is an open question in this circuit."); *Lopez*, 455 F. App'x at 434 (following *Spotts* in declining to decide "whether a properly pled state law tort claim predicated on a decision that violates the Constitution may obviate the discretionary function exception"). However, two unpublished Fifth Circuit opinions have held that the Eighth Amendment protection against cruel and unusual punishment is not specific enough to render the discretionary function exception inapplicable in a failure-to-protect context. *See Campillo v. U.S. Penitentiary Beaumont*, 203 F. App'x 555 (5th Cir. 2006) (per curiam) (finding no plain error in the dismissal of FTCA claim based on a failure to protect under the Eighth Amendment); *Garza v. United States*, 161 F. App'x 341, 343-44 (5th Cir. 2005) (addressing discretionary function exception with respect to an Eighth

---

[16] The en banc court also agreed "that the constitutional claims [we]re moot," as explained by the district court. *See Castro III*, 608 F.3d at 268. As the district court had explained, it had previously "ruled that Plaintiffs cannot seek monetary damages for their constitutional claims," thus making only injunctive relief available and the only injunctive relief sought was assistance in finding Castro's daughter, who had already been returned to her. *Castro v. United States (Castro I)*, No. CIV.A. C-06-61, 2007 WL 471095, at *9 (S.D. Tex. Feb. 9, 2007), *rev'd*, 560 F.3d 381 (5th Cir. 2009), *aff'd on reh'g en banc*, 608 F.3d 266 (5th Cir. 2010). As evident from this brief discussion, *Castro III* did not address constitutional claims as a conduit for finding the discretionary function exception inapplicable.

Amendment failure-to-protect claim).

It is within this context that this Court must tread into the murky waters of the interplay between alleged constitutional violations and the discretionary function exception. And the Court treads carefully into these waters. Based upon *Spotts*, *Campos II*, and *Doe*, this Court has a clean canvass upon which to consider the interplay. But it also has the Government's concession that specific prescriptions within the Constitution may remove discretion. Two positions have emerged in this area, a generally older and more established majority position, and a generally newer minority position. Both positions may inform the Court's analysis on this complex issue. But before reviewing those positions, the Court first addresses the Government's argument relying on *Butz*.

### 2. *Butz*

The Government essentially argues that "*Butz* and subsequent decisions . . . leave no doubt that conduct that violates the Constitution may constitute the type of abuse of discretion that falls within the scope of the discretionary function exception." Mot. at 28. And, in the context of discussing absolute versus qualified immunity with respect to constitutional violations by federal employees, the Supreme Court stated: "Moreover, no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused." *Butz v. Economou*, 438 U.S. 478, 505 (1978).

However, if *Butz* has the impact to which the Government attributes to it, then circuit court opinions regarding the issue are simply meaningless, even those from the Fifth Circuit. But *Butz* does not appear to end the discussion, because if it did, the Fifth Circuit would have had no reason to state that it had not yet determined the interplay between the discretionary function exception and alleged constitutional violations. If *Butz* indeed presents the definitive answer, then there appears to be no reason for the Fifth Circuit to highlight its lack of determination.

The Court knows of no case in which a court has applied *Butz* in the manner suggested by the Government. The Court finds the statement in *Butz* to be non-binding dictum. Still, the

statement is pertinent when considering the persuasiveness of presented precedent. *Butz* also recognizes that the American

> system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law: "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it."

438 U.S. at 506 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)). While *Butz* does not end the discussion, the Court will remain mindful of its legal principles as it proceeds with the issues of this case.

### 3. **Majority Position**

As recognized in *Castro II*, the majority of other circuits accept the principle that a constitutional violation renders the discretionary function exception inapplicable. *See* 560 F.3d 381, 389 (5th Cir. 2009). Plaintiffs also cite to additional circuit cases. *See* Resp. at 13. Having reviewed these cases, the Court finds them persuasive. *See Loumiet v. United States*, 828 F.3d 935, 944 (D.C. Cir. 2016); *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001); *Nurse v. United States*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000); *Prisco v. Talty*, 993 F.2d 21, 26 n.14 (3d Cir. 1993); *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975). Furthermore, in a different context, the Supreme Court has specifically held that "a municipality has no 'discretion' to violate the Federal Constitution, its dictates are absolute and imperative." *Owen v. City of Independence*, 445 U.S. 622, 649 (1980). Applying that rationale to the discretionary function exception removes the requisite discretion to make the exception applicable. This holding further supports the Court's conclusion that *Butz* does not have the impact to which the Government attributes to it.

### 4. **Minority Position**

The Seventh Circuit has taken a different approach. *See Linder v. United States*, 937 F.3d

1087, 1090-91 (7th Cir. 2019). It begins with the proposition that "the theme that 'no one has discretion to violate the Constitution' has nothing to do with the Federal Tort Claims Act, which does not apply to constitutional violations." *Id.* at 1090. But the fact the FTCA does not encompass constitutional claims does not mean that a constitutional violation cannot be a conduit for overcoming the discretionary function exception. Further, while addressing the plaintiff's argument that "just as no one has discretion to violate the Constitution, no one has discretion to commit a tort," the Seventh Circuit agreed that "[n]o one should commit a civil wrong." *Id.* at 1091. But to avoid draining § 2680(a) of all meaning, it found that the discretionary function exception "must apply to discretionary acts that are tortious." *Id.* However, the fact that the exception must apply to discretionary tortious acts does not mean that a constitutional violation cannot remove the discretion necessary for the exception to apply. The *Linder* line of reasoning is simply unpersuasive to this Court.

    *Linder* relies on *Kiiskila v. United States*, 466 F.2d 626 (7th Cir. 1972) for the proposition that "[n]othing in [§ 2680(a)] suggests that some discretionary but tortious acts are outside the FTCA while others [are not]." *See* 937 F.3d at 1091. First, the quoted language misses an important nuance. The courts that find discretionary function exception inapplicable in the context of unconstitutional conduct do so because there is an absence of discretion in such instances. Therefore, such cases are not saying that "some discretionary but tortious acts are outside the FTCA while others [are not]," they are simply finding no discretion involved in committing unconstitutional acts. *Kiiskila* is a very brief, per curiam opinion that does not analyze whether unconstitutional conduct may eliminate discretion and thus make the discretionary function exception inapplicable. It simply applies the exception while recognizing the "constitutionally repugnant" governmental actions. *See* 466 F.2d at 627-28. It finds constitutionally repugnant discretion where other courts find that conduct which violates the Constitution is simply outside the realm of discretion. The latter line of reasoning makes more sense. *See Owen*, 445 U.S. at 649.

The Eleventh Circuit has followed *Linder* and *Kiiskila* to likewise find that the discretionary function exception bars unconstitutional tortious actions. *See Shivers v. United States*, 1 F.4th 924, 932-33 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1361 (2022). *Shivers* begins its analysis with the statutory text and concludes that the plain statutory text leaves "no room for [an] extra-textual 'constitutional-claims exclusion.'" *Id.* at 930.

The Eleventh Circuit, however, takes no issue with the principle that "a 'federal statute, regulation, or policy" precludes the application of the discretionary function exception." *See id.* at 931 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). And from that principle, the Eleventh Circuit surmises:

> Only when a federal employee acts contrary to a specific prescription in federal law—be it a statute, regulation, or policy—does the discretionary function exception not apply. The Supreme Court has repeatedly said that the discretionary function exception applies unless a source of federal law "specifically prescribes" a course of conduct.

*Id.* (citing *Gaubert* and *Berkovitz*).

However, neither cited Supreme Court case uses "unless" in that context. *Gaubert* uses "unless" once, but the usage relates to replacement of management and directors. *See Gaubert*, 499 U.S. at 319. *Berkovitz* also uses the term once when making the following holding: "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." *See* 486 U.S. at 536. Neither *Gaubert* nor *Berkovitz* preclude finding the discretionary function exception inapplicable when the Constitution has removed discretion. To the contrary, the rationale for finding that federal statutes, regulations, and policies may eliminate the requisite discretion appears equally (if not more strongly) applicable in the constitutional context. And applying the rationale in the constitutional context comports with the Government's concession that a specific

constitutional prescription may remove discretion. *See* Mot. at 27.

While § 2680(a) mentions statutes and regulations, it does so in the context of the "due care" exception, not its second discrete exception – the discretionary function exception. The statute does not even mention a policy violation, but such a violation may render the discretionary function exception inapplicable. Moreover, because it is well-accepted that a violation of a statute, regulation, or policy may remove discretion and render the discretionary function exception inapplicable, the same rationale can apply to a constitutional violation. This Court is not convinced by the statutory interpretation of the Eleventh Circuit. The statute requires "a discretionary function or duty" to invoke applicability of the discretionary function exception. If a statute, regulation, or policy can remove discretion, then surely the Constitution of the United States can as well. Absent discretion the exception cannot apply.

Furthermore, to the extent *Shivers* relies on the Seventh Circuit, this Court finds such reliance unpersuasive for the reasons previously stated. In addition, this Court specifically finds the dissenting opinion in *Shivers* to be well-reasoned and persuasive. *See Shivers*, 1 F.4th at 936-40 (Wilson, J., dissenting). One aspect of the dissent, which has not yet been explicitly mentioned is that the discretionary function "exception 'applies only to conduct that involves *permissible* exercise of policy judgment.'" *Id.* at 937 (Wilson, J., dissenting) (adding emphasis and quoting *Berkovitz*, 486 U.S. at 539). Further, "if government employees violate the Constitution, they are necessarily—and impermissibly—acting outside the scope of their discretion, rather than merely abusing the discretion they have." *Id.* (Wilson, J., dissenting).

Interpreting "the plain language of the FTCA," the Eastern Division of the Southern District of Louisiana concluded that "[n]owhere within the plain language of the FTCA does it provide that a constitutional violation may serve as a basis for casting aside the discretionary function exception." *Hernandez v. Causey*, No. 2:17-CV-123-TBM-MTP, 2022 WL 4594023, at *5 (S.D. Miss. Sept. 29, 2022). This Court is not convinced by the statutory interpretation of the Southern

District of Louisiana for the same reasons discussed with respect to the Eleventh Circuit's inter-pretation. The Southern District recognized the circuit split and found the Seventh and Eleventh Circuit cases "most persuasive." *Id*. at *5. But the Southern District adds nothing persuasive to the analyses of the Seventh and Eleventh Circuits, which this Court has already found to be unpersua-sive.

The District of Utah has also refused to find the discretionary function exception inappli-cable when a government agent engages in unconstitutional conduct. *See Ramirez v. Reddish*, No. 2:18-cv-176-DME, 2020 WL 1955366, at *27-33 (D. Utah Apr. 23, 2020). In general, *Ramirez* adds little more to the analysis. It essentially relies on specific language set out in *Gaubert* and *Berkovitz* without considering whether those cases support a contrary conclusion. *Id*. at *27-29. It then states its approval of the Seventh Circuit decisions, *see id*. at *30, before setting out why it viewed the *Loumiet* decision as "flawed" and had reached an "odd conclusion," *see id*. at *30-32. It also cites with approval the dissent in *Castro II* as support for noting that the Supreme "Court has never included the federal constitution as a possible source mandating a course of action" and noting parenthetically that such omission should be dispositive as to whether the Constitution may be a source "that nullifies the discretionary function exception." *See id*. at *31 (citing *Castro II*, 560 F.3d 381, 393 (5th Cir. 2009) (Smith, J., dissenting)).

Just this year, the Eastern District of Pennsylvania has stepped away from three Third Cir-cuit opinions that have "held that (contrary to *Shivers* et al.,) conduct cannot be protected by the discretionary function defense if it violates the Constitution." *Shahen v. United States*, No. CV 21-2039, 2023 WL 1805828, at *7 (E.D. Pa. Feb. 6, 2023). It does so by first noting that, "although these cases do contain language which suggest that a constitutional violation precludes application of the discretionary function exception in each case the discussion was dicta." *Id*. It then recog-nized that all three Third Circuit cases "were decided before the Supreme Court's decision in *Meyer*, which, as other courts have noted, at least casts significant doubt on that proposition." *Id*.

at *8 (citing *Shivers*, 1 F.4th at 928, 930).

*Shahen* properly characterizes the question at issue in *Meyer* as "whether a *Bivens* action—normally brought against federal agents who allegedly violate the Constitution—can also be brought directly against an agency of the United States." *Id*. at *6 (citing *FDIC v. Meyer*, 510 U.S. 471, 473 (1994)). In *Meyer*, the Supreme Court held that "Meyer's constitutional tort claim is not 'cognizable' under [the FTCA, 28 U.S.C.] § 1346(b) because it is not actionable under § 1346(b)—that is, § 1346(b) does not provide a cause of action for such a claim." 510 U.S. at 477. *Shahen* recognizes that "[c]ircuit courts have taken divergent approaches in evaluating what the Supreme Court meant" in *Meyer*. 2023 WL 1805828, at *6. It simply sides with *Shivers*, which this Court has found unpersuasive.

### 5. Reasoning for Following Majority Position

As stated in a prior section, this Court finds the majority position more persuasive, including the reasoned opinions of the D.C. Circuit (*Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016)) and the First Circuit (*Limone v. United States*, 579 F.3d 79 (1st Cir. 2009)). The following brief passage from *Loumiet*, exemplifies the persuasive reasoning:

> A plaintiff who identifies constitutional defects in the conduct underlying her FTCA tort claim—whether or not she advances a *Bivens* claim against the individual official involved—may affect the availability of the discretionary-function defense, but she does not thereby convert an FTCA claim into a constitutional damages claim against the government; state law is necessarily still the source of the substantive standard of FTCA liability. The First Circuit has similarly emphasized, in holding unconstitutional conduct to fall outside of "the sweep of the discretionary function exception," that it does not view the government's "constitutional transgressions as corresponding to the plaintiffs' causes of action—after all, the plaintiffs' claims are not *Bivens* claims—but rather, as negating the discretionary function defense." *Limone*, 579 F.3d at 102 & n. 12.

828 F.3d at 945-46.

After reviewing both sides of discretionary function exception issue, the Court finds the majority position better reasoned. Neither *Gaubert* nor *Berkovitz* dealt with any constitutional violation. In a unanimous opinion, *Berkovitz* at least twice emphasizes that the discretionary function

exception applies only when challenged conduct "involves the permissible exercise of policy judgment." *See* 486 U.S. 531, 537, 539 (1988). It also specifically recognized that the question before it was whether the challenged governmental activities were of such "discretionary nature." *Id.* at 539. It later states:

> The discretionary function exception . . . does not apply if the acts complained of do not involve the permissible exercise of policy discretion. Thus, if the Bureau's policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful.

*Id.* at 546-47.

Relying on *Berkovitz*, *Gaubert* held: "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536). The Government appears to have no disagreement with including the United States Constitution to this list, but some courts favoring the minority position, make much of the absence of the Constitution from this list. However, nothing indicates that the list was meant to be all encompassing or intended to specifically exclude the Constitution. The most obvious reason for the omission is that neither Supreme Court case had need to address any constitutional violation. There is no basis to reasonably infer from the omission that the cases should be limited to the listed sources.

Nor is there any basis to reasonably infer from the omission that unconstitutional conduct can be protected as discretionary when violations of federal statutes, regulations, and policies can be deemed non-discretionary with respect to the applicability of the discretionary function exception. The general legal principles set out in *Berkovitz* and *Gaubert* appear equally applicable in the context of alleged unconstitutional conduct. Such appearance is bolstered by the Supreme Court's earlier recognition that there is "no 'discretion' to violate the Federal Constitution," because "its

dictates are absolute and imperative." *Owen v. City of Independence*, 445 U.S. 622, 649 (1980). And based on the majority of courts of appeals that have addressed the matter, the discretionary function exception does not shield unconstitutional government conduct.

While not addressing either of the conflicting positions, a recent opinion from the Western District of Texas also supports following the majority position. *See D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *4 & n.63 (W.D. Tex. Mar. 23, 2023). In concluding that the discretionary function exception is inapplicable when challenged actions violate the United States Constitution, it primarily relies on *McElroy v. United States*, 861 F. Supp. 585 (W.D. Tex. 1994). *See id.* at *4 n.63. After citing *McElroy*, the court (1) recognized the lack of clarity within the Fifth Circuit, (2) noted *Sutton*'s clear direction, (3) notes that *Spotts* specifically stated the matter has not been determined in the Fifth Circuit, and (4) concludes that, based upon *Owen*, "the Supreme Court would likely agree with this court's conclusion that constitutional violations defeat the discretional function exception." *Id.*

*McElroy* reconciled *Sutton* with *Gaubert* by interpreting "the language 'mandatory compliance with a federal statute' to include mandatory compliance with the Constitution." 861 F. Supp. at 593. While *McElroy* also noted "how the broader interpretation arising from . . . the reconciliation of *Sutton* and *Gaubert* could become problematic," it alleviated such potential through *Gaubert* itself. *Id.* It concluded that "[i]n light of *Gaubert* . . . the statutory or constitutional mandate that eliminates discretion must be specific and intelligible so that the [government agent] knows or should know he loses discretion when the particular circumstances arise which the mandate controls." *Id. McElroy* found the requirement "not unlike the *Harlow* criteria for qualified immunity in constitutional tort cases, i.e. that the officer must violate a clearly established constitutional right." *Id.* at 593 n.15 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)).

This Court has thoroughly reviewed the minority position not in an effort to discredit any case, but to sincerely consider persuasive reasoning for applying the minority view as to the

interplay between the discretionary function exception and constitutional violations. Having found no persuasive reasoning, the Court follows the majority view, which is consistent with relevant Supreme Court precedent. The majority view is also consistent with the two previously discussed panel opinions of the Fifth Circuit – *Castro II* and *Sutton*. While the en banc Fifth Circuit vacated *Castro II*, it did so by "pretermitting the issue and affirming judgment below based on alternative grounds." *See Doe v. United States*, 831 F.3d 309, 319 (5th Cir. 2016). Since the en banc decision (*Castro III*), the Fifth Circuit has treated *Sutton* as non-binding as to interplay between the discretionary function exception and a constitutional violation. *See*, *e.g.*, *id.*(considering the issue to be "an open question in this circuit").

Given the current state of Fifth Circuit precedent in this area and the Government's position that relied upon constitutional provisions must be specific enough to affect the applicability of the discretionary function exception, the Court accepts the majority view while withholding a ruling on whether there is a specificity requirement as to asserted constitutional violations. Under the majority view, accepted herein, the duty to comply with the United States Constitution may remove discretion from federal actors and thus render the discretionary function exception inapplicable. With that in mind, the Court must determine if and when a plausible constitutional violation occurred on the facts of this case. When plaintiffs lack "any plausible basis for a constitutional violation," they "also lack grounds to argue for avoiding the discretionary function exception." *Lopez v. U.S. Immigr. & Customs Enf't*, 455 F. App'x 427, 434 (5th Cir. 2011) (per curiam).

### 6. Constitutional Violations Presented in Complaint

The starting point for such a determination naturally begins with Plaintiffs' operative pleading. Although Plaintiffs do not assert any constitutional claims in this FTCA action, they do assert violations of the Constitution as a pathway to rendering the discretionary function exception inapplicable. From their operative complaint, Plaintiffs appear to challenge the following actions of government actors: (1) developing the Family Separation Policy with knowledge and intent to

cause harm (Compl. ¶¶ 16-33); (2) mistreating them when taken into custody (*id.* ¶¶ 33-35); (3) detaining them in the "icebox," including failing to provide medical attention to C.M. (*id.* ¶¶ 36-45); (4) separating them for three months (*id.* ¶¶ 46-61); and (5) abusing D.V. during the separation (*id.* ¶¶ 62-66). Each of these listed actions are comprised of multiple discrete actions, but for ease of reference, the Court will refer to each listed action as Listed Action 1, Listed Action 2, and so forth.

Despite the allegations in their complaint, Plaintiffs address only their separation as being unconstitutional in response to the motion to dismiss. *See* Resp. at 13-25. Furthermore, Plaintiffs concede that they are not challenging the prosecutorial and detention decisions; they are instead challenging the Government's practice of separating families. *Id.* at 23. They point out that the Government mischaracterizes their core claim by arguing that they challenge the efforts to prose-cute C.M., to detain him for prosecution and service of sentence, and to detain noncitizens pending resolution of immigration proceedings. *Id.* at 23-24. But they maintain that they are not challenging such general conduct of the Government. *Id.* at 24. Nor are they challenging the general duties to transfer unaccompanied minors to the ORR. *Id.* They instead challenge their involuntary and pro-longed separation without justification. *Id.*

In reply, the Government contends that Plaintiffs have abandoned any argument that the discretionary function exception does not bar their conditions of confinement claims. Reply at 3. Although Plaintiffs do not assert any conditions of confinement claims per se, *see* Compl. ¶¶ 77-98 (identifying Plaintiffs' claims), the Court agrees that, by failing to address Listed Actions 2, 3, and 5 in response to the motion to dismiss, Plaintiffs have abandoned reliance on them as an inde-pendent basis to render the discretionary function exception inapplicable. *See Tex. Cap. Bank N.A. v. Dallas Roadster, Ltd. (In re Dallas Roadster, Ltd.),* 846 F.3d 112, 126 (5th Cir. 2017); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588, n.1 (5th Cir. 2006). Abandoned reliance does not carry a party's burden to show the existence of jurisdiction. As discussed in the next three subsections,

moreover, the Court further notes that Plaintiffs' allegations as to Listed Actions 2, 3, and 5 do not state a plausible constitutional violation in any event.

### a. **Alleged Constitutional Violations Based on Listed Action 2**

The second listed action consists of mere verbal abuse and a single allegation that agents violently forced C.M. to the ground and caused a neck injury. *See* Compl. ¶¶ 34-35. But as the Fifth Circuit noted nearly forty years ago, "mere threatening language and gestures of a custodial officer do not, even if true, amount to a constitutional violation." *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983) (citation omitted); *accord Wyatt v. Fletcher*, 718 F.3d 496, 504 (5th Cir. 2013) ("verbal abuse does not give rise to a constitutional violation"); *Jimenez v. Travis Cnty. Sheriff's Dep't*, 856 F. App'x 534, 536 (5th Cir. 2021) (per curiam) (citing *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993)). Stated differently, "mere allegations of verbal abuse or epithets, reprehensible though they may be, do not amount to a cognizable constitutional violation." *Matthews v. LeBlanc*, No. 21-40086, 2022 WL 2951759, at *1 (5th Cir. July 26, 2022) (per curiam). Thus, the alleged verbal abuse is not sufficient to assert a plausible constitutional violation.

Further, although the Fourth Amendment provides a potential constitutional basis for a claim based on an agent forcing C.M. to the ground during his apprehension, the single-sentence allegation is not sufficient to state a plausible Fourth Amendment violation. *See Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (setting out elements of a Fourth Amendment excessive force claim). While Plaintiffs allege an injury to C.M., they allege neither of the other two required elements, i.e., that the applied force was excessive to the need, or that it was objectively unreasonable based on the facts and circumstances. *See id.* (discussing three elements). These two elements are required to state a plausible excessive force claim. As will be seen later, the Court's analysis differs when addressing Plaintiffs' battery claim and the Texas use-of-force defense within the context of Fed. R. Civ. P. 12(b)(6).

### b. <u>Alleged Constitutional Violations Based on Listed Action 3</u>

Listed Action 3 consists of (1) detaining Plaintiffs in the "icebox" facility as the Government initially processed them for about forty-eight hours, (2) additional verbal abuse during that time, and (3) not providing medical attention to C.M. during that period. *See* Compl. ¶¶ 36-45. The Court need not further discuss alleged verbal abuse.

Before addressing the other two aspects, the Court briefly discusses Plaintiffs' proper classification. Once placed into a detention facility, D.V. became classified as a detainee awaiting immigration proceedings. Upon detention, C.M.'s initial classification was either a detainee awaiting immigration proceedings or a pretrial detainee awaiting criminal proceedings. During his twenty-five-day sentence he was a convicted inmate. And once he fully served that sentence, he reverted back to an immigration detainee awaiting immigration proceedings. In any event, whether Plaintiffs were awaiting immigration or criminal proceedings, their "constitutional claims are considered under the due process clause instead of the Eighth Amendment." *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000). Furthermore, for the twenty-five-day incarceration period, there is "no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs, including medical care and protection from violence." *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996) (en banc).

With those classifications in mind, the deprivation of medical care fails because Plaintiffs merely allege: "Over the two days he was held in the *hielera*, [(icebox)] C.M. did not receive medical treatment for his neck injury, despite the bruising and pain it caused." Compl. ¶ 43. There is no allegation about the nature or severity of the injury. Even if observed by government personnel, bruising does not necessarily reflect a need for medical treatment. Pain, furthermore, comes in varying levels, and is not necessarily indicative of a required need for medical attention. There is no allegation that C.M. told anyone he was in pain or that he requested medical treatment. There is no allegation that government personnel knew of or disregarded any excessive risk to his health.

Without such allegations, a denial-of-medical care claim fails. *See Hare*, 74 F.3d at 643-45.

As for the temperature aspect, the Court also finds allegations lacking to support a constitutional claim. Depriving a detainee of an "identifiable human need such as food, warmth, or exercise" may violate the Constitution. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (addressing Eighth Amendment violation); *Dockery v. Cain*, 7 F.4th 375, 378 (5th Cir. 2021) (quoting *Wilson*). As part of such a claim, courts properly consider the duration spent in the alleged constitutionally offending conditions. *Hutto v. Finney*, 437 U.S. 678, 687 (1978) (addressing Eighth Amendment violation). "In addition to duration, however, [courts] must consider the totality of the specific circumstances that constituted the conditions of . . . confinement, with particular regard for the manner in which some of those conditions had a mutually enforcing effect." *Palmer v. Johnson*, 193 F.3d 346, 353 (5th Cir. 1999). Furthermore, "the degree to which the temperature actually fell is relevant to a conclusive determination." *Id*.

For such a conditions-of-confinement claim, Plaintiffs must allege a deprivation that is objectively sufficiently serious to deprive them of the minimal civilized measures of life's necessities and that the defendant was, subjectively, deliberately indifferent to the risk of harm posed by the deprivation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Importantly, "the Constitution does not mandate comfortable prisons" or detention facilities, and they need not be "free of discomfort" to satisfy constitutional requirements. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

Here, agents took outer clothing from C.M. and deprived detainees of blankets, Compl. ¶¶ 38, 42, both of which would have a mutually enforcing effect regarding a cold environment. Agents also deprived detainees of cots and mattresses, providing only hard benches and the floor upon which to sleep. *See id*. ¶ 42. But Plaintiffs make no allegation of the particular temperature endured. They merely allege that it was cold enough to cause C.M. to physically shake and that agents said the cold was intended as a punishment. *Id*. ¶ 39. They also describe the temperature as frigid, *id*. ¶ 42, and detainees referred to the facility as the icebox., *id*. ¶ 37.

It is undisputed that the Government detained Plaintiffs in this south Texas facility for approximately two days in the early part of March. There is no allegation that the facility was using air conditioning to enhance the coldness or that government personnel were wearing extra layers to keep warm. And the allegations do not reveal whether Plaintiffs endured the cold environment continually or simply at night. In fact, there is no allegation of any impact to D.V. from the cold environment and no allegation of any harm, injury, or potential harm to C.M. from the cold environment. The allegation that agents took C.M.'s outer clothing and told Plaintiffs that the coldness was intended as punishment is troubling. And that intent is relevant to the subjective element of the claim, but without more allegations as to how cold it was, it is difficult to ascertain the risk of harm, let alone whether any agent was deliberatively indifferent to the risk of harm from the low temperature. Independent research about the low temperature for March 8 and 9, 2018, shows that lows were in upper-forties to lower-fifties.[17]

Although Plaintiffs allege that the cold temperatures violated the CBP's own internal policy, *see* Compl. ¶ 37, "a mere failure to follow . . . internal rules, policies, and procedures, without more, does not state a constitutional violation," *Vela v. Pinney*, No. 2:13-CV-004, 2013 WL 1948127, at *4 (S.D. Tex. Apr. 3, 2013) (recommendation of Mag. J.) (citing *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996)) *adopted by* 2013 WL 1949535 (S.D. Tex. May 9, 2013); *accord Harris v. Payne*, 254 F. App'x 410, 417 (5th Cir. 2007) (per curiam) (recognizing that "violat[ing] internal policies does not transform [a] claim into one of constitutional dimension"); *Ross v. City of Dallas*, No. 3:20-CV-1690-E, 2022 WL 992593, at *5 (N.D. Tex. Mar. 31, 2022) (agreeing that a determination that an officer has violated internal rules and procedures does not equate to a constitutional violation and holding that such "determination has no bearing on the Court's evaluation of whether the officers acted with deliberate indifference").

---

[17] *See* Climate in Eagle Pass, https://weatherspark.com/y/5210/Average-Weather-in-Eagle-Pass-Texas-United-States-Year-Round (last visited April 6, 2023) (follow links to the historical temperatures for specific dates).

Based on the allegations of Plaintiffs' complaint, as supplemented by uncontested facts for purposes of the Court's jurisdictional analysis, the Court cannot find the conditions endured by Plaintiffs during their initial two-day joint detention to be more than "temporary inconveniences and discomforts" that are insufficient to state a constitutional violation. *See Adams v. Pate*, 445 F.2d 105, 108 (7th Cir. 1971) (holding that "temporary inconveniences and discomforts . . . cannot be regarded as a basis for judicial relief"). Further, although Plaintiffs do not appear to allege a deprivation of exercise, the two-day period is insufficient to state a plausible denial of exercise to the extent their statement that agents would not permit them to go outside implies such deprivation.

### c. <u>Alleged Constitutional Violations Based on Listed Action 5</u>

The fifth listed action concerns abuse of D.V. during the separation. *See* Compl. ¶¶ 62-66. These alleged abuses consist of (i) locking him in a dark room as punishment for crying for his family, (ii) an adult physically striking him "[o]n at least one occasion" for crying for his mother, and (iii) failing to protect D.V. from physical and verbal attacks of other children. *See id.* ¶¶ 62-63. Even considering D.V.'s tender years, Plaintiffs simply make insufficient factual allegations to state a plausible constitutional violation. There is no allegation of any physical injury. There is no allegation as to the length of time D.V. spent in the dark room. There are no alleged facts to show that the severity of these conclusory occurrences rises to the level needed for a constitutional violation. As the Fifth Circuit has recognized, "[t]echnical batteries, angry words, or passing thumps do not rise to constitutional abuses." *United States v. Bigham*, 812 F.2d 943, 949 (5th Cir. 1987).

### d. <u>Alleged Constitutional Violations Based on Listed Actions 1 and 4</u>

Listed Actions 1 and 4 are interconnected in that they relate to separating a parent from a child. But they differ in that the Listed Action 1 specifically concerns the Family Separation Policy while Listed Action 4 concerns the specific three-month separation of D.V. and C.M. These alleged governmental actions lie at the core of Plaintiffs' argument for overcoming the discretionary

function exception based on constitutional violations. Plaintiffs assert that their separation violates the Fifth Amendment in that they have a liberty interest to family integrity and familial association. Compl. ¶ 73 (citing *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011)).

Under the Due Process Clause of the Fifth Amendment, "[n]o person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Fifth Amendment "applies only to the federal government," which explains the need for "the Fourteenth Amendment—to ensure that the states too may not 'deprive any person of life, liberty, or property, without due process of law.'" *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 243 (5th Cir. 2022) (Ho, J., concurring) (quoting U.S. Const. amend. XIV). Given the undeniable "textual parallel between the Fifth and Fourteenth Amendments" courts "understandably construe[] 'due process of law' to mean the same thing under the Fifth and Fourteenth Amendments alike." *Id*. Thus, when applying due process caselaw, it does not matter whether the caselaw arises in the context of the Fifth or Fourteenth Amendment.

The Supreme Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected." *Quilloin*, 434 U.S. at 255 (citing cases). "The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." *Romero v. Brown*, 937 F.3d 514, 519 (5th Cir. 2019) (cleaning up and quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). The Fifth Circuit has not been hesitant "in finding constitutional protection for the relationship between" child and a natural parent. *Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000). "Because a child's right to family integrity is concomitant to that of a parent, [courts] define the scope of [the child's] rights in this context with reference to [the parent's] rights." *Id*. (footnote and citations omitted). State and federal governments have a "general overarching concern for serving the best interests of children" and they have a "paramount interest in the welfare of children." *Lehr v. Robertson*, 463

U.S. 248, 257 (1983).

Supreme Court "decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion). Through our families, "we inculcate and pass down many of our most cherished values, moral and cultural." *Id.* at 503-04.

> The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases. In deciding whether this is such a case, however, [courts] must consider the broad framework that has traditionally been used to resolve the legal problems arising from the parent-child relationship.

*Lehr*, 463 U.S. at 256.

The Supreme Court has stated that "a parents' right to 'care, custody, and control of their children' is 'perhaps the oldest of the fundamental liberty interests recognized by [it].'" *See Romero*, 937 F.3d at 519 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). And it has also stated that there is

> little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest."

*Quilloin*, 434 U.S. at 255 (quoting *Smith v. Org. of Foster Families*, 431 U.S. 816, 862-63 (1977) (Stewart, J., concurring in judgment)).

When the Government takes away a parent's right to custody and control of his or her child, it may violate substantive due process. *Romero*, 937 F.3d at 519 (citing *Moore*, 431 U.S. at 498-500, 503; *Troxel*, 530 U.S. at 65, 72-73, *Morris v. Dearborne*, 181 F.3d 657, 665 (5th Cir. 1999)). And interfering with parents' "liberty interest in the care, custody, and management of their children" may also violate the procedural due process, which requires that "certain procedures" be followed "before encroaching on those parental rights." *Id.* at 521. Undoubtedly, Plaintiffs, "like

all persons who are on American soil, have certain inalienable rights." *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 24 (1st Cir. 2007). One such right is "to family integrity, which is secured by procedural and substantive due process" and "extends to each Plaintiff individually and to citizens and noncitizens alike." *D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *8 (W.D. Tex. Mar. 23, 2023). The right to family integrity is also known as the right to familial association, and under either label, applies to noncitizens like Plaintiffs here. *See Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018). As recognized more than a century ago, "[t]he term 'person,' used in the fifth amendment, is broad enough to include any and every human being within the jurisdiction of the republic." *Wong Wing v. United States*, 163 U.S. 228, 242 (1896).

Because "the right to family integrity has been recognized in only a narrow subset of circumstances," Plaintiffs must demonstrate that the "guarantee of substantive due process encompasses their assertions." *Aguilar*, 510 F.3d at 23. "As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-26 (1985)). The Supreme Court cautions that [t]he doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever . . . asked to break new ground in this field." *Id*. Courts must, therefore, "focus on the allegations in the complaint to determine how [the party] describes the constitutional right at stake and what" was allegedly done to constitute a deprivation of that right. *Id*.

In contrast to the more nebulous "substantive due process" considerations, "there are bright lines when it comes to the procedural safeguards." *Romero*, 937 F.3d at 521.[18] An essential

---

[18] Although *Romero* addressed "the fuzzy continuum that governs due process" in the qualified immunity context, *see* 937 F.3d at 521, substantive due process is fuzzy and nebulous even outside that context. This case does not involve

principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). It is not the deprivation itself which is unconstitutional; instead, "what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). And, for procedural due process in the current context, the bright line "rule is this: A child cannot be removed 'without a court order or exigent circumstances." *Romero*, 937 F.3d at 521 (quoting *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 434 (5th Cir. 2008)). Here, there is no specific court order regarding the separation of C.M. and D.V. Furthermore, at no time did the Government conduct any hearing regarding C.M.'s fitness as a parent or whether he posed any risk to D.V.

"Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains [with the parent]." *Gates*, 537 F.3d at 429. Under such a definition, there is nothing to suggest that this case presents any exigent circumstances.

Thus, the Government could not constitutionally separate D.V. from his father absent a court order. For resolution of the motion before it, the Court will assume without deciding that the judgment of conviction constitutes an adequate court order to separate a parent from a child without any additional hearings or findings. This comports with the long-standing principle that a parent's incarceration does not violate the "right to family integrity." *D.A.*, 2023 WL 2619167, at *9. And it remains unquestioned that "parents and children may lawfully be separated when the parent is placed in criminal custody." *Ms. L. v. U.S. Imm. & Customs Enf't*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018); *accord D.A.*, 2023 WL 2619167, at *9.

---

qualified immunity, and the Court is making no analogy to the qualified immunity context.

But even if those events provide all the process that was due initially, they do not explain the failure of the Government to conduct any sort of hearing regarding C.M.'s parental rights upon his return to immigration detention in April 2018. *See D.A.*, 2023 WL 2619167, at *9. Plaintiffs, furthermore, do not challenge the prosecutorial and detention decisions, they instead challenge the Government involuntarily separating them and keeping them separated without justification. Resp. at 23-24.

In light of Plaintiffs' specific challenges, it is prudent to identify certain principles that are not at issue here. "It goes without saying the Government retains and exercises its prosecutorial discretion and prerogative when charging a criminal defendant. Charging a defendant with a petty misdemeanor for illegal entry surely reflects an exercise of this discretion." *United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *8 n.14 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom.*, *United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019). While many may vehemently disagree with exercising such discretion when its exercise may require separating a parent from a child, in general, one cannot reasonably argue that the decision to prosecute is not an exercise of discretion. Although agency discretion may be withdrawn through agency policies or guidance, *see Texas v. EEOC*, 933 F.3d 433, 441-42 (5th Cir. 2019) (recognizing that "withdrawal of discretion distinguishes a policy statement . . . from a final agency action"), and such a purported withdrawal might provide an avenue to reasonably argue that immigration agents were without prosecutorial discretion, *see C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *14 (E.D. Pa. Mar. 28, 2023), the Court has no occasion to decide on the instant motion whether such prosecutorial discretion was withdrawn during the time period relevant to this action.

In any event, Plaintiffs have plausibly alleged that the Government violated the Fifth Amendment when it separated C.M. from his son without adequate procedural safeguards. Even if, given the circumstances of this case, the alleged violation occurred not when the Government

first separated them so that it could pursue the misdemeanor charge against C.M., but when the Government returned C.M. to immigration detention following his twenty-five-day sentence, Plaintiffs still plausibly allege that the Government violated procedural due process rights under the Fifth Amendment. It is just a matter of timing.

Substantive due process, on the other hand, does not provide such a bright-line rule. With respect to substantive due process, the Supreme Court long ago held that "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).[19] It further recognized that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*. at 849.

Determining this threshold question is a fact-intensive endeavor. While behavior may be egregious and outrageous in one circumstance, it may be acceptable or even necessary in a different context. Thus, even though Plaintiffs have a "generally held constitutional right to family integrity," they must show that such right "applies in the particular circumstances alleged here." *Ms. L.*, 302 F. Supp. 3d at 1162. This is part of their burden to establish jurisdiction at this stage.

And relevant to the Court's inquiry is what Plaintiffs do and do not challenge. *See id*. At least with respect to Listed Action 4, the following synopsis applies equally for Plaintiffs here as it did for the plaintiffs in *Ms. L.*:

> [Plaintiffs] do not challenge the Government's initial separation of parent and child when the parent is arrested for violating the nation's criminal laws. Nor do Plaintiffs challenge the Government's decision to separate families when there are legitimate questions regarding parentage, fitness, or danger to the child. Nor do they challenge the Government's powers to deport or detain aliens. What Plaintiffs challenge is

---

[19] Some courts have noted that *Saucier v. Katz*, 533 U.S. 194 (2001) abrogated *Lewis* on other grounds. *See*, *e.g.*, *Manion v. N.C. Med. Bd.*, 693 F. App'x 178, 181 (4th Cir. 2017) (per curiam); *Smiley v. Ala. Dep't of Transp.*, 778 F. Supp. 2d 1283, 1300 (M.D. Ala. 2011) (explaining abrogation). Because the Supreme Court has receded from the portion of *Saucier* that abrogated *Lewis*, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Court declines to recognize the abrogation other than in the context of this footnote.

the Government's separation of migrant parents and their minor children when both are held in immigration detention and when there has been no showing the parent is unfit or poses a danger to the child. Plaintiffs assert separation of parents and minor children under such circumstances violates their due process rights.

*See id.*

Further, like a plaintiff in *Ms. L.*, C.M. "did not do everything right" when he bypassed the normal port of entry and entered the United States illegally – he instead committed a crime, "and was prosecuted and imprisoned for [his] transgression." *See id.* at 1164. But, after serving his sentence and the Government returned him to immigration custody to pursue his asylum claim, he became "on equal footing," for purposes of pursuing due process claims, with noncitizens who had not committed a crime as they entered the United States. *See id.*

As was the case in *Ms. L.*, a request for "asylum is important to the due process analysis." *See id.* This is so for many reasons as set out in *Ms. L.*: (1) the law concerning asylum arose largely from international agreements that Congress incorporated into immigration law; (2) asylum relates to refugees; (3) the United States is a signatory to the United Nations Convention Relating to Status of Refugees which sought to "provide a uniform protocol for refugee policy"; (4) through 8 U.S.C. § 1101(a)(42), the United States has adopted the definition of refugee set out by the Convention; (5) through the Refugee Act in 1980, asylum became a formal part of the domestic law of the United States; and (6) "seeking *sanctuary* from persecution in accordance with our country's own asylum laws is significant given that due process is particularly concerned with 'ordered liberty' and 'fundamental fairness.'" *See Ms. L.*, 302 F. Supp. 3d at 1164 (citations omitted). As appropriately recognized in *Ms. L.*, "[a]rriving on United States soil with one's minor child to pursue relief extended by U.S. law—as well as international law to which the United States has acceded—calls out for careful assessment of how governmental actors treat such people and whether constitutional protections should apply." *Id.*

This careful assessment properly factors in allegations of a formal national policy of

deterring noncitizens from coming to the United States. *Id.* at 1165. Such allegations factor into whether Plaintiffs have made sufficient allegations "to demonstrate that the guarantee of substantive due process encompasses their assertions." *See id.* When "a substantial number of young children [are] knowingly placed in harm's way, it is easy to imagine how viable claims might lie" under the substantive due process clause. *Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 22 (1st Cir. 2007). Such allegations "present that 'narrow subset of circumstances,' where the right to family integrity ought to [(and does)] apply." *See Ms. L.*, 302 F. Supp. 3d at 1165.

Aguilar ultimately found no constitutional violation. But, as *Ms. L.* points out, *Aguilar* is factually distinguishable from cases involving the apprehension of noncitizen parents and children together – rather, *Aguilar* dealt with noncitizens "detained at [a] worksite while their children were elsewhere in the community." 302 F. Supp. 3d at 1163. In this case, the Government apprehended Plaintiffs – father and son – together after avoiding immigration authorities at a port of entry. For the first two days, the Government housed them together and subjected them to various verbal and environmental abuses. When the Government ultimately separated them, immigration agents made false statements as to the separation. Upon his conviction, C.M. served his twenty-five-day sentence and the Government then returned him to immigration custody, where it detained him separately from his son for three months with limited communication.

Where the *Aguilar* court was appropriately "influenced by a realization that evenhanded enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate substantive due process," *see* 510 F.3d at 22, this case does not involve the evenhanded enforcement of immigration laws. It instead appears to reflect a heavy-handed change in enforcement to deter noncitizens from coming to the United States, even those pursuing asylum recognized by both international and United States law.

Where the *Aguilar* court addressed "interference with the right to family integrity alleged

[that] was incidental to the government's legitimate interest in effectuating detentions pending the removal of persons illegally in the country," *see id*., the interference here went beyond such incidental interference. Where the *Aguilar* court confronted an interference merely "transitory in nature," *see id*. at 23, the interference here exceeded a brief transitory period, it encompassed three-months after the father had served his twenty-five-day sentence and returned to immigration custody. And detaining father and son separately after the completion of a sentence for a misdemeanor offense is much more than merely incidental to the criminal aspect of the detention. Because the Government apprehended father and son together and then separated them, the immigration detention in separate facilities is more than merely incidental to effectuating detention for removal purposes.

The Government proffers no reason for denying Plaintiffs reunification while they awaited their removal after C.M. finished his sentence. Although it states that 8 U.S.C. § 1232(c)(3)(A) precluded immigration authorities from reunifying C.M. and D.V., not only while C.M. was serving his sentence but also after he was transferred to a secure adult detention facility pending his expedited removal, Reply at 12, that reliance does not explain why the Government could not house C.M. in a facility that permitted reunification with his son. The Government later explains that C.M. was subject to mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii) & (iii)(IV) whereas it could release D.V. into foster care pending removal. *See id*. at 21. But, standing alone, the cited provisions do not dictate where the Government must house C.M. or mandate that it separate the family.

Under the circumstances alleged here, Plaintiffs have alleged sufficient facts of a plausible substantive due process violation. Absent a justifiable reason for the separation, Plaintiffs have plausibly alleged egregious and outrageous conduct to keep a father separated from his seven-year-old son. C.M. certainly did not do everything right when he avoided immigration authorities at the port of entry. But he did seek asylum in accordance with domestic and international law. Plaintiffs plausibly allege that, once the C.M. served his twenty-five-day sentence it was egregious and

outrageous to keep him separated from his son without any justifiable reason.

While substantive due process violations are not as clearly defined as their procedural due process sibling, the recent *D.A.* opinion provides persuasive reasoning for finding a substantive due process violation on facts similar to this case:

> Plaintiffs' long-term separation was arguably arbitrary since, following [the mother's] incarceration, she could have been reunited with her children in a family immigration detention center. Alternatively, she could have promptly been given a credible fear interview and released on bond. It was made conscience shocking, moreover, by virtue of the sheer completeness of the separation and the cruel, heart-less way it was effectuated and maintained. Indeed, the staggering backlash that the Trump Administration received following implementation of its Zero Tolerance Policy—which caused that administration to retract the policy after little over two months—evinces the conscience-shocking nature of its forced family separations.

2023 WL 2619167, at *9.

Although the Court has focused on Listed Action 4, i.e., the three-month separation of father and son, such focus does not preclude finding a constitutional violation based on Listed Action 1, i.e., developing the Family Separation Policy with knowledge and intent to cause harm. Indeed, the Western District of Texas has recently "joined many district courts around the country that have found forced family separations in comparable circumstances likely unconstitutional." *See D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *10 (W.D. Tex. Mar. 23, 2023).

### 7. Clearly Established Requirement

Now that the Court has found plausible constitutional violations based upon the facts of this case, the question is whether they remove the discretion of government agents such that the violations render the discretionary function exception inapplicable. Relying on legal principles relevant to official and qualified immunity for individuals, the Government would require the con-stitutional prescription to be clearly established before it could render the exception inapplicable. Mot. at 27-30. The argument is not without some logic. First, as stated by the Supreme Court, when a "federal statute, regulation, or policy *specifically prescribes* a course of action for an

employee to follow," then the employee has no further discretion to exercise. *Id.* at 27 (adding emphasis and quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Relying on this logic, the Government concedes: "The Constitution is no different: in some cases, the Constitution may establish such a specific prescription that it removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute." *Id.*

From the requirement for specific prescription of conduct in the context of federal statutes, regulations, and policies, the Government jumps to the doctrine of official immunity set out in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) and qualified immunity discussed in *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). In *Harlow*, the Supreme Court held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 475 U.S. at 818. And in *Wilson*, the Supreme Court explained that "in practice," this means "that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." 526 U.S. at 614 (citations and internal quotations marks omitted).

The Government thus argues that "the discretionary function exception is not made inapplicable by every allegation of unlawful or unconstitutional conduct, but only by a showing that the government official's discretion was cabined by a specific, clearly established directive, accompanied by plausible assertions that the specific directive was violated." Mot. at 28 (citing *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019)). In *Bryan*, the plaintiffs did not dispute the government's actions were discretionary, but instead argued that the discretionary function exception did not shield the government action because the officers "through exercising their discretion, violated 'clearly established . . . constitutional rights of which a reasonable person would

have known.'" 913 F.3d at 364 (quoting *Harlow*, 475 U.S. at 818).

Plaintiffs here have not made that concession. They specifically argue that discretionary function exception is inapplicable precisely because the government agents had no discretion to violate their constitutional rights. Resp. at 13-20. They disagree that the clearly established standard applies. *Id*. at 20-22. And they point to four cases that have found the discretionary function exception inapplicable without considering whether the unconstitutional conduct was clearly established. *Id*. at 21 (citing *Loumiet v. United States*, 828 F.3d 935, 946 (D.C. Cir. 2016); *Limone v. United States*, 579 F.3d 79, 101-02 (1st Cir. 2009); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000)). In *Loumiet*, the D.C. Circuit considered the same argument raised by the Government here, noted that the court had "found no precedent in any circuit holding as the government urges" and the Government had not cited any, and declined to accept the legal principle "to preserve discretionary function immunity for some unconstitutional acts." 828 F.3d at 946. Nevertheless, it left "for another day the question whether the FTCA immunizes exercises of policy discretion in violation of constitutional constraints that are not already clear." *Id*.

While recognizing that "[t]he Fifth Circuit has not, in a controlling opinion, addressed under what circumstances an allegation of a constitutional violation removes discretion under the [discretionary function exception]," the Government argues that the Fifth Circuit has held in two unpublished opinions that an alleged violation of the Eighth Amendment only removes discretion if it prescribed a specific course of conduct. Mot. at 28 & n.9 (citing *Campillo v. U.S. Penitentiary Beaumont*, 203 F. App'x 555 (5th Cir. 2006) (per curiam); *Garza v. United States*, 161 F. App'x 341 (5th Cir. 2005)). Facially, these cases provide some support for the cited proposition. But dipping below the surface reveals questions as to their broad application.

First, *Campillo* merely found no plain error in the dismissal of an FTCA claim for lack of subject matter jurisdiction while noting that the plaintiff had "pointed to no rule or regulation

showing that the prison guards or medical staff lacked discretion in handling prisoner-on-prisoner attacks or medical treatment of prisoners." 203 F. App'x at 556-57. Second, although both cases indicate agreement with the other circuits that have recognized that "neither [18 U.S.C.] § 4042's mandate to protect prisoners nor the prohibition against cruel and unusual punishment defines a non-discretionary course of action specific enough to render the discretionary function exception inapplicable," *id.* at 557 (citing *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 396 (6th Cir. 2004); *Santana–Rosa v. United States*, 335 F.3d 39, 41-45 (1st Cir. 2003); *Cohen v. United States*, 151 F.3d 1338, 1342-43 (11th Cir. 1998); *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997)); *Garza*, 161 F. App'x at 343 (citing same cases except for *Santa-Rosa*), each of the circuit opinions cited by the unpublished Fifth Circuit cases addressed only § 4042. None of the cited circuit cases addressed the Eighth Amendment.

While unpublished opinions such as *Campillo* and *Garza* are not binding, they may be persuasive. *See Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006). Because this case does not present an Eighth Amendment violation, the Court has no occasion to consider their persuasive value in that context. And to the extent the cases may reflect a more general view that all constitutional violations must prescribe specific conduct so as to remove discretion, this Court need not definitively decide whether that is so. Although this case requires no definitive decision, this Court, however, does recognize the logic for that general view set out in *McElroy*, *see* 861 F. Supp. at 593, which it finds to have more persuasive value in this context than the unpublished Fifth Circuit opinions. Further, to the extent the unpublished Fifth Circuit cases support finding that clearly established is a prerequisite to finding the discretionary function exception inapplicable, this Court likewise need not make a definitive decision. Such finding appears one step further than merely requiring that a constitutional provision prescribe specific conduct.

Nevertheless, if specificity is required, the constitutional prescription of procedural due process was clearly established well before the circumstances of this case. *See D.A. v. United*

*States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *9 (W.D. Tex. Mar. 23, 2023). "At least with respect to procedural due process," the Government wrongly asserts that "the Constitution's mandates concerning family integrity are not sufficiently specific such that federal agents should have known that separating Plaintiffs was prohibited." *Id*. To the contrary, "the constitutional right to family integrity has been 'well established' since at least 1992," as recognized in *Morris*, and "is protected by a clear and straightforward rule," that has existed since at least 2008 when recognized in *Gates*. *See id*. (quoting *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999) and citing *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 434 (5th Cir. 2008)).

Because substantive due process is more amorphous and ill-defined it may be more difficult to find it clearly established. But, in this instance, the procedural and substantive due process violations overlap in large part. Moreover, under the majority view, it only takes one constitutional violation to remove discretion from government agents and thus render the discretionary function exception inapplicable. Disregarding the potential substantive due process violation, Plaintiffs have carried their burden to show that the discretionary function exception is inapplicable based upon their plausible procedural due process violation.

The Fifth Amendment prescribes a specific course of action for government entities and personnel – do not deprive any person of life, liberty, or property without due process of law. U.S. Const. amend. V. Not only have Plaintiffs relied upon this specific, nondiscretionary duty, but they have stated enough facts to state a plausible violation of this constitutional duty. When the plaintiff points "to a 'specific, nondiscretionary function or duty' that 'prescribe[s] a specific course of action for an agency or employee,' then there is no discretion." *Joiner v. United States*, 955 F.3d 399, 404 (5th Cir. 2020) (quoting *Freeman v. United States*, 556 F.3d 326, 338 (5th Cir. 2009)). In light of Plaintiffs' reliance on the due process clause of the Fifth Amendment, the government agents and entities lacked discretion to do otherwise.

**B. Designed to Shield**

Once the Court finds conduct that qualifies as discretionary, it must determine whether such conduct is "of the kind that the discretionary function exception was designed to shield." *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). This part of the test means that the courts "consider whether the actions taken are 'susceptible to policy analysis.'" *Gibson v. United States*, 809 F.3d 807, 812 (5th Cir. 2016) (quoting *Gaubert*, 499 U.S. at 325). "The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 537 (1988). In short, "the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Id.*

Because the Court has found alleged condut to be nondiscretionary under the accepted majority view, it has no reason to address this second prong of the *Gaubert* test. *See D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *10 (W.D. Tex. Mar. 23, 2023) ("Because Defendant likely did not have discretion to separate Plaintiffs, the court need not reach the second prong of the discretionary function analysis—namely, whether the decision to separate Plaintiffs was grounded in social, economic, and political policy.").

**C. Other Jurisdictional Considerations**

The Government further contends that Plaintiffs cannot avoid the discretionary function exception by focusing on their separation rather than the prosecution and secure detention of C.M. and the resulting transfer of D.V. because the latter unchallenged actions directly caused the separation. Reply at 3. This contention, however, ignores the reality that, after C.M. served his twenty-five-day sentence for the offense to which he had pled guilty, the Government made no attempt to reunite Plaintiffs – it instead continued to keep them separated for almost three months. Nothing about the conviction or sentence justified the continued separation.

The Government's argument, furthermore, highlights the intricacies of the immigration

framework. The Court has specifically found plausible constitutional violations for the post-sentence time-period. Because Plaintiffs have indicated that they do not challenge the prosecutorial or detention decisions generally, the Court has mostly avoided the incarceration time period while recognizing that the policy of forced separation of families, whether due to the Zero-Tolerance Policy or the broader Family Separation Policy as defined by Plaintiffs, may also violate the Constitution. To the extent the Government argues discretion exercised prior to the conviction directly caused all the separation, the Court disagrees. While C.M.'s actions may have initiated the incarceration separation, the Government's independent actions caused the post-sentence separation by keeping father and son apart for three months.

Further, viewing the issues from a big picture perspective, Plaintiffs have presented claims that arose directly from the Family Separation Policy (including the Zero-Tolerance Policy) – even though the Government had not yet formally published such policy in written form. And, at least arguably, that Zero-Tolerance Policy removed the prosecutorial discretion with respect to charges levied against C.M. *See C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *14 (E.D. Pa. Mar. 28, 2023) (rejecting government's "argument that prosecutorial discretion still existed under the zero-tolerance policy"). If the Court were to find that the Zero-Tolerance Policy mandated C.M.'s prosecution, then the discretionary function exception would not shield even that decision. *See id*. Nor would the due care exception provide such a shield because only a mandatory statute or regulation invokes such exception – not a policy arising from an Executive Order. *See id*. at *15; *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 597-98 (S.D.N.Y. 2022); *Wilbur P.G. v. United States*, No. 4:21-CV-04457-KAW, 2022 WL 3024319, at *5 (N.D. Cal. May 10, 2022); *Nunez Euceda v. United States*, No. 2:20-CV-10793-VAP-GJSx, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2021).

In light of this thorough consideration of the various jurisdictional issues, the Court finds that the FTCA has waived the Government's sovereign immunity. As one court has stated under

similar circumstances, "the court finds federal sovereign immunity nonexistent in this case" and that "none of the FTCA exceptions raised by the federal government are applicable to the factual allegations here at this stage." *See C.D.A.*, 2023 WL 2666064, at *1.

## VI. FAILURE TO STATE A CLAIM

Now that the Court has resolved the jurisdictional issues raised by the instant motion to dismiss, it proceeds to that portion of the Government's motion brought under Fed. R. Civ. P. 12(b)(6). The Government argues that Plaintiffs' claims challenge conduct considered privileged under Texas law, and that they fail to state a claim under Texas law for intentional infliction of emotional distress, abuse of process, negligence, and loss of consortium. Mot. at 34. Plaintiffs do not oppose the dismissal of their claims for abuse of process and loss of consortium, but they disagree that they challenge conduct privileged under Texas law and that they have failed to allege sufficient facts to support their other claims. Resp. at 31.

### A. Standards for Rule 12(b)(6) Motion to Dismiss

Under Fed. R. Civ. P. 12(b)(6), litigants may move to dismiss asserted claims for "failure to state a claim for which relief can be granted." As required by Fed. R. Civ. P. 8(a)(2), every pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such requirement provides opposing parties "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In general, a court addressing a motion under Rule 12(b)(6) "must limit itself to the contents of the pleadings, including attachments thereto." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (citation omitted). But it is also "clearly proper . . . to take judicial notice of matters of public record" when deciding a Rule 12(b)(6) motion. *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

When ruling on a motion to dismiss, courts "accept all well-pled facts as true, construing

all reasonable inferences in the complaint in the light most favorable to the plaintiff." *White v. U.S. Corr., LLC*, 996 F.3d 302, 306-07 (5th Cir. 2021). But courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (citations and internal quotation marks omitted). And despite the natural focus on the allegations of the operative pleading, the party moving for dismissal under Rule 12(b)(6) has the burden to show that dismissal is warranted. *Cantu v. Guerra*, No. SA-20-CV-0746-JKP-HJB, 2021 WL 2636017, at *1 (W.D. Tex. June 25, 2021).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). Nevertheless, plaintiffs must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Plaintiffs need not plead the legal basis for a claim, but they "must plead facts sufficient to show that [the] claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam). And they satisfy that standard when they allege "simply, concisely, and directly events" that are sufficient to inform the defendant of the "factual basis" of their claim. *Id*.

Facts alleged by the plaintiff must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

> To withstand a motion to dismiss under Rule 12(b)(6), a complaint must present enough facts to state a plausible claim to relief. A plaintiff need not provide exhaustive detail to avoid dismissal, but the pleaded facts must allow a reasonable inference that the plaintiff should prevail. Facts that only conceivably give rise to relief don't suffice. Thus, though we generally take as true what a complaint alleges, we do not credit a complaint's legal conclusions or threadbare recitals of the elements of a cause of action.

*Smith v. Heap*, 31 F. 4th 905, 910 (5th Cir. 2022) (quoting *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021)). As *Twombly* states, to avoid dismissal under Rule 12(b)(6),

plaintiffs must allege facts that "nudge" an asserted claim "across the line from conceivable to plausible." 550 U.S. at 570. The focus is not on whether the plaintiff will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted claims. *Id.* at 563 n.8.

Further, while asserted defenses may support dismissal under Rule 12(b)(6), they only do so when the operative "pleading conclusively establishes the affirmative defense." *Reagan v. U.S. Bank, Nat. Ass'n*, No. CIV.A. H-13-00043, 2013 WL 510154, at *2 (S.D. Tex. Feb. 12, 2013) (addressing res judicata defense). And, although defendants may raise defenses through a motion to dismiss under Rule 12(b)(6), the courts view them through the standards applicable to such motions.

## B. Privileged Conduct

The Government advances two privilege arguments. First, it argues that it was authorized to separate the family members. Mot. at 34-36. Next, it argues that the Texas use-of-force privilege bars C.M.'s battery claim. *Id.* at 36-38. The Government may indeed invoke state law privileges in FTCA cases. *See Mendez v. Poitevent*, 823 F.3d 326, 335 (5th Cir. 2016); *Villafranca v. United States*, 587 F.3d 257, 264 (5th Cir. 2009).

### 1. <u>Under-Authority-of-Law Privilege</u>

Here, the Government contends that Texas law bars Plaintiffs' separation-based claims because they challenge privileged conduct. In doing so, it relies on two cases in which courts have found claims of false imprisonment barred because the government actors were acting under authority of law. Mot. at 35-36 (citing *Caban v. United States*, 728 F.2d 68, 71-72 (2d Cir. 1984); *Tovar v. United States*, No. 98-CV-1682, 2000 WL 425170, at *5-7 (N.D. Tex. Apr. 18, 2000)).

While this Court has no reason to doubt the potential applicability of such a privilege in the false imprisonment context, this case involves no claim of false imprisonment. As recognized in *Tovar*, one element of a false imprisonment under Texas law is that the detention is "without

authority of law." *See* 2000 WL 425170, at *5 (quoting *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995)).*Caban*, likewise, noted that one element of such claim (albeit under New York law) is that "the confinement was not otherwise privileged." 728 F.2d at 71. Had Plaintiffs asserted a claim for false imprisonment, these cases would provide some useful insights or applicability. But Plaintiffs have asserted no such claim. Therefore, the cited cases are distinguishable, and the privilege does not bar Plaintiffs' claims. *See C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *22 (E.D. Pa. Mar. 28, 2023).

The Government has presented no state law privilege regarding the separation-based claims Plaintiffs pursue in this case. On the arguments presented, the Court declines to recognize an authority-of-law privilege with respect to Plaintiffs' claims of intentional infliction of emotional distress and negligence. Plaintiffs' operative pleading, moreover, does not conclusively establish such a defense.

### 2. Use-of-Force Privilege

With respect to Plaintiffs' battery claim, the Government invokes a use-of-force privilege available under Texas law. *See* Mot. at 36-38. Texas law indeed provides a "civil privilege' defense, Tex. Penal Code § 9.51(a), which a peace officer may assert against intentional tort claims. *Mendez*, 823 F.3d at 335.

> The statute provides, in pertinent part, that a "peace officer . . . is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or search ... if: the actor reasonably believes the arrest or search is lawful . . .; and before using force, the actor ... identifies himself as a peace officer."

*Davila v. United States*, 713 F.3d 248, 261 (5th Cir. 2013) (quoting § 9.51(a)). Because federal law enforcement officers "are peace officers for the purpose of the Texas criminal assault statute and its civil privilege defense" the defense protects them, and they may assert the defense against an assault under Texas law. *Id*. But as emphasized in *Davila*, the defense is inapplicable unless the federal agents had a reasonable belief that the force was immediately necessary to secure an arrest

or search. *Id*. at 262. Applicability of the defense requires consideration of "the totality of the circumstances." *Id*.

Viewing the allegations of the pleading through the lens of a Rule 12(b)(6) motion to dismiss, the Court does not find that the pleading conclusively establishes the applicability of the defense at this stage of the litigation. As the Government points out, the Court can decide the defense at the pleading stage, *see* Reply at 16 (citing *Davila*), but that does not dispense with the requirements that the Court view the allegations in the light most favorable to the Plaintiffs or that the pleading must conclusively establish the Government's defense.

The Government states that the Court may "take judicial notice of the fact that C.M. was apprehended while attempting to run through the vehicular lanes into the United States." *Id*. It urges the Court to take judicial notice of C.M.'s conviction and order of removal, more specifically, that C.M. was charged with and pled guilty to attempting to enter the United States by eluding inspection. *Id*. at 17. The Judgment in Criminal Case shows that guilty plea. *See* ECF Nos. 20-10, 22-9. Further, the Determination of Inadmissibility shows that C.M. "attempted to elude inspection into the United States from Mexico at the Eagle Pass Port of Entry #1, Eagle Pass, Texas, by running through the vehicle primary lanes." *See* ECF Nos. 20-12, 22-11. That document also shows that C.M. "made a credible fear claim" upon his apprehension. *Id*. Another submitted document shows that statements of a CBP agent formed the factual basis for the criminal complaint. *See* ECF Nos. 20-8, 22-7.

Plaintiffs contend that the Court should not take judicial notice of the submitted documents at least in part because they dispute the statements that C.M. resisted or attempted to evade arrest. *See* Resp. at 35-36. They offer to amend their complaint to expressly allege the lack of resistance or attempt to evade. *Id*. at 36 n.15.

The Court finds the cited documents subject to judicial notice. But even taking judicial notice of these documents does not conclusively establish the defense. Plaintiffs' pleading contains

no allegations that they were resisting or attempting to evade arrest. *See, generally*, Compl. Their allegations instead show immediate mistreatment by federal agents, including name calling, baseless accusations, and violently forcing C.M. to the ground and striking him in the neck. *Id.* ¶¶ 32-35. The fact that C.M. was eluding inspection by running through traffic does not of itself present justification for taking C.M. to the ground as he has alleged. Eluding inspection encompasses many possible factual scenarios and may differ materially from resisting arrest or attempting to evade arrest. Without further development it is uncertain what actually transpired when Plaintiffs first encountered federal border agents. But the pleading stage is not the time to sort out such uncertainties.

The Government concedes, as it must, that "the crime of evading entry would not render all uses of force objectively reasonable." Reply at 18. It further properly concedes that the pertinent "question is whether Plaintiff[s have] alleged facts sufficient to show an unreasonable use of force *in this circumstance*." *Id.* But the Government missteps when it contends that C.M. "cannot meet his pleading burden by omitting key circumstances of his arrest and alleging that some force was used against him." *See id.* Plaintiffs are "the master of the complaint," *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987), and the pleading rules merely require them to allege enough facts to state a claim. The rules do not require allegations for every fact or allegations to overcome a possible defense to asserted claims. The omission of pertinent facts may present a rosier picture of an asserted claim thereby presenting a claim that survives a Rule 12(b)(6) motion to dismiss, but Plaintiffs ultimately have the burden to support their claims with evidence and the opposing side has the opportunity to provide any omitted facts. However, this is not the time to address such evidentiary concerns or to require more facts than necessary to plausibly state a claim.

When viewed in the light most favorable to Plaintiffs, as required when dispensing with Rule 12(b)(6) motions, neither the pleaded allegations nor the additional information exhibit a reasonable belief that taking C.M. to the ground was immediately necessary to secure his arrest.

Under the alleged facts as supplemented by judicially noticed documents, the Court need not consider whether, before the application of force, C.M. knew the officer's purpose and identity, either through express identification by the officer or otherwise. At his point, the Court does not find the use-of-force privilege conclusively established.

## C. Failure to State a Claim

The Government next argues that Plaintiffs have failed to state a claim for negligence or intentional infliction of emotional distress related to their separation and treatment. Mot. at 38-41, 43-46.

The Court has no difficulty in finding that, under the totality of the circumstances, Plaintiffs have alleged enough facts to plausibly state a claim of intentional infliction of emotional distress that survives the instant motion to dismiss. Among other things, they have alleged that they were housed in a cold environment without adequate clothing or protection, subjected to verbal and physical abuse, fed lies about what would happen during their separation, and separated without contact. *See* Compl. ¶¶ 34-61. They have alleged that they have suffered severe emotional distress from the intentional conduct of the Government. *Id.* ¶ 79. The Court will not belabor this point. It instead denies the motion on this claim essentially for the reasons stated by Plaintiffs in their response. *See* Resp. at 36-38.

Similarly, while the Texas Supreme Court has held "that Texas does not recognize an independent cause of action for negligent infliction of emotional distress," *Garza v. United States*, 881 F. Supp. 1103, 1108 (S.D. Tex. 1995) (citing *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993)), that means "only that there is no general duty not to negligently inflict emotional distress," *Boyles*, 855 S.W.2d at 597. The Texas Supreme Court specifically held that its "decision does not affect a claimant's right to recover mental anguish damages caused by defendant's breach of some other legal duty." *Id.* (citing numerous examples of such negligence actions, including negligent infliction of a direct physical injury, a wrongful death, a failure to timely deliver a death message,

an invasion of privacy, and a negligent handling of a corpse). Properly understood, *Boyles* merely stands for the unremarkable principle that there is no independent duty in Texas as to negligently inflicting emotional distress. But when there has been a breach of a duty owed, then one can sue for emotional damages. *Id*. at 598-99.

Furthermore, although "layering [a] general negligence charge on top of . . . specific claims" may "sound suspiciously like an impermissible claim for negligent infliction of emotional distress," *Garza*, 881 F. Supp. at 1108, Plaintiffs here are not asserting claims of assault and false arrest that were at issue in *Garza* but are instead alleging negligence grounded in a breach of the duty owed by federal agents to persons in their care, *see* Compl. ¶¶ 91-92. At this stage of the litigation, Plaintiffs have alleged enough facts to plausibly state a negligence claim. The Court will not eliminate their opportunity to present evidence on such claim.

## VII. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the *Motion to Dismiss* (ECF No. 22) filed by Defendant United States of America. It grants the motion as to Plaintiffs' claims of abuse of process and loss of consortium and **DISMISSES** those claims with prejudice under Fed. R. Civ. P. 12(b)(6). It otherwise denies the motion.

**SIGNED this 4th day of May 2023.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**